**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ALION SCIENCE & TECHNOLOGY CORP.,<br><br>Petitioner,<br><br>-against-<br><br>BOMBARDIER, INC.,<br><br>Respondent. | ECF CASE<br><br>Civil Action No.: 07-cv-3547 (SHS)<br><br>**DECLARATION** |

I, GREGORY W. GILLIAM, being duly admitted to practice law in the State of New York and this Court, hereby submits this Declaration under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. A true and accurate copy of the Demand for Arbitration, without attachments, is attached hereto as Exhibit A.

2. A true and accurate copy of the sub-contract at issue is attached hereto as Exhibit B.

3. A true and accurate copy of the correspondence notifying Bombardier, Inc. ("Bombardier") of the new entity, Alion Science & Technology Corp. ("Alion"), is attached hereto as Exhibit C.

4. A true and accurate copy of the correspondence wherein Bombardier refuses to acknowledge Alion as the successor in interest of IIT Research Institute is attached hereto as Exhibit D.

5. Upon information and belief, Bombardier has objected to all of Petitioner's claims described in the Demand for Arbitration as being time-barred under the limitations period contained in the New York Uniform Commercial Code.

6. Upon information and belief, Bombardier has also asserted that the applicable statute of limitations issue should be resolved by the Court, rather than the contractually agreed arbitral panel.

Dated: May 3, 2007
New York, New York

Gregory W. Gilliam (GG-2857)

# EXHIBIT A

## DISPUTE NOTICE REGARDING OTHER DISPUTES

ALION SCIENCE AND TECHNOLOGY, CORP. *
Successor-in-Interest to IIT Research Institute
1750 Tysons Boulevard *
Suite 1300
McLean, VA 22102 *

Claimant, *

v. * Case No. __________

Bombardier, Inc., *
1101 Parent Street
Saint-Bruno, Quebec *
Canada, J3V-6E6
*
Respondent.
*

* * * * * * * * * * * * *

## DEMAND FOR ARBITRATION

Claimant Alion Science and Technology Corporation ("Alion"), successor-in-interest to IIT Research Institute ("IITRI") (collectively "Claimant" or "Subcontractor"), by its undersigned attorneys, files this Demand for Arbitration against Respondent Bombardier, Inc., ("Bombardier" or "Prime Contractor") and in support thereof states as follows:

## STATEMENT OF FACTS

### Introduction

1. Claimant commences this arbitration seeking a declaratory award that Bombardier breached the terms of the May 2000 subcontract agreement between Claimant and Bombardier by failing to issue Change Orders consistent with Bombardier's evolving subcontract requirements and causing unnecessary delays in the delivery schedule by failing to provide parts and data to Claimant in a timely manner.

Additionally, Claimant seeks a declaratory award that Bombardier failed to act in good faith by refusing to acknowledge Alion as successor-in-interest to IITRI and ignoring Alion's efforts to resolve this dispute outside of arbitration.

2. Accordingly, Claimant seeks a declaration from the arbitral panel that (i) Bombardier breached the May 2000 subcontract agreement by failing to issue Change Orders consistent with Bombardier's evolving subcontract requirements; (ii) Bombardier breached the May 2000 subcontract agreement by causing unnecessary delays in the delivery schedule by failing to provide parts and data to Claimant in a timely manner; (iii) Bombardier acted in bad faith by refusing to acknowledge Alion as successor-in-interest to IITRI and ignoring Alion's efforts to resolve this dispute outside of arbitration; and that as a result of these events, or either of them, Claimant is thereby entitled to monetary damages in an amount no less than $597,823.18.

**The Parties**

3. Bombardier is a publicly-traded global corporation headquartered in Canada. Its core businesses include rail transportation equipment and regional and business aircraft. Bombardier has over 55,000 employees worldwide.

4. IITRI was the non-profit research entity of the Illinois Institute of Technology.

5. Alion was formed in December 2002 when approximately 1,600 of IITRI's 1,650 employees purchased substantially all IITRI's assets through an employee stock ownership plan ("ESOP"). Alion's core business is delivering technical expertise and operational support to the Department of Defense, civilian government agencies, and

commercial customers. It is still employee-owned and has approximately 3,700 employees.

**The Subcontract Agreement**

6. On or about May 16, 2000, Claimant and Bombardier entered into a certain subcontract agreement ("Subcontract Agreement") whereby Claimant agreed to provide services and equipment to Bombardier under Bombardier's prime contract (Contract No. 5646) with Long Island Rail Road Company ("LIRR") and Metro-North Commuter Railroad Company ("Metro-North"). A copy of the Subcontract Agreement is attached hereto as Exhibit 1.

7. Under Article 101 of the Subcontract Agreement, Claimant and Bombardier agreed to the following scope of work:

> A. The Subcontractor agrees to perform the Subcontract Work (as defined below) and to manufacture, supply, test and warrant the following in accordance with the Subcontract Documents:
>
> > (a) 1 Cab Simulator to be installed and delivered to Authority's site in New York;
> >
> > (b) furnish and deliver any manuals, catalogs, schedules, training, technical support, samples, additional production components and all other items to be delivered pursuant to the Subcontract Documents and to do all Subcontract Work incidental thereto.

8. Technical information about the exact specifications of the work to be performed is included in the Technical Description and Technical Specifications, which are incorporated into the Subcontract Agreement by reference. The Technical Description is attached hereto as Exhibit 2.

9. Section A.1 (Rev. 9) ("Scope") of the Technical Description acknowledges that the scope of work to be provided under the Subcontract Agreement

will likely evolve throughout its duration. Section A.1 (Rev. 9) states: "This Technical description is intended to be generally complete and comprehensive but does not show all the details of the work required to be performed. Therefore, it must be supplemented by the Supplier based on its experience with simulator" (*sic.*).

10.    Under Article 306 of the Subcontract Agreement, Bombardier is required to issue a Final Completion Certification ("FCC") once Claimant completely performs all subcontract work with respect to the Cab Simulator. The FCC "state[s] that the Cab Simulator has been accepted under Article 207 and there are no Open Items or open warranty defects." As a condition precedent to issuing the FCC, Article 306.B.1 requires the Subcontractor to submit to Bombardier a general release and to provide a statement to Bombardier listing any claims against Bombardier or LIRR which are not included in the general release. Claimant has submitted numerous statements of claim (as described more fully below) but has not submitted a general release. Accordingly, Bombardier has not yet issued an FCC.

11.    Under Article 309, the Subcontractor's acceptance of final payment for work performed under the subcontract shall operate as a release to Bombardier and LIRR. Before Claimant submitted an invoice for the last scheduled progress payment under the Subcontract Agreement in February 2004, Claimant provided Bombardier with written notice of Claimant's various claims and the amounts in dispute. Accordingly, Claimant has not waived its rights nor released its claims through acceptance of the final progress payment.

**The Subcontract Agreement's Provisions for Arbitration**

12. Article 803 of the Subcontract Agreement addresses dispute resolution procedures. Article 803.B.1 divides disputes into two categories, technical and "other." "Other" disputes include disputes "relating to determinations of whether Disputed Work constitutes Change Order work" and "determinations of Excusable Delay," both of which are the subject of this Demand for Arbitration. Accordingly, the dispute resolution provisions of Article 803.2 apply.

13. Article 803.2 states:

> With respect to "Other Disputes" defined as any Dispute other than those specified in Subparagraphs (1) above, solely between the Subcontractor and Bombardier, as determined in the sole discretion of Bombardier, the parties agree as follows:
>
> (i) "Other Disputes" shall be finally settled in New York by means of a Contractual Dispute Resolution Board (the "CDRB").
>
> (ii) The CDRB shall consist of three (3) members, one member to be selected by Bombardier and one member to be selected by the Subcontractor. The third member, to serve as Chairman of the CDRB, will be selected by the CDRB representatives selected by Bombardier and the Subcontractor. Each party shall bear the fees and expenses of its own representative and the parties shall share equally any fees and expenses of the Chairman and any other costs associated with actions and activities of the CDRB.

14. Article 803.5 establishes the timeline for "other" disputes:

> Upon submission of a Dispute Notice regarding "Other Disputes" as provided for above, within ten (10) working days, each party shall select its representative for the CDRB, and within twenty (20) working days, the representatives shall select a Chairman. If the representatives are unable to agree on the selection of a Chairman, then either party may petition the commercial section of the American Arbitration Association to appoint an arbitrator as Chairman. Upon selection, the Chairman shall contact the parties to arrange for a hearing, at which time the parties will have an opportunity to present their respective positions on the merits of the disagreement before the CDRB. The procedures to be followed by the

parties at the hearing shall be as determined by the CDRB. In the event of a disagreement by the members of the CDRB, a majority of the members shall govern with respect to such matters. Within thirty (30) days after the CDRB has convened to hear the parties' positions on the merits of the dispute and received all materials and arguments, the CDRB shall issue its ruling on the matter. The decision of the CDRB shall be final and binding on both parties.

## COUNT I

## Breach of Contract for Failing to Issue Change Orders Consistent with Bombardier's Evolving Subcontract Requirements

15. Claimant hereby repeats each and every allegation contained in Paragraphs 1 through 14 as if set forth fully herein.

16. Bombardier breached the provisions of the Subcontract Agreement by failing to issue change orders consistent with Bombardier's evolving subcontract requirements and failing to initiate dispute resolution procedures when it denied Claimant's proposed change orders.

17. Under Article 401 of the Subcontract Agreement, Bombardier must give prior written approval for any changes in the Subcontract Agreement. For the purposes of Article 401, "Change Order" or "Extra Work" means "an order issued by Bombardier for work within the general scope of this Subcontract that adds to or differs from the Subcontract Work then required under this Subcontract, or for the deletion of any Subcontract Work then required under this Subcontract." If Bombardier fails to initiate the Change Order procedure, the Subcontractor must provide notice to Bombardier requesting a Change Order. The Subcontractor must then provide Bombardier with a detailed Proposal on Change Order ("PCO"). The PCO shall be accepted or modified by negotiations between the Subcontractor and Bombardier.

18. Under Article 402, Bombardier may issue an Extra Work Directive directing the Subcontractor to perform the additional work if the parties fail to reach an agreement with respect to a proposed Change Order. Article 402.B permits the Subcontractor to initiate a dispute with Bombardier by furnishing Bombardier with a written statement. Under Article 402.C, in the event that the Subcontractor and Bombardier are unable to agree on a negotiated price and the Subcontractor has proceeded with the additional work, the Subcontractor "shall be paid for the Extra Work on the basis of Subcontractor's costs."

***Change Order for Additional Display Screens***

19. Under the Section A.1.3.2 (Rev. 9) of the Technical Description, Claimant was obligated to provide certain display screens for the simulator, including a Train Operator Display ("TOD") unit, a Central Diagnostic Panel ("CDP") unit, communications control, and the Automatic Train Control ("ATC") Aspect Display Unit.

20. On March 20 and 21, 2001, representatives of LIRR, Bombardier, and IITRI held a meeting, during which the parties discussed LIRR's need for additional display screens. The minutes of the meeting, attached hereto as Exhibit 3, clearly indicate that these additional display screens are outside of the scope of work proposed by Claimant. For example, the minutes state that "The scope of work on which IITRI proposed did not include the troubleshooting, maintenance, and combined screens. The combined TOD/CDP screen is not in the Scope of IITRI's bid . . . The CDP troubleshooting and maintenance screens are not in the scope of IITRI's bid." (PRM001-002, Train Operator Display Presentation).

21. On May 9, 2001, Bobette Ash, Claimant's Vice President for Administration, sent a letter to Ginette Bazinet, Bombardier's Purchasing Agent, in which Ash discussed the various maintenance and operational screens to be provided in the simulator. Ash stated that certain screens were not included in Claimant's bid, such as the three train diagrams and CDS/CDP&TOD Combined Mode. Ash's letter is attached hereto as Exhibit 4.

22. On July 10 and 11, 2001, representatives from LIRR, Bombardier, and IITRI held a meeting at which the parties again discussed additional screens. The minutes of the meeting, attached hereto as Exhibit 5, include an entry entitled "Design Freeze" (B472.006), which, in part, appears as follows: "Bombardier stated that, at some point, the requirements must be frozen so that they can provide IITRI with a specification, and IITRI can get started on the simulator. The Railroad wants to 'leave the door open' on future screens." The action items attached to the minutes indicate that Claimant is to provide the cost of additional screens for TOD/CPD Screens (B472.004).

23. On August 17, 2001, Bazinet sent a letter to Ash, forwarding a memo from Paul Dagenais, Bombardier's Customer Service Supervisor. In his memo, Dagenais provided a list of screens to be included with the simulator. The memo indicates that Bombardier is aware that Claimant plans to submit a POC for the additional screens and that Bombardier expects any change order associated with the performance of this work to be submitted within 15 days. Bazinet's letter, along with the memo, is attached hereto as Exhibit 6.

24.    On August 30, 2001, Claimant submitted a POC to Bombardier. The POC provided four different options, ranging in price from $564,000 to $793,000. The POC is attached hereto as Exhibit 7.

25.    On September 13, 2001, Bazinet responded to Claimant's POC by forwarding a memo from Alain Charette, Bombardier's Customer Service Representative, in which Charette stated that the requested screens all fall within the original scope of work and no change orders will be issued. Bazinet's letter, along with the memo, is attached hereto as Exhibit 8.

26.    On October 4, 2001, Ash responded to Bombardier's denial of the change order, expressing confusion regarding Bombardier's "abrupt reversal of its position on this issue." The letter contains excerpts of notes taken at various meetings, all of which support IITRI's position that the requested screens were to be provided at an additional cost. Ash's letter is attached hereto as Exhibit 9.

27.    On March 22, 2002, Thomas Rodehau, Claimant's Vice President for Administration/Sector Contracts Manager, wrote a letter to Bazinet, in which he provided Claimant's revised price breakdown for the additional screens and functionality. The cost of the proposed change is $249,100. Rodehau's letter is attached hereto as Exhibit 10.

28.    On April 9, 2002, Bazinet responded to Rodehau's letter, indicating that the figures proposed in Rodehau's letter were different from the figures proposed by Claimant at a meeting with Bombardier on October 18, 2001. Bazinet's letter is attached hereto as Exhibit 11.

29.    On August 15, 2002, Rodehau provided Gilles Aubry, Bombardier's Contract Administrator, with detailed explanations of the cost figures in Claimant's $249,100 COP. Claimant broke down the $249,100 proposal as follows: $106,200 for maintenance screens, $91,700 for combined display screens, and $51,200 for system architecture and navigational control. Rodehau's letter is attached hereto as Exhibit 12.

30.    On September 19, 2002, representatives of Claimant and Bombardier held a meeting at which the POC for the additional screens was discussed in conjunction with a proposed deductive change order for the provision of the cab shell (as described more fully below). According to Rodehau's notes from the meeting, memorialized in a letter to Aubry dated September 26, 2002, Claimant proposed a best and final offer of $150,000 for all proposed changes (deductive and incremental). Rodehau's letter is attached hereto as Exhibit 13.

31.    On September 26, 2002, Aubry wrote a letter to Rodehau, rejected Claimant's settlement offer, accusing Claimant of acting in bad faith, and blaming the failure to reach a settlement on Claimant's "attitude." Aubry's letter is attached hereto as Exhibit 14.

32.    On November 24, 2002, Rodehau wrote a letter to Aubry, attaching a proposed completion schedule and addressing Claimant's expectations regarding change orders for several items, including additional display screens. Rodehau explained that Claimant has incurred additional costs because of Bombardier's delays and the additional demands for screens and functionality. Rodehau's letter is attached hereto as Exhibit 15.

33.    On December 13, 2002, Aubry responded to Rodehau's concerns. In this letter, Aubry emphasized Bombardier's refusal to negotiate on the Extra Work:

"Bombardier expects IITRI to fulfill its obligations to deliver a M-7 Cab Simulator, and associated documentation, as committed, at the agree subcontracted cost, with a credit to Bombardier in the amount of $100,000 to cover the costs of the cab." Aubry's letter is attached hereto as Exhibit 16.

34. On January 22, 2003, Rodehau sent a letter to Aubry with the revised completion schedule for the simulator project and a chart summarizing Claimant's requests for equitable adjustment. An upward equitable adjustment in the estimated amount of $250,000 is included for the additional display screens. Rodehau's letter is attached hereto as Exhibit 17.

35. When LIRR requested additional screens beyond the scope of work in Claimant's proposal, Claimant followed change order procedures as outlined in the Subcontract Agreement. Claimant notified Bombardier of its intent to request a change order and timely submitted its COP. When Bombardier flatly rejected Claimant's change order, Claimant appropriately provided Bombardier with a letter disputing Bombardier's decision. In good faith, Claimant attempted to negotiate a settlement with Bombardier, which Bombardier again flatly rejected at every turn. At minimum, under the terms of Article 402.C in the Subcontract Agreement, Claimant is entitled to reimbursement of its costs for the additional screens in the amount of $249,100.

***Deductive Change Order for the Provision of the Cab Shell***

36. In its proposal, Claimant agreed to supply the exterior shell of the cab for the simulator and included $103,360 in its budget for the acquisition of the cab. Because Claimant had successfully provided three cab simulators for LIRR in the past, Claimant had established relationships with cab vendors.

37. Upon information and belief, after the Subcontract Agreement was executed, Bombardier informed Claimant that Bombardier would supply the exterior shell of the cab for the simulator because LIRR wanted the simulator to exactly duplicate the look of the actual M-7 train cab. Bombardier requested that Claimant submit a deductive POC consistent with the reduction in the scope of work associated with the provision of the exterior cab shell.

38. On July 17, 2001, Ash sent an e-mail to Bazinet, proposing a deductive change order in the amount of $60,000.

39. On July 19, 2001, Bazinet wrote a letter to Ash, indicating that Claimant's proposed deductive change order in the amount of $60,000 was insufficient, as it "does not cover the entire costs that IITRI would have expended to fabricate the cab." Bazinet's letter is attached hereto as Exhibit 18.

40. On August 3, 2001, Ash sent a letter to Bazinet, requesting clarification of the scope of work related to the cab. Ash noted, "[A]s all our conversations with LIRR have indicated that schedule was LIRR's primary concern and they had no preference for a particular cab supplier, we would appreciate seeing this direction from LIRR directing Bombardier to supply the cab." Bombardier never produced verification as requested. Ash's letter is attached hereto as Exhibit 19.

41. On March 13, 2002, Rodehau sent a letter to Bazinet explaining that Claimant had already incurred significant cab-related costs, such as engineering design services and project management expenses, prior to the contract change. Claimant incurred the same costs again for reconfiguring its design once it learned that Bombardier would provide the cab replica. Rodehau attached a detailed spreadsheet to his letter

showing IITRI's sunk costs in the simulator and proposing a deductive change of $36,276.82. Rodehau's letter is attached hereto as Exhibit 20.

42. On April 2, 2002, Bazinet wrote a letter to Rodehau indicating that Bombardier never advised Claimant that Bombardier would provide the cab replica at no cost. Bazinet requested an explanation of the engineering design services and project management expenses incurred by Claimant in association with the provision of the cab. Bazinet's letter is attached hereto as Exhibit 21.

43. On August 16, 2002, Rodehau sent a letter to Aubry with detailed explanations of Claimant's expenses associated with the provision of the cab. Rodehau's letter is attached hereto as Exhibit 22.

44. As discussed more fully above, Claimant made numerous attempts to reach a settlement with Bombardier regarding the amount of a deductive change order for the provision of the cab shell (see Rodehau's letters dated September 26, 2002 (Exhibit 13) and November 24, 2002 (Exhibit 15), as well as Aubry's letter dated December 13, 2002 (Exhibit 16)).

45. In his letter dated January 22, 2003, attached as Exhibit 17 hereto, Rodehau includes a downward equitable adjustment in the estimated amount of $36,000 for the provision of the cab shell.

46. When Bombardier insisted that it supply the exterior shell of the cab simulator, Claimant followed change order procedures as outlined in the Subcontract Agreement. Claimant notified Bombardier of the amount of its initial proposed deductive change order via e-mail. When Bombardier flatly rejected Claimant's change order, Claimant appropriately provided Bombardier with a letter disputing Bombardier's

decision and explaining the costs already incurred by Claimant for engineering design services and project management expenses in association with the provision of the cab. In good faith, Claimant attempted to negotiate a settlement with Bombardier, which Bombardier again flatly rejected at every turn. As detailed in the spreadsheet attached to Exhibit 20, Bombardier is at most entitled to a deductive change order for the provision of the cab shell in the amount of $36,276.82.

*Change Order for Additional Functionality*

47. On October 21-22, 2002, representatives of LIRR, Bombardier, and Claimant held a meeting which served as the pre-CDR (Critical Design Review) meeting. During this meeting, as memorialized in a memo from Charette to Aubry dated October 29, 2002, and attached as Exhibit 23 hereto, the parties discussed the functionality of the simulator. The memo states, "[T]he Simulator must be a full function simulator for use in training operators in all operating functions for the fleet, including normal operation and every typical emergency. The simulator must provide technically correct, real-time response to operator inputs from all subsystems in a physical environment which is functionally, operationally, and visually the same as actually operating a train."

48. As a result of this meeting, Claimant added the following model features to the cab simulator: rollback protection, pump back function, instructor facility for door zone indications, parking brake functionality, parking brake display on TOD, train number scoring, and initial train conditions. None of these features were included in Claimant's proposal.

49. In his letter dated November 24, 2002, attached as Exhibit 15 hereto, Rodehau requests confirmation of the new functionality for the cab simulator. He states,

"It is our expectation that the other changes made to the requirements of this subcontract will also be promptly negotiated and an amendment will be issued in a timely manner incorporating these agreed upon price adjustments in our subcontract." He notes that one of the changes is "associated with the new modeling functionality identified during the Pre-CDR."

50.     In the chart accompanying his letter dated January 22, 2003, attached as Exhibit 17 hereto, Rodehau includes an upward equitable adjustment for the additional functionality in the estimated amount of $125,000.

51.     When Bombardier requested that Claimant provide functionality above and beyond the functionality provided for in Claimant's proposal so that the cab simulator would exactly replicate the physical environment of the actual train, Claimant complied with Bombardier's request and expected to be reimbursed for its efforts. Claimant provided Bombardier with a POC in the amount of $125,000. Bombardier ignored Claimant's request. Accordingly, Claimant is entitled to reimbursement of its costs for the additional functionality in the amount of $125,000.

*Change Order for Additional Cab Assembly and Integration Activities*

52.     Because Bombardier supplied the shell of the cab, Claimant incurred additional expenses for cab assembly and integration which were not included in its proposal. Upon receipt of the exterior shell of the simulator cab, Claimant had to identify and integrate missing parts and correct deficiencies with the cab.

53.     On Enclosure C of his letter dated November 24, 2002, attached as Exhibit 15 hereto, Rodehau provided a detailed report of Claimant's inspection of the cab supplied by Bombardier. In the main body of the letter, Rodehau indicates that the report

"addresses the specific problems with the fit, form, and function of the cab that require corrective action." He further states, "This additional work, however, represents a change to the requirements of the subcontract and can be performed by IITRI only if additional funds are made available for the performance of this out-of-scope work."

54.    In his letter dated December 13, 2002, attached as Exhibit 16 hereto, Aubry responds to the issue of additional cab assembly and integration as follows: "Bombardier will review and provide its position upon receipt of the details and cost impact from IITRI. However no settlement will negotiated separately from the cab credit and IITRI shall not start any repair without Bombardier's approval" (*sic.*). Unfortunately, in order o meet delivery deadlines, Claimant had no choice but to perform the necessary work.

55.    In the chart accompanying his letter dated January 22, 2003, attached as Exhibit 17 hereto, Rodehau includes an upward equitable adjustment for the additional cab assembly and integration activities in the estimated amount of $60,000.

56.    When Bombardier provided Claimant with a cab shell which required additional assembly and integration activities not included in Claimant's proposal, Claimant performed the necessary work in order to fulfill its contractual obligations and not further delay delivery deadlines. Claimant expected to be reimbursed for its efforts and provided Bombardier with a POC in the amount of $60,000. Bombardier ignored Claimant's request. Accordingly, Claimant is entitled to reimbursement of its costs for the additional cab assembly and integration activities in the amount of $60,000.

*Change Order for Additional CDR Documentation Requirements*

57.      Under the terms of Section B of the Technical Description, attached as Exhibit 2 hereto, document requirements are specifically associated with production items, which are subject to the full rigor of requirements imposed on the design of the M-7 Electric Cars.  The cab simulator is not a production item and is therefore not subject to the document requirements in Section B of the Technical Description.

58.      On August 19, 2002, Rodehau sent a letter to Aubry requesting clarification of the required CDR documentation.  Rodehau explained that Claimant had supplied simulators to LIRR in the past and that LIRR's Director of Training indicated that he wished to have documentation similar to what Claimant had supplied for the other simulators.  Claimant's understanding was that LIRR and Bombardier representatives followed up on the documentation issue and that Claimant was required to supply LIRR with the following documentation: Software Requirement Specification ("SRS"), Hardware Design Description ("HDD"), and Software Verification Test Plan ("SVTP").  Rodehau's letter is attached hereto as Exhibit 24.

59.      On September 11, 2002, Aubry responded to Rodehau's letter in an e-mail stating, "As far as the documentation required for the CDR, we agree to relax the requirements as requested by IITRI and consider this as a change in the subcontract work."  Aubry's e-mail is attached hereto as Exhibit 25.

60.      On October 29, 2002, Rodehau wrote a letter to Aubry requesting, among other things, a revision of the Technical Description to accurately reflect the agreed-upon documentation for the cab simulator. Rodehau's letter is attached hereto as Exhibit 26.

61.     On November 15, 2002, Aubry wrote a response to Rodehau.  Aubry attached to his letter a memo from Charette stating that Claimant's proposed revisions to the Technical Description are unacceptable because they "represent a major Reduce Scope of Work from the Base Contract" (*sic*). The letter also contained the following admonition: "Furthermore, due to lack of visibility from IITRI on this project, it is very difficult for Bombardier to keep our customer LIRR informed on progress.  Therefore, IITRI is hereby requested to provide before Friday, November 22nd, 2002, a clear position in regards to any requested claim or cost adjustment." Bombardier also requested a detailed project schedule. Aubry's letter is attached hereto as Exhibit 27.

62.     In his letter dated November 24, 2002, attached as Exhibit 15 hereto, Rodehau addressed the documentation issue.  He stated, "The updated Technical Description reflects agreements reached with Bombardier and LIRR, as confirmed by Bombardier under the [September 11, 2002] email message." Rodehau also highlights Claimant's expectation that Bombardier will issue a change order for the revision of the CDR documentation to include cross-references to vehicle design documents.

63.     In his letter dated December 13, 2002, attached as Exhibit 16 hereto, Aubry states that Bombardier does not accept Claimant's position regarding the CDR documentation.

64.     In the chart accompanying his letter dated January 22, 2003, attached as Exhibit 17 hereto, Rodehau includes an upward equitable adjustment for the additional CDR documentation requirements in the estimated amount of $50,000.

65.     When Bombardier imposed additional CDR documentation requirements on Claimant, Claimant complied with Bombardier's demands with the expectation that

  
Bombardier would issue a change order for the additional work. Bombardier ignored Claimant's POC. Accordingly, Claimant is entitled to reimbursement of its costs for the additional CDR documentation requirements in the amount of $50,000.

**COUNT II**

**Breach of Contract for Failing to Provide Parts and Data in a Timely Manner**

***Provision of Parts and Data Under Section D.1.3.1***

66. Claimant hereby repeats each and every allegation contained in Paragraphs 1 through 65 as if set forth fully herein.

67. Bombardier breached the provisions of the Subcontract Agreement by failing to provide parts and data in a timely manner as required by Section D.1.3.1 (Rev. 9) of the Technical Description and causing delays in the provision of the exterior shell of the cab.

68. Section D.1.3.1 (Rev. 9) of the Technical Description provides a list of components to be supplied by Bombardier, including but not limited to detailed car and car equipment engineering drawings; complete console; two Master Door Controller panels; low voltage circuit breaker panel; by-pass/cut-out switch panel; Communication Control Panel; radio control head and radio speaker; operator seat; any additional cab device or equipment related to the supplied equipment; destination sign; observer seat; and ancillary equipment, such as sun visors and coat hooks.

69. Section D.1.3.1 further states:

> The technical and performance information will be provided by Bombardier to the supplier in a preliminary version as soon as it will be available for Bombardier's engineering department and in a final version not less than seven (7) months prior to Factory Acceptance Testing ("FAT"). The hardware will be provided by Bombardier from the

system's CDR dates but not less than seven months prior to FAT, date depending on the availability of the material.

70.    During the pendency of the subcontract, Claimant was often forced to wait for Bombardier to supply parts and data before Claimant could proceed with its work on the cab simulator. The minutes of the various meetings support Claimant's position. For example, the minutes of the meeting held on March 20-21, 2001, attached as Exhibit 3 hereto, indicate that Bombardier had 15 action items, all of which involved supplying Claimant with information or data. In contrast, for the same meeting, Claimant had two action items, and LIRR had none.

71.    The problems with Bombardier's delays became so severe that on May 8, 2001, Ash wrote a letter to Bazinet in which Ash provided formal notice that Claimant "claims a schedule delay and also reserves the right to submit a cost claim as a result of Bombardier's delays in providing data and parts to IITRI." Ash noted that under Section D.1.3 of the Technical Description, Bombardier was obligated to supply these items no later than seven months prior to FAT. Because FAT was initially scheduled for November 26, 2001, Bombardier had to supply these items to Claimant by April 26, 2001. Ash's letter is attached hereto as Exhibit 28.

72.    More than four months after the initial deadline passed, Bombardier had still not delivered the parts and data to Claimant as mandated in the Subcontract Agreement. On August 28, 2001, Bazinet wrote a letter to Ash, attaching a list of parts that were shipped to Claimant. Bazinet's letter is attached hereto as Exhibit 29.

73.    On September 4, 2001, Bazinet wrote another letter to Ash, indicating that more parts had been shipped to Claimant. Bazinet's letter is attached hereto as Exhibit 30.

74. On September 25, 2001, in a letter to Bazinet, Ash informed Bombardier that Claimant was still missing parts and data. Bazinet's letter is attached hereto as Exhibit 31.

75. On September 27, 2001, Ash notified Bazinet that Claimant would not be able to meet the revised schedule for the submission of CDR documents because Claimant was still missing a significant portion of the data to be supplied by Bombardier. Ash's letter is attached hereto as Exhibit 32.

76. On October 3, 2001, Bazinet finally provided Claimant with a substantive response regarding the missing parts and data, in the form of a memo prepared by Charette, Bombardier's Customer Service Supervisor. Bazinet's letter, with Charette's memo, is attached hereto as Exhibit 33.

***Delays Related to Bombardier's Provision of the Cab***

77. In its proposal, Claimant provided for the supply of the exterior shell of the cab for the simulator. As discussed more fully above, after the Subcontract Agreement was executed, Bombardier informed Claimant that it would supply the exterior shell of the cab for the simulator because LIRR wanted the simulator to duplicate the look of the actual M-7 train cab.

78. In her August 3, 2001, letter to Bazinet, attached as Exhibit 19, Ash expressed her concern about Bombardier's delays: "At this point, we are extremely concerned about meeting LIRR's schedule, where we do not have similar concerns using our standard cab vendor."

*Delays Generally*

79.    In his January 22, 2003, letter to Aubry, attached as Exhibit 17 hereto, Rodehau enclosed a revised completion schedule and an update on the contractual status of the M-7 simulator.  The completion schedule includes numerous notations where Bombardier's delays caused Claimant to revise its scheduled completion date.  The chart accompanying this letter includes an upward equitable adjustment for the project delay impact in the estimated amount of $150,000

80.    Bombardier breached the Subcontract Agreement by failing to provide parts and data in a timely manner as required by Section D.1.3.1 (Rev. 9) of the Technical Description and causing delays in the provision of the exterior shell of the cab.  As evidenced by the attached documents, these delays were as much as six months after the promised delivery date.  This prolonged delay – which Bombardier never even made an effort to explain – goes beyond the notion of "excusable delay," as discussed in Article 204 of the Subcontract Agreement.  Because Bombardier never addressed the delay with the Claimant, Claimant was forced to second-guess when Bombardier might supply the parts and data and had no choice but to maintain full staffing levels in anticipation that Bombardier would soon supply the necessary parts and data.  Claimant suffered significant out-of-pocket expenses as a direct result of Bombardier's delay and should be compensated in the amount of $150,000.

**COUNT III**

**Breach of Contract for Failure to Negotiate Change Orders**

81. Claimant hereby repeats each and every allegation contained in Paragraphs 1 through 80 as if set forth fully herein.

82. Bombardier breached the Subcontract Agreement by failing to perform its obligations in good faith under the Subcontract Agreement. Moreover, acting in bad faith, Bombardier refused to negotiate change orders, as described more fully above, and refused to recognize affirmatively IITRI's valid and enforceable assignment of the Subcontract Agreement to Alion.

83. Under Article 107 of the Subcontract Agreement, the Subcontractor "shall not assign, transfer, convey, sublet, or otherwise dispose of this Subcontract or its right, title or interest in or to the same or any part thereof without the previous consent in writing of Bombardier."

84. Under New York law, assignments made in contravention of an anti-assignment clause are deemed void "if the contract contains clear, definite, and appropriate language declaring the invalidity of such assignments." *Sullivan v. Int'l Fidelity Ins. Co.*, 96 A.D.2d 555, 556 (2nd Dep't 1983). In *Sullivan*, the Court refused to uphold an anti-assignment clause which "contained no provision that the assignment made without [...] consent [...] should be void, nor does it provide that an assignee would acquire no rights by reason of any such assignment, nor does it provide that the contractor shall not be required to recognize or accept any such assignment." *Id.* See also *Bel-Ray Co., Inc. v. Chemrite (Pty) Ltd.*, 181 F.3d 435, 442 (3rd Cir. 1999); *Pro Cardiaco Pronto Socorro Cardiologica, S.A. v. Trussell*, 863 F. Supp. 135, 137

(S.D.N.Y. 1994). Similarly, the anti-assignment clause in this case contains no such language, and the assignment from IITRI to Alion cannot be deemed void.

85.    On December 20, 2002, Terry Buckner, Alion's Corporate Vice President/Director, Contracts and Procurement, wrote a letter to Aubry announcing that on October 4, 2002, IITRI executed an asset purchase agreement with Alion to purchase substantially all IITRI's assets and that the agreement would be effective December 20, 2002. The letter indicated that Alion will begin assigning or novating subcontracts effective upon closing and stated that "Other than substitution of the company's name from IITRI to Alion, the terms and conditions of existing agreements/subcontracts/purchase orders, including delivery locations and payment terms, shall remain unchanged and in full force and effect." Buckner's letter is attached hereto as Exhibit 34.

86.    On January 15, 2003, Rodehau sent Aubry a letter attaching the press release concerning the formation of Alion, as well as a corporate organization chart. The press release provides significant background on IITRI and Alion and describes how IITRI's 1,650 employees purchased most of IITRI's assets through an ESOP, with the result that Alion is a 100 percent employee-owned company. Rodehau's letter is attached hereto as Exhibit 35.

87.    For his January 22, 2003, letter to Aubry, attached as Exhibit 17 hereto, Rodehau used Alion letterhead and signed the letter "Thomas J. Rodehau, Vice President for Administration, Senior Contracts Manager."

88.    On January 24, 2003, Aubry finally responded to Rodehau's letters of January 15 and 22, 2003. In his letter, Aubry stated, "Bombardier has contracted with

IITRI for the supply of the M-7 Simulator and as of now, there has been no change in that respect. Since there is no contractual relationship between Alion and Bombardier and until further development with IITRI, we would like to inform you that Bombardier will not hold any meetings with Alion Science and Technology with regard to the M-7 Simulator project." Aubry's letter is attached hereto as Exhibit 36 (the date of the letter mistakenly reads January 24, 2002).

89.    On January 31, 2003, Rodehau replied to Aubry, expressing his confusion about Bombardier's refusal to hold meetings with Alion. Rodehau explained that all of IITRI's corporate management staff and all its technical and administrative employees were now employees of Alion and the vast majority of IITRI's intellectual property rights were transferred to Alion: "As a result of this acquisition, all of the resources needed to successfully complete the M-7 Simulator Upgrade Project now reside within Alion." Rodehau enclosed a consent to assignment form and urged Aubry to execute it as soon as possible so as not to cause additional delays with the simulator project. Rodehau's letter is attached hereto as Exhibit 37.

90.    On March 12, 2003, Jose Padilla, Alion's Associate General Counsel, sent a letter on IITRI letterhead to David Allen, Bombardier's Vice President, Contracts. Padilla requested that Bombardier recognize the validity of IITRI's assignment of the Subcontract Agreement to Alion and that Bombardier supply Alion with the missing parts and data so that the simulator may progress to Factory Acceptance Testing. Padilla's letter is attached hereto as Exhibit 38.

91.    On March 17, 2003, Allen responded to Padilla with a strong denial of Alion's contractual standing: "Bombardier does not recognize any contractual

relationship with Alion . . . No work should have been performed by Alion for the M-7 Simulator, and Bombardier will not consider any of its work." Allen's letter is attached hereto as Exhibit 39.

92.    On March 18, 2003, Allen responded to a letter sent by Manik K. Rath, Alion's Associate General Counsel, to Bombardier's Sylvie Bourdon, Esq., Vice President, Group Contracts. Allen's entire letter is as follows: "In response to your letter dated February 21, 2003, addressed to Sylvie Bourdon, Bombardier has no contract with Alion Science and Technology whatsoever, and does not recognize the assignment of IIT Research Institute's subcontract for the M-7 simulator for the LIRR project to Alion." Allen's letter is attached hereto as Exhibit 40.

93.    Notwithstanding Bombardier's written refusals to recognize IITRI's assignment of the Subcontract Agreement to Alion, Bombardier acquiesced in the assignment by accepting Alion's performance of work remaining under the Agreement. At all times Alion, as successor-in-interest to IITRI, has continued to perform under the Agreement. Alion has completed all work required by the Agreement, with the exception of *de minimis* warranty work, which is still ongoing. Bombardier made the final progress payment required by the Subcontract Agreement in February, 2004.

94.    Following the receipt of the final progress payment in February 2004, Claimant, by letter dated December 20, 2006, and attached hereto as Exhibit 41, made a final demand that Bombardier compensate it in the amount of $570,000 for the additional work associated with the unresolved change orders. Bombardier refused to respond to Claimant's demand letter. Accordingly, Bombardier has breached the Subcontract Agreement under New York law.

**PRAYER FOR RELIEF**

95. As a result of Bombardier's failure to comply in all material respects with the obligations contained in the Subcontract Agreement, the Claimant has suffered economic harm.

96. Claimant has suffered total damages in the amount of $597,823.18, as set forth in detail above, plus reasonable attorneys' fees, costs and expenses, including all costs and expenses incurred in connection with the Arbitration proceedings and all costs and expenses incurred prior to the Arbitration proceedings as a result of Bombardier's breach of contract, and interest from the date that Bombardier should have paid Claimant for additional work.

WHEREFORE, Claimant requests that it be awarded damages in the amount of $597,823.18 as well as reasonable attorneys' fees, costs and expenses, including all costs and expenses incurred in connection with the Arbitration proceedings and all costs and expenses incurred prior to the Arbitration proceedings as a result of Bombardier's breach of contract, plus interest and any other costs that the arbitration panel determines should be awarded to Claimant.

Dated: New York, New York
March 27, 2007

Respectfully submitted,

Edmund M. O'Toole
Venable LLP
405 Lexington Avenue
Chrysler Building, 56th Floor
New York, NY 10174
Telephone (212) 307-5500
Facsimile (212) 307-5598

OF COUNSEL:
J. Scott Hommer
Kristen E. Burgers
Venable LLP
8010 Towers Crescent Drive
Suite 300
Vienna, VA 22182
Telephone:  (703) 761-1600
Facsimile:  (703)

*Attorneys for Claimant*

# EXHIBIT B

# SUBCONTRACT TERMS AND CONDITIONS

## LIRR – METRO-NORTH

## M-7 PROJECT

## TABLE OF CONTENTS

CHAPTER 1 - GENERAL PROVISIONS AND DEFINITIONS ........ 1

ARTICLE 101 AGREEMENT ........ 1
ARTICLE 102 DEFINITIONS ........ 2
ARTICLE 103 NOTICES, TRANSMISSION OF DOCUMENTS, COMMUNICATIONS AND LANGUAGE ........ 8
ARTICLE 104 PROJECT DESCRIPTION/SUBCONTRACT WORK ........ 10
ARTICLE 105 RESERVED ........ 11
ARTICLE 106 RESERVED ........ 11
ARTICLE 107 CONSENT OF BOMBARDIER REQUIRED FOR SUBLETTING OR ASSIGNMENT ........ 11
ARTICLE 108 MAJOR SUB-SUBCONTRACTORS (SUB-SUBCONTRACTORS AND SUPPLIERS) ........ 12
ARTICLE 109 SPECIAL CONDITIONS FOR SOFTWARE ........ 12
ARTICLE 110 ORDER OF PRECEDENCE OF CONTRACT DOCUMENTS ........ 13
ARTICLE 111 DETAILED PROGRAM SCHEDULE AND PROGRESS REPORTS ........ 13

CHAPTER 2 - DELIVERY AND ACCEPTANCE ........ 14

ARTICLE 201 GENERAL TIME CONSIDERATIONS ........ 14
ARTICLE 202 DELIVERY AND TIME FOR COMPLETION ........ 15
ARTICLE 203 RESERVED ........ 15
ARTICLE 204 EXTENSION OF TIME ........ 15
ARTICLE 205 EXTENSION OF TIME NOT CUMULATIVE ........ 17
ARTICLE 206 RELEASE FOR SHIPMENT AND NOTICE OF ARRIVAL AND DELIVERY ........ 18
ARTICLE 207 ACCEPTANCE OF EQUIPMENT ........ 19
ARTICLE 208 REJECTION ........ 20
ARTICLE 209 STOP WORK ORDER ........ 21
ARTICLE 210 TERMINATION FOR CONVENIENCE BY BOMBARDIER ........ 21
ARTICLE 212 TITLE TO EQUIPMENT ........ 23
ARTICLE 202A RESERVED ........ 23

CHAPTER 3 - PRICE AND PAYMENT ........ 25

ARTICLE 301 AMOUNT TO INCLUDE AND PRICE TO BE PAID ........ 25
ARTICLE 303 PAYMENTS TO SUBCONTRACTOR ........ 25
ARTICLE 304 SET OFFS, WITHHOLDING AND DEDUCTIONS ........ 28
ARTICLE 305 PROGRESS PAYMENTS ........ 28
ARTICLE 306 FINAL COMPLETION CERTIFICATION ........ 29
ARTICLE 307 NO ESTOPPEL ........ 29
ARTICLE 309 FINAL PAYMENT TO ACT AS RELEASE ........ 30

CHAPTER 4 - CHANGES TO THE SUBCONTRACT ........ 30

ARTICLE 401 CHANGE ORDERS ........ 30
ARTICLE 402 EXTRA WORK DIRECTIVE ........ 32
ARTICLE 403 NEW STATUTES AND REGULATIONS AFFECTING THE SUBCONTRACT WORK ........ 34

CHAPTER 5 - SECURITY FOR THE PERFORMANCE OF SUBCONTRACT WORK ........ 34

ARTICLE 501 PERFORMANCE BOND ........ 34
ARTICLE 502 WITHHOLDING MONEY DUE SUBCONTRACTOR TO MEET CLAIMS ........ 35
ARTICLE 503 USE OF MONIES WITHHELD ........ 36

CHAPTER 6 - SUBCONTRACTOR'S LIABILITY, INDEMNIFICATION, RISK OF LOSS ........ 36

ARTICLE 601 INDEMNIFIED PARTIES ....36
ARTICLE 602 RESPONSIBILITY FOR INJURIES TO PERSONS AND PROPERTY ....36
ARTICLE 603 INDEMNIFICATION ....37
ARTICLE 604 RISK OF LOSS TO THE SUBCONTRACT WORK ....38
ARTICLE 605 REQUIRED INSURANCE ....38
ARTICLE 606 EXCLUSION OF CERTAIN DAMAGES ....40
ARTICLE 607 CAP ON SUBCONTRACTOR'S LIABILITY ....41

**CHAPTER 7 - SUBCONTRACT TERMINATION ....41**

ARTICLE 701 TERMINATION FOR DEFAULT ....41
ARTICLE 703 RESERVED ....42
ARTICLE 704 THE AUTHORITY AND BOMBARDIER MAY AVAIL THEMSELVES OF ALL REMEDIES ....42
ARTICLE 705 DISPOSITION OF THE CAB SIMULATOR AFTER TERMINATION ....42

**CHAPTER 8 - AUTHORITY OF BOMBARDIER, DISPUTES AND CLAIMS ....42**

ARTICLE 801 AUTHORITY OF BOMBARDIER ....42
ARTICLE 803 DISPUTES RESOLUTION PROCEDURE ....43
ARTICLE 804 ADDITIONAL PROVISION RELATING TO THE PROSECUTION OF CLAIMS OR MONEY DAMAGES 46
ARTICLE 805 CHOICE OF LAW, CONSENT TO JURISDICTION AND VENUE ....47

**CHAPTER 9 - INSPECTION, TESTING, GUARANTEES AND CHARACTER OF SUBCONTRACT WORK ....47**

ARTICLE 901 INSPECTION ....47
ARTICLE 902 UNCOVERING FINISHED SUBCONTRACT WORK ....49
ARTICLE 903 SUBCONTRACT TECHNICAL SPECIFICATION AND TECHNICAL DESCRIPTION ....49
ARTICLE 904 CHARACTER OF SUBCONTRACT WORK / KEY PERSONNEL AND SUPPORT AT BOMBARDIER'S OFFICES ....50
ARTICLE 905 TESTING ....50
ARTICLE 906 GENERAL WARRANTY ....51
ARTICLE 908 SOFTWARE WARRANTY ....53
ARTICLE 909 QUALITY SYSTEM REQUIREMENTS ....54
ARTICLE 910 EFFECT OF FAILURE TO COMMENT OR APPROVE ....54
ARTICLE 911 PROGRESS REVIEW MEETINGS ....54
ARTICLE 912 EFFECT OF APPROVAL ....54
ARTICLE 913 FIELD INSPECTION OFFICES ....55

**CHAPTER 10 - MISCELLANEOUS PROVISIONS ....55**

ARTICLE 1001 EQUAL EMPLOYMENT OPPORTUNITY ....55
ARTICLE 1002 ANTITRUST ASSIGNMENT ....57
ARTICLE 1003 TRANSFER OF WORK; ASSIGNMENT OF AUTHORITY RIGHTS ....57
ARTICLE 1004 AUDIT AND INSPECTION ....57
ARTICLE 1005 INDEPENDENT CONTRACTOR ....58
ARTICLE 1006 GENERAL REPRESENTATIONS AND WARRANTIES ....58
ARTICLE 1008 COMPLIANCE WITH LAWS, RULES AND REGULATIONS/INCLUDING ENVIRONMENTAL MATTERS 60
ARTICLE 1009 AUTHORITY OR BOMBARDIER SUPPLIED MATERIAL, LABOR OR FACILITIES ....61
ARTICLE 1010 QUALIFIED PRODUCTS LIST ....61
ARTICLE 1011 BRAND NAMES/SUBSTITUTION OF SPECIFIED MATERIAL ....62
ARTICLE 1012 NO CLAIM AGAINST THE MTA, THE STATE OR THE FEDERAL GOVERNMENT ....63
ARTICLE 1013 SUBCONTRACTOR HAS EXAMINED ALL OF THE SUBCONTRACT DOCUMENTS AND MASTER CONTRACT ....63
ARTICLE 1014 INSERTION OF REQUIRED PROVISIONS ....63
ARTICLE 1015 SEVERABILITY ....64

ARTICLE 1016 CORRESPONDENCE TRACKING ....64
ARTICLE 1017 SUBCONTRACT DOCUMENTS CONTAIN ALL TERMS ....64
ARTICLE 1018 RESERVED ....64
ARTICLE 1020 FIELD SERVICE AND REPLACEMENT PARTS FACILITIES ....64
ARTICLE 1021 ROUTING AND SHIPPING INSTRUCTIONS ....65
ARTICLE 1022 COLLECTIVE BARGAINING ....65
ARTICLE 1023 NOTICE OF LABOR DISPUTES ....65

CHAPTER 11 - NEW YORK STATE CONTRACT PROVISIONS ....65

ARTICLE 1101 OPPORTUNITIES FOR MINORITY AND WOMEN OWNED BUSINESS ENTERPRISES ....66
ARTICLE 1102 NEW YORK STATE LABOR LAW ....66
ARTICLE 1103 NEW YORK STATE CONTENT ....66
ARTICLE 1105 PROHIBITION ON PURCHASE OF TROPICAL HARDWOODS ....67

CHAPTER 12 SPECIAL CONDITIONS ....67

ARTICLE 1201 DESIGN REVIEW SPECIAL CONDITIONS ....67

ATTACHMENT 1 ....69

ATTACHMENT 2 ....70

ATTACHMENT 3 ....71

ATTACHMENT 4 ....72

ATTACHMENT 5 ....73

ATTACHMENT 6 ....75

ATTACHMENT 7 ....76

ATTACHMENT 8 ....77

ATTACHMENT 9 ....78

ATTACHMENT 10 ....79

ATTACHMENT 11 ....80

ATTACHMENT 12 ....81

# SUBCONTRACT TERMS AND CONDITIONS

AGREEMENT made this 16th day of May, 2000, between Bombardier Inc., a Canadian corporation, having a place of business at 1101 Parent Street, St-Bruno, Québec, Canada, J3V 6E6, including its successors and permitted assigns ("Bombardier"), and the IIT Research Institute, an Illinois not-for-profit corporation, having a place of business at 10 West 35th Street, Chicago, Illinois 60616, including its successors and permitted assigns, (the "Subcontractor").

WHEREAS, the Long Island Rail Road Company and the Metro-North Commuter Railroad Company have awarded Contract No. 5646 to Bombardier Transit Corporation (the "Master Contract"), pursuant to which Bombardier Transit Corporation agreed to perform the Work.

WHEREAS, Bombardier Transit Corporation has signed a contract with Bombardier for the supply of certain equipment and services in connection with the design, production and delivery of Cars pursuant to the Master Contract.

WHEREAS, Bombardier desires to enter into this Subcontract with the Subcontractor pursuant to which the Subcontractor will be a subcontractor to Bombardier to perform certain services and/or provide certain material as set forth in the Subcontract Documents (as defined below) in connection with the performance of the Master Contract.

WHEREAS, the Subcontractor desires to enter into this Subcontract with Bombardier.

NOW, THEREFORE, the parties, in consideration of the mutual covenants and agreements herein contained, mutually covenant and agree as follows:

## CHAPTER 1 - GENERAL PROVISIONS AND DEFINITIONS

### *ARTICLE 101 AGREEMENT*

A. The Subcontractor agrees to perform the Subcontract Work (as defined below) and to manufacture, supply, test and warrant the following in accordance with the Subcontract Documents:

(a) 1 Cab Simulator to be installed and delivered to Authority's site in New York;

(b) furnish and deliver any manuals, catalogs, schedules, training, technical support, samples, additional production components and all other items to be delivered pursuant to the Subcontract Documents and to do all Subcontract Work incidental thereto.

In consideration for the complete and proper performance of the Subcontract Work by the Subcontractor, Bombardier agrees to provide to Subcontractor the equipment, data and drawings listed in Attachment 1 and to pay to the Subcontractor the sums of money at the time and in the manner and upon the terms and conditions as set forth in this Subcontract.

*ARTICLE 102 DEFINITIONS*

A. The following terms used in the Subcontract Documents shall, except where, by the context, it is clear that another meaning is intended, be construed as follows:

**"Acceptance"** or **"Approval"** – A determination by Bombardier that the Cab Simulator and any other Equipment appear to meet the requirements of the Subcontract.

**"ADA"** - The Americans with Disabilities Act of 1990 as amended as of the date hereof or as it may be amended in the future and the regulation promulgated thereunder. As used in the **TECHNICAL SPECIFICATION** AND/OR **TECHNICAL DESCRIPTION**, references to ADA requirements or compliance means the requirements for accessibility of Commuter Rail Transportation and Systems for people with disabilities, as specified at the time of approval of the final design by the Authority under the Master Contract.

**"Affiliate of the Authority"** - Metropolitan Transportation Authority, New York City Transit Authority, Metro North Commuter Railroad Company, Triborough Bridge & Tunnel Authority, Metropolitan Suburban Bus Authority, MTA Card Co., WSSY Land Authority, Staten Island Rapid Transit Operating Authority and Manhattan and Bronx Surface Transit Operating Authority.

**"Agent"** - Any employee of, or contractor or subcontractor to, Bombardier, Bombardier Transit Corporation, the Authority or any subsidiary or affiliate of Bombardier, Bombardier Transit Corporation or the Authority designated as such by Bombardier Transit Corporation or the Authority, as the case may be.

**"Apparatus"** - All those parts, equipment, goods and articles required to be furnished by the Subcontractor that are not (i) incorporated into the Cab Simulator when delivered and (ii) included in the TCSAP.

**"Authority"** - The Long Island Rail Road Company and/or Metro-North Commuter Railroad Company, both being a public benefit corporation existing by virtue of the New York Public Authorities Law and any successor public benefit corporation or governmental agency, acting through its officers and duly authorized employees and agents.

**" Cab Simulator Price"** – As defined in Article 301.

**"Base Order Cars"** - The 192 Cars to be delivered to LIRR as part of the base order under the Master Contract.



"**Base Subcontract**" - The portion of the Subcontract that relates to the Cab Simulator and specified Apparatus that are not included in an Option described in Chapter 2A.

"**Bombardier**" - As defined in the preamble to this Subcontract.

"**Car**"- A complete assembly of an A car or B car, or an alternate configuration car to be delivered to the Authority pursuant to the Master Contract.

"**Cab Simulator**" – The equipment to be supplied by the Subcontractor hereunder.

"**Change Order**" or "**Extra Work**" - A change to the Subcontract agreed to by Bombardier and the Subcontractor pursuant to Article 401.

"**Conditional Acceptance**" – A determination by Bombardier that the Cab Simulator appears to meet the Subcontract requirements with the exception of Open Items enumerated in the Notice of Conditional Acceptance issued pursuant to Article 207B.

"**Consumable Items**" – Except for Scheduled Maintenance Parts, those parts of a particular System or Subsystem which are required to be periodically replaced at specified time/distance intervals.

"**Contract Drawings**" - Drawings provided by the Authority as part of the **TECHNICAL SPECIFICATION**.

"**Contractor's Drawings**" - Items such as general arrangement drawings, detail drawings, graphs, diagrams, and sketches which are prepared by Bombardier or Bombardier Transit Corporation to detail its work.

"**Days**" - Unless otherwise designated, days as used in the Subcontract Documents means calendar days.

"**Days, Working**" - Those calendar days during which regular business is conducted, excluding Saturdays and Sundays and all Authority-observed Federal, State, and municipal holidays.

"**Delivery**" - The words "delivery", "delivering", or "delivered", and words of like import shall mean, respectively, the delivery of, delivering of or delivered Cab Simulator or Apparatus at the point in the Subcontract or in the **TECHNICAL SPECIFICATION** and **TECHNICAL DESCRIPTION** designated therefor.

"**Delivery Schedule**" - Refers to the schedule established in the Purchase Order, as amended from time to time.



**"Destination Point(s)"** - The location where the Cab Simulator is to be delivered as described in Article 202.

**"Detailed Program Schedule"** – The schedule to be submitted by the Subcontractor pursuant to Article 111.

**"Dispute"** - As defined in Article 803.A.

**"Effective Date"** - Date of signature of this Subcontract by Bombardier and the Subcontractor.

**"Emergency"** - A situation involving danger to life, safety or property, or which impairs the efficient operation of or the adequate provisions of the Authority service, and which requires immediate corrective action.

**"Equal"** or **"Or Equal"** or **"Approved Equal"** - A product that is equal to or better than the indicated brand product(s) in terms of performance, function, salient features or properties, quality of workmanship, reliability, ease of maintenance and relative cost of replacement.

**"Equipment"** - Refers to all items to be supplied by the Subcontractor pursuant to the Subcontract.

**"Excusable Delay"** – As defined in Article 204.B.

**"Extension of Time"** – A determination made by Bombardier to extend the Delivery Schedule pursuant to Article 205.

**"Extra Work"** - As defined in Article 401.

**"Extra Work Directive"** - As defined in Article 402.

**"Final Completion Certification"** - A certification pertaining to the completion of the work issued by Bombardier pursuant to Article 306.

**"First Article"** - The first one of any production component, part, major assembly, Subassembly System, Subsystems, Apparatus, or material.

**"First Article Testing ("FAT")** - An inspection of a First Article to establish First Article approval.

**"FRA"** - Federal Railroad Administration of United States Department of Transportation.

**"FTA"** - Federal Transit Administration of the United States Department of Transportation.

"**Key Personnel**" - Those employees of the Subcontractor and/or its Major Subcontractors that are committed to work on this Project as set forth in Article 904.

"**License Agreement**" – License agreement number SLA-130-1128 executed by and between the Subcontractor and the Authority, with respect to the licensed software and other documentation provided with respect to this Subcontract and its Cab Simulator.

"**LIRR Car**" – Refers to a Car to be delivered to LIRR pursuant to the Master Contract.

"**Long Island Rail Road** or **LIRR**" - The Long Island Rail Road Company.

"**Manufacturer**" or "**Original Equipment Manufacturer (OEM)**" - The original builder or producer supplying materials, equipment, parts, components or subsystems for installation on the Cab Simulator.

"**Master Contract**" - Means the contract between Bombardier Transit Corporation and Long Island Rail Road Company and the Metro-North Commuter Railroad Company dated May 24, 1999.

"**Master Contract Award Date**" The date the notice of award was issued by the Authority to Bombardier Transit Corporation under the Master Contract, which is May 24, 1999.

"**Metro-North Commuter Railroad** or **MNCR**" - The Metro-North Commuter Railroad Company.

"**MTA**" - The Metropolitan Transportation Authority, a public benefit corporation existing by virtue of the New York Public Authorities Law and any successor public benefit corporation or government agency.

"**Notice**" or "**notice**" - A written announcement.

"**Notice of a Proposed Change Order**" - A formal written notification issued by Bombardier pursuant to Article 401C1.

"**Notice of Rejection**" - A document issued pursuant to Article 208 indicating that a Cab Simulator or part of a Cab Simulator is rejected.

"**Party, Parties**" - Entity(ies) entering into the Subcontract.

"**Price Schedules or Tables**" - Schedules and/or Tables pertaining to the prices to be paid to the Subcontractor and which are set forth in Attachment 3.



**"Proposal on Change Order (PCO)"** - A proposal by the Subcontractor in response to a Notice of Proposed change order pursuant to Article 401D.

**"Purchase Order"** - –Refers to the Purchase Order _________ issued by Bombardier to Subcontractor as of ______________ and as subsequently revised in accordance with this Subcontract.

**"Quality System Manual"** - A manual the Subcontractor is required to provide pursuant to Section of the **TECHNICAL SPECIFICATION**.

**"Quality Plan"** - A plan the Subcontractor is required to provide pursuant to Article 909.

**"Quality System"** - The Subcontractor's overall system to meet the Quality requirements as defined in Section 104.A.1 of the **TECHNICAL SPECIFICATION** and in the **TECHNICAL DESCRIPTION**.

**"Site"** - The word "site" or "work site" or words of like import shall mean the location or locations where work is performed.

**"Special Delivery"** - Means an express delivery of Equipment, at the Subcontractor's expenses, to be made by the Subcontractor in those cases where the Subcontractor has failed to deliver the Equipment on or before the scheduled delivery date.

**"Special Tools"** - Means the special tools which the Subcontractor is required to furnish pursuant to the Subcontract Documents.

**"State"** - The State of New York.

**"Subcontract"** or **"Subcontract Documents"** - The SUBCONTRACT TERMS AND CONDITIONS, **TECHNICAL SPECIFICATION**, **TECHNICAL DESCRIPTION**, CONTRACT DRAWINGS, SUBCONTRACT DRAWINGS (if any), the Purchase Order, Change Orders executed by Bombardier and the Subcontractor and other modifications executed by the parties subsequent to the award of this Subcontract.

**"Subcontract Drawings"** - Drawings provided by the Subcontractor as part of this Subcontract.

**"Subcontract Work"** or **"Project"** - All required obligations of the Subcontractor hereunder relating to the Equipment, including, but not limited to, the design and manufacture, testing, submission of deliverables, performance of warranty obligations, furnishing of all equipment, Cab Simulator, Spare Parts, Special Tools, materials, parts, systems, data, design, services, and other matters and things necessary or the required labor and management to be done by the Subcontractor pursuant to this Subcontract, including all miscellaneous and incidental work.



**"Subcontractor"** - As defined in the preamble to this Subcontract. For convenience, the Subcontractor is hereinafter referred to as if the Subcontractor were an individual. The word "he" shall, as the sense may require, include "she", "it" and "they"; the word "him" shall include "her", "it" and "them"; and the word "his" shall include "her", "its" and "their".

**"Subcontractor's Drawings"** - Items such as general arrangement drawings, detail drawings, graphs, diagrams, and sketches which are prepared by the Subcontractor to detail its work.

**"Sub-subcontractor"** - Any person, firm, contractor or combination thereof who enters into a contract to furnish labor or services only or labor, material, equipment, supplies, or apparatus in connection with the Subcontract Work directly or indirectly for or on behalf of the Subcontractor and whether or not in privity of contract with the Subcontractor.

**"Subsystem"** - A combination of components, parts and/or Subsystems, whether or not mechanical in nature, which, when performing together or taken as a whole, constitutes or provides the discrete function of a System of a Car or Cab Simulator. For purposes of this definition, a component, part or other Subsystem comprising a given Subsystem may also comprise a different Subsystem.

**"Supplier"** - A person, firm, contractor, corporation or combination thereof who furnishes materials, equipment or supplies for the Subcontract Work to the Subcontractor either directly or indirectly and whether or not in privity of contract with the Subcontractor.

**"System"** - A combination of Subsystems, components and/or parts whether or not mechanical in nature, which, when performing together or taken as a whole constitutes or provides a discrete operation, function or subdivision of a Car or a Cab Simulator. For purposes of this definition, a Subsystem, component, or part comprising a given System may also comprise a different System.

**"TECHNICAL DESCRIPTION "** - Means Bombardier **Technical Description** Sheets Nos.: 045 BTD 1006, Revision 8 as amended from time to time.

**"TECHNICAL SPECIFICATION,** Specifications or specifications" - As used in this Subcontract, shall mean that portion of the Master Contract that detail the technical requirements for the supply of the Cars and associated equipment (including without limitation with respect to the Subcontract Work), including any changes or addenda made.

**"Total Cab Simulator Acquisition Price (TCSAP)"** - Total Price (including all non-recurring and recurring costs) for the Cab Simulator as contained in Attachment 3.

**"Total Subcontract Price"** – Refers to the total amount to be paid for all Equipment and services to be provided to Bombardier by the Subcontractor pursuant to this Subcontract.

**"Unscheduled Maintenance Parts (UMP)"** - The parts referred to in Article 204A and listed in the UMP Price Schedule.

"**Warranty Parts**" – As defined in Article 906.I.

"**Warranty Plan**" – As defined in Article 906.K.

"**Warranty Work**" – All the work to be performed by the Subcontractor pursuant to the warranty provisions of this Subcontract.

"**Year 2000 Compliant**" – As defined in Article 908B.

As used herein the singular shall mean and include the plural; the masculine gender shall mean the feminine and neuter genders; and vice versa.

B. Whenever in this Subcontract the words "required", "determined", "directed", "specified", "authorized", "ordered", "given", "designated", "indicated", "considered necessary", "deemed necessary", "permitted", "reserved", "suspended", "established", "approval", "approved", "disapproved", "acceptable", "unacceptable", "suitable", "accepted", "satisfactory", "unsatisfactory", "sufficient", "insufficient", "rejected", "condemned", or words of like import are used, it is understood as if such words were followed by the words, in writing, "by Bombardier", "to Bombardier", unless otherwise specifically stated.

C. Wherever the words "provided", "supplied" or "installed" are used in the Subcontract Documents in reference to work to be performed by the Subcontractor, it is understood to mean "furnished and delivered completed".

D. All initially capitalized words used in this Subcontract and not otherwise defined in this Subcontract shall have the meanings assigned to them in the Master Contract.

*ARTICLE 103 NOTICES, TRANSMISSION OF DOCUMENTS, COMMUNICATIONS AND LANGUAGE*

A. The delivery of any notice by Bombardier to the Subcontractor at the address set forth in the Purchase Order and the delivery of any notice by the Subcontractor to Bombardier at the address set forth in ARTICLE 103.B. shall be made in writing and by (i) personal delivery, (ii) depositing the same, in a postpaid wrapper directed to the aforesaid addresses, in any post office box regularly maintained by the Canadian or U.S. Postal Service, as the case may be, or (iii) by overnight courier, and shall be deemed to be sufficient service thereof as of the date of such delivery or in the case of (ii), three days after deposit. The address of either party may be changed at any time by Notice to the other party in writing. Notwithstanding the foregoing, any Notice may be sent by fax by Bombardier to the Subcontractor or by the Subcontractor to Bombardier at their respective fax number set forth in Article 103.C. and deemed valid provided that such Notice sent by fax is followed by a letter of confirmation duly signed by the sender within a period of three (3) days after the sending of such Notice. If the Notice sent by fax is duly



confirmed by a letter in accordance with the provisions of this Article 103.A., the delivery date shall be the date on which the Notice has been sent by fax. If such Notice is not confirmed by a letter in accordance with the provisions of this Article 103.A, such Notice shall be deemed null and void.

B.   The Subcontractor shall, at no additional cost to Bombardier or the Authority provide for a transmittal service for all documents, including but not limited to drawings, directives and technical data, allowing not more than three days delivery time, in either direction, between its facilities and Bombardier's offices at 1101 Parent Street, Saint-Bruno, Quebec, Canada, J3V 6E6, to the attention of Bombardier's representative from the Procurement Department assigned to this Subcontract or such other location or to the attention of such other person as Bombardier may designate. The Subcontractor may select a commercial delivery service for that purpose, but shall nevertheless be responsible for timely delivery of all documents.

C.   Under the present Subcontract, in order to render official all communications and Notices and to bind Bombardier to them, the Subcontractor must have those communications with Bombardier's representative from the Procurement Department assigned to this Subcontract, or any other representative qualified as its substitute. Furthermore, any communication may be made by fax between the parties and sent to the attention of and at the following fax number:

A) If to Subcontractor:

Name:      IIT Research Institute
Address:   10 West 35th Street
           Chicago, Illinois 60616

Contact:   Bobette J. Ash

Fax Number:      312-567-4030

B) If to Bombardier

Address:   1101 Parent Street
           St-Bruno (Québec)
           Canada J3V 6E6

Contact:   Suzanne Poirier

Fax number: (450) 441-8117

D.   Without exception, all correspondence, data, all technical information, drawings, instruction books, manuals, catalogs, training, nameplates, or other written communications shall be written in English language. For all means of communications, i.e., telephone conversations, meetings, etc., the English language shall be used.



E. The Subcontractor hereby agrees and acknowledges that Bombardier may provide to the Authority a copy of this Subcontract, as may be modified from time to time.

*ARTICLE 104 PROJECT DESCRIPTION/SUBCONTRACT WORK*

A. Subject to ARTICLE 104.B below, the Subcontract Work to be performed under the Subcontract is set forth in the Subcontract Documents. The Subcontract Work to be performed generally consists of providing all material, labor, plant, tools, transportation, and all other items of expense necessary for performing all Subcontract Work and testing all Equipment as specified and for delivering them on the schedule specified and to the points listed in the Purchase Order and for fulfilling all other obligations of the Subcontractor under the Subcontract (including warranty obligations). The Subcontract Work shall be performed as and at the production rate specified in the Purchase Order.

B. The intent of this Subcontract is to impose on Subcontractor the obligations that Bombardier Transit Corporation has to the Authority under the Master Contract with respect to the Subcontract Work. Without limiting the foregoing, Subcontractor agrees to assume all-of the obligations and responsibilities that Bombardier, by those documents, assumes with respect to the Subcontract Work. In the event that changes are made to the terms and conditions of the Master Contract Documents affecting the Subcontract Work, Bombardier may, at its sole option, impose such changes on the Subcontractor, subject to the Change Order provision under this Agreement. Bombardier shall give to the Subcontractor a copy of these changes but may, at its sole discretion, withdraw some information that Bombardier judges to be of confidential nature, but in any event the Subcontractor will be given adequate information to allow it to fully evaluate and respond to such changes

C. The Subcontractor agrees that Bombardier has provided him with a copy of an edited version of the Master Contract (the "Edited Version") relating directly or indirectly to the Subcontract Work to be performed and the materials to be furnished.

D. The Cab Simulator shall be designed as described in the **TECHNICAL DESCRIPTION** and in the **TECHNICAL SPECIFICATION**.

E. Subcontractor's acceptance of any provision or clause in this Subcontract that requires Subcontractor to accept a decision of the Authority concerning this Subcontract or that limits Subcontractor's rights and remedies under this Subcontract to decisions, amounts, or time limits granted under the Master Contract, including, but not limited to, Articles 104, 204, 205, 209, 210, 401, 402 and 803, is expressly contingent upon (1) Bombardier timely and promptly presenting all information, arguments, and supporting documentation to the Authority that IITRI presents to Bombardier and (2) where advance notice is given by the Authority of potential discussion on a Subcontract-related topic, Bombardier inviting Subcontractor and arranging for Subcontractor to participate in that portion of its meeting with the Authority. If Subcontractor does not attend such meetings or discussions, then Bombardier agrees to pursue Subcontractor's position with the



Authority and protect the best interest of the Subcontractor to the maximum extent possible. Bombardier further agrees to consult with Subcontractor prior to accepting settlement of less than Subcontractor's request for any such decision, amounts, or time limit from the Authority. If such conditions are not met, then Subcontractor's acceptance of decision, limitation, clause or provision shall be deemed immediately revoked and the parties will negotiate an equitable resolution in lieu thereof.

*ARTICLE 105 RESERVED*

A. The term "Subcontractor Software, Technology or Documentation" shall mean all or any part of the computer programs installed by Licensor on the Cab Simulator or supplied to LIRR, MNCR or Bombardier, together with all documentation for such programs or for the Cab Simulator, including but not limited to, all software documentation, design documentation, users manuals for the programs, and drawings, and any corrections or updates to any of them, during the term of this Agreement.

B. The Authority's rights to Subcontractor Software, Technology or Documentation are set forth in a separate License Agreement between Subcontractor, LIRR and MNCR.

C. Bombardier's use, reproduction and disclosure of any Subcontractor Software, Technology or Documentation which it may receive or to which it may have access under this Subcontract or as part of the LIRR M-7 project will be strictly governed by the non-disclosure agreement executed by Bombardier and Subcontractor on March 9, 2000 and attached to this Subcontract as Attachment 4.

D. Subcontractor Software, Technology or Documentation and all updates to the Software, Technology or Documentation are and shall remain the property of Subcontractor and title to them shall remain in the Subcontractor. All applicable law and statutory rights in the Software, Technology or Documentation and trade secret material, object code, trademarks, service marks, patents, and copyrights shall remain the property of the Subcontractor or those who have licensed the Subcontractor. Bombardier shall have no right, title or interest in such proprietary rights.

*ARTICLE 106 RESERVED*

*ARTICLE 107 CONSENT OF BOMBARDIER REQUIRED FOR SUBLETTING OR ASSIGNMENT*

The Subcontractor shall not assign, transfer, convey, sublet or otherwise dispose of this Subcontract or its right, title or interest in or to the same or any part thereof without the previous consent in writing of Bombardier.



*ARTICLE 108 MAJOR SUB-SUBCONTRACTORS (SUB-SUBCONTRACTORS AND SUPPLIERS)*

A With respect to all proposed Sub-subcontractors or Suppliers, the following procedure shall apply unless waived in writing by Bombardier. The Subcontractor, before making any sub-subcontract or issuing a purchase order for work or goods, shall state in writing to Bombardier the name of the proposed Sub-subcontractor or Supplier, the portion of the Subcontract Work which the Sub-subcontractor or Supplier is to do, the place of business of such Subcontractor or Supplier, and such other information as Bombardier may request. Bombardier shall have the right to require the Subcontractor not to award any Sub-subcontract nor to issue a purchase order to a person, firm or corporation disapproved by Bombardier or the Authority and shall endeavor to notify the Subcontractor in writing within twenty-five (25) days of the Subcontractor's submission to Bombardier of any disapproval thereof, stating the reasons. Oral notifications to the Subcontractor thereof will be followed up in writing. Failure of Bombardier to respond within twenty-five (25) days shall not be deemed an approval and the Subcontractor enters into such sub-subcontracts or purchase orders at its own risk in the event such person, firm or corporation is subsequently disapproved by Bombardier or the Authority. Notwithstanding anything in Article 910 to the contrary, at any time after the twenty-five (25) day period, the Subcontractor may make a demand on Bombardier to approve or reject, in which event failure to reject within six (6) days of this demand shall constitute an approval.

B. In order to qualify as a Sub-subcontractor or Supplier satisfying to Bombardier, the Sub-subcontractor or Supplier must be prepared to prove to the satisfaction of Bombardier and the Authority that he has, among others, the necessary facilities, skill and experience, and ample financial resources to perform part of the Subcontract Work in a satisfactory and timely manner. To be considered skilled and experienced, the Sub-subcontractor or Supplier must show to the satisfaction of Bombardier that it has satisfactorily performed Subcontract Work of the same general type which is required to be performed under this Subcontract.

C. The provisions of this Subcontract and of the Master Contract shall apply to each Sub-subcontractor, the Supplier and their officers, agents and employees in all respects as if he and they were employees of the Subcontractor; and the Subcontractor shall not be in any manner thereby discharged from his obligations and liabilities hereunder, but shall be liable hereunder for all acts of negligence of the Sub-subcontractor, his officer, agents and employees as if they were employees of the Subcontractor.

*ARTICLE 109 SPECIAL CONDITIONS FOR SOFTWARE*

The Subcontractor shall have a mature software development process that meets the requirements of Section 506 of the TECHNICAL SPECIFICATION except for the requirement for level 2 of the Capability Maturity Model (CMM level 2) requirement which is waived for the purposes of this Subcontract and except for submission of source code other than in an escrow account as specified in the License Agreement. With the exception of the CMM



Level 2 requirement, the Subcontractor's software development process shall follow all software Quality Assurance requirements, in accordance with the Specifications. For this purpose the Subcontractor shall give access to its facilities to Bombardier and the independent evaluator and shall make available to Bombardier all pertinent and necessary documentation and material in order to complete such assessment.

*ARTICLE 110 ORDER OF PRECEDENCE OF CONTRACT DOCUMENTS*

In the event of a conflict between provisions appearing in different parts of the Subcontract Documents, the following shall be the order of precedence:

A) Change Order;
B) License Agreement;
C) Purchase Order;
D) Subcontract terms and conditions and its appendices;
E) **TECHNICAL SPECIFICATION** and its appendices;
F) Contract Drawings;
G) **TECHNICAL DESCRIPTION** and its appendices;
H) Subcontract Drawings;

*ARTICLE 111 DETAILED PROGRAM SCHEDULE AND PROGRESS REPORTS*

The Subcontractor shall prepare and submit to Bombardier which shall be agreed upon by the Subcontractor and Bombardier, within thirty (30) days of the Effective Date, a Detailed Program Schedule in a bar chart form, showing, for each activities, the commencement and finish dates. Such Detailed Program Schedule shall be updated monthly (or, if deemed necessary by Bombardier, at any more frequent interval ordered by Bombardier) and harmonized with Bombardier Detailed Contract Schedule to be provided pursuant to the Master Contract. The intent of this paragraph is to develop and establish a complete and thorough project schedule in agreement with all the requirements of the Contract Documents.

Such schedule shall include, but shall not be limited to the followings (if applicable):

1. All key major engineering activities including Preliminary Design Review (PDR) dates and Critical Design Review (CDR) dates;

2. All key major manufacturing engineering and/or method services activities including availability and preparation of the major tools for the manufacturing, if applicable;

3. Procurement activities and purchase order dates of major components and tooling, if applicable;

 

4. Quality assurance activities;

5. Manufacturing Schedule;

6. Issuance date of Qualification test procedures;

7. Qualification tests dates;

8. Qualification tests results dates;

9. First Article Testing (F.A.T.) date;

10. Delivery Schedule for each Cab Simulator; and

11. Contractual Data Requirements List (CDRL) with the scheduled dates for submittal of all such data.

The last Friday of each month, the Subcontractor shall submit a progress report showing the progress of Subcontract Work for each activity of the Detailed Program Schedule. The Subcontractor shall, during the course of the design, development and testing of the Cab Simulator and the Cars provide to Bombardier and the Authority and their agents, with such designs, drawings and instructions as may be reasonably necessary for purposes of Bombardier and Authority's review.

## CHAPTER 2 - DELIVERY AND ACCEPTANCE

### *ARTICLE 201 GENERAL TIME CONSIDERATIONS*

A. The Subcontractor shall diligently prosecute the Subcontract Work and shall deliver the Equipment as set forth in this Chapter. The Total Subcontract Price is based on the Subcontractor working as many hours as necessary to properly perform the Subcontract Work and achieve the Delivery Schedule requirements. If the Subcontractor incurs any overtime costs and other costs to fulfill its obligation hereunder, the Subcontractor shall be responsible for all such costs.

B. If, in the opinion of Bombardier, the Subcontractor is not achieving the Delivery Schedule, the Subcontractor shall take such steps as may be necessary to improve its progress. Bombardier may require the Subcontractor, at its sole expense, to submit for approval, a recovery schedule or schedules as may be deemed necessary to demonstrate the manner in which the agreed rate of progress will be regained, without cost to Bombardier.

 

*ARTICLE 202* *DELIVERY AND TIME FOR COMPLETION*

A. The Equipment shall be delivered by the Subcontractor C.I.P., Hollis, New York (the "Destination Point") in accordance with the Delivery Schedule set forth in the Purchase Order as revised from time to time, provided however, that Bombardier shall have the right, notwithstanding any other provision, without any additional costs to Bombardier, which it may exercise at any time, to notify in writing the Subcontractor that the Delivery Schedule shall be delayed by up to three (3) months.

The term C.I.P. above mentioned shall be interpreted in accordance with the Incoterms (1990).

B. Bombardier reserves the right to change the Delivery Point within New York State on at least 20 days' advance written notice to the Subcontractor.

C. If the Subcontractor is beyond schedule, it shall use, at its own expense, the fastest means of Special Delivery available.

D. Reserved

E. Delivery may be made on any day of the week within Bombardier's normal business hours. The Subcontractor shall provide Bombardier with a fifteen (15) day written notice prior to its planned delivery.

F. The Subcontractor shall provide Bombardier with a minimum of five (5) days advance written notice when canceling or postponing the previously scheduled delivery date pursuant to this Subcontract.

*ARTICLE 203* *RESERVED*

*ARTICLE 204* *EXTENSION OF TIME*

A. If performance of the Subcontract Work under this Subcontract should, as determined by Bombardier, be unavoidably delayed, as provided herein, Bombardier shall grant an Extension of Time for completion of this Subcontract for the determined number of days of Excusable Delay and shall make the appropriate revision to the Delivery Schedule. A delay is Excusable Delay only if (1) the delay arose from causes beyond the Subcontractor's control and the delay was without his fault, and (2) the cause of the delay arose after the Effective Date, neither was nor could have been anticipated by the Subcontractor by reasonable investigation before such Effective Date and in fact caused the Subcontractor to miss the Delivery date. Moreover, even though a delay meets each of the conditions set forth in (1) and (2), above, an extension shall be granted only to the extent that (i) the completion of the affected work is actually and necessarily delayed and (ii) the effect of such cause cannot be anticipated and avoided or mitigated by the exercise of all reasonable precautions, efforts and measures (including planning, scheduling and





rescheduling) whether before or after the occurrence of the cause of delay and (iii) an equivalent extension of time has been provided under the Master Contract. Any reference in this Article to the Subcontractor shall be deemed to include any permitted Sub-subcontractors and Suppliers, whether or not in privity of contract with the Subcontractor, all of whom shall be considered as agents of the Subcontractor for the purposes of this Article. The period of any extension of time shall be only that which is necessary to make up the time actually lost, but in any event shall never exceed the period of time granted to Bombardier pursuant to the Master Contract if Bombardier has requested such extension of time as a result of Subcontractor's excusable delay. Bombardier may defer all or part of its decision on an Extension of Time and any Extension of Time may be rescinded or shortened if it is subsequently found that the delay can or could have been overcome or reduced by the exercise of reasonable precautions, efforts and measures.

B. The Subcontractor agrees to supply, as soon as such data are available, any reasonable proof that may be required by Bombardier to make a decision with respect to any request for Extension of Time. Bombardier within a reasonable time after submission by the Subcontractor, will examine the request and any documents supplied by the Subcontractor and will determine and advise the Subcontractor in writing if the Subcontractor is entitled to an Extension of Time and the duration of such extension or if further information is required, or if Bombardier is unable to determine at this time whether an extension should be granted. Failure of Bombardier to furnish the Subcontractor with the foregoing advisement shall not, however, be deemed to waive Bombardier's right to deny an Extension of Time. Bombardier will issue at the completion of the Subcontract Work in conjunction with issuing its Certificate of Final Completion a final determination on any Subcontractor request for an Extension of Time not theretofore determined. If the Subcontractor disputes Bombardier's decision, the provisions of ARTICLE 803 shall apply.

C. Bombardier's permitting of the Subcontractor to complete the Subcontract Work or any part thereof after the time fixed for such delivery in the Delivery Schedule or after the date to which the time for such Delivery may have been extended, or the making of payment to the Subcontractor after any of such periods, shall in no way operate as a waiver on the part of Bombardier or the Authority of any rights under this Subcontract or the law.

D. In the event that any Change Order under ARTICLE 401 shall be issued after the completion date for performance of this Subcontract or any portion thereof, or after any delays have accrued, such Change Order shall not constitute a waiver of any delays accrued prior to issuance of the Change Order.

E. As a condition precedent to the granting of an Extension of Time, the Subcontractor shall give written notice to Bombardier within five (5) days after the time when the Subcontractor knows or should know of any cause which might under reasonable foreseeable circumstances result in delay for which he may claim an Extension of Time (including those causes for which Bombardier or the Authority themselves are responsible or of which Bombardier or the Authority have knowledge), specifically stating in such notice that an Extension of Time is or may be claimed; identifying such cause and describing, as fully as practicable, at that time, the nature and expected duration of the delay and its effect on the completion of that part of the work identified in the

 

notice. Since the possible necessity for an Extension of Time may materially alter the scheduling plans, and other actions of Bombardier and since, with sufficient notice, Bombardier may, if it should so elect, attempt to mitigate the effect of the delay for which an extension of time might be claimed, and since mere oral notice may cause dispute as to the existence or substance thereof, the giving of written notice as above required shall be of the essence of the Subcontractor's obligations hereunder.

It shall in all cases be presumed that no Extension of Time is due unless the Subcontractor shall affirmatively demonstrate the extent thereof to the reasonable satisfaction of Bombardier. To this end, the Subcontractor shall maintain adequate records supporting any claim for an Extension of Time.

Notwithstanding the above, the Subcontractor's obligation to give such notice shall exist independently of whether any delay is claimed by the Subcontractor and deemed by Bombardier to be excusable.

F. The Subcontractor shall have no right to rescind, suspend or terminate the Subcontract by reason of any delay, obstruction or interference of any kind or duration whatsoever. In the event of damages sustained by Subcontractor due to Bombardier's or the Authority's fault, such damages, unless otherwise not compensable under the Subcontract shall be limited to the compensation granted to Bombardier pursuant to the Master Contract in connection with the Subcontract Work, if Bombardier has requested a compensation as a result of a delay due to the Authority's fault, as provided in this Article. The Subcontractor agrees to make no claim for damages for delay of any kind in the performance of this Subcontract in excess of the limitation set forth in the preceding sentence whether occasioned by any act or omission to act of Bombardier or the Authority or any of their representatives (whether it is an Excusable Delay), and the Subcontractor agrees that any claim for such delay in excess of the limitations in this Paragraph shall be compensated for solely by an Extension of Time to complete performance of the Subcontract Work as provided herein.

G. In regard to an injunction, strike or interference of public authority which may delay the Subcontract Work, the Subcontractor shall give Bombardier a copy of the injunction or other orders and of the papers upon which the same shall have been granted. Bombardier and the Authority or any of them shall be accorded the right to intervene or become a party to any suit or proceeding in which any such injunction shall be obtained and to move to dissolve the same or otherwise, as Bombardier or the Authority may deem proper.

*ARTICLE 205 EXTENSION OF TIME NOT CUMULATIVE*

A. Only the actual delay necessarily resulting from the causes contained in ARTICLE 204, as determined by Bombardier, shall be grounds for Extension of Time. In case the Subcontractor shall be delayed at any time or for any period by two or more of such causes, the Subcontractor shall not be entitled to a separate Extension of Time for each one of the causes but only an Extension of Time for the one period shall be granted for the delay.

B. In case the Subcontractor shall be actually and necessarily delayed from one or more of such causes in the delivery of any portion of the Subcontract Work, the Extension of Time to be granted to the Subcontractor shall be only for such portion of the Subcontract Work affected. If the Subcontractor shall be so delayed as to a portion of the Subcontract Work he shall nevertheless proceed continuously and diligently with the prosecution of the remainder of the Subcontract Work. No demand by the Subcontractor that Bombardier determine and certify any matter of Extension of Time for the completion of the Subcontract Work or any part thereof will be of any effect whatsoever unless the same be made in accordance with ARTICLE 204.

C. Adjustments shall also be made to the terms and conditions of this Agreement if Bombardier and/or the Authority is affected by a cause mentioned above. In such cases Bombardier shall give Subcontractor written notice of any of the foregoing causes as soon as practicable following the occurrence thereof. The notice shall state the effect of the cause for the Excusable Delay, the portions of the terms and conditions affected thereby and the date when it became so affected.

*ARTICLE 206* *RELEASE FOR SHIPMENT AND NOTICE OF ARRIVAL AND DELIVERY*

When the Cab Simulator is complete and ready for shipment to the Destination Point, the Subcontractor shall so notify Bombardier, fifteen (15) days in advance of shipment and, if in that delay, Bombardier do not inform the Subcontractor not to deliver the Cab Simulator, the delivery shall occur and a Bombardier representative may, at Bombardier's discretion, inspect such Cab Simulator at the Destination Point.

Time is of the essence in this Subcontract and Subcontractor shall meet the Delivery Schedule.

If the pre-shipment inspection indicates that the Cab Simulator has been manufactured in accordance with the requirements of the Subcontract Documents, Bombardier shall accept the Cab Simulator for shipment.

If the pre-shipment inspection indicates that the Cab Simulator has been manufactured in accordance with the requirements of the Subcontract Documents, except for minor defects and deficiencies, Bombardier may, in its discretion, conditionally accept the Cab Simulator for shipment; subject, however, to the Subcontractor's obligation to make any necessary repairs or take any other necessary corrective action at its own expense. The Subcontractor shall repair any such Cab Simulator prior to its shipment to the Destination Point. If the Subcontractor fails to make such repairs or take such corrective action within a reasonable time, Bombardier may deliver a Notice of Rejection as if the Cab Simulator had been rejected upon inspection. Such conditional acceptance for shipment by Bombardier does not relieve the Subcontractor from meeting the Delivery Schedule.



If the pre-shipment inspection indicates that the Cab Simulator has not been manufactured in accordance with the requirements of this Subcontract, Bombardier shall notify the Subcontractor of its rejection of the Cab Simulator and that the Cab Simulator will not be released until such defects have been corrected, at the Subcontractor's expense, in accordance with the requirements of this Subcontract.

If Bombardier chooses not to perform a pre-shipment inspection within the above-mentioned fifteen (15) days period, the Subcontractor shall ship the Equipment as scheduled without being inspected prior to pre-shipment by Bombardier.

The Cab Simulator must be adequately packaged for shipment to the Destination Point.

*ARTICLE 207 ACCEPTANCE OF EQUIPMENT*

A. If post-delivery inspection shows that the Cab Simulator appears to have been delivered to the Destination Point in accordance with the requirements of this Subcontract and has been received in sound and serviceable condition and has passed all tests to be performed, Bombardier will begin using the Cab Simulator.

B. If post-delivery inspection shows that the Cab Simulator has been delivered with defects or deficiencies, including without limitation, failure to pass all required tests to be performed, which in the opinion of Bombardier do not render the Cab Simulator unfit for service, Bombardier may in its sole and absolute discretion deliver to the Subcontractor a "Notice of Conditional Acceptance" which shall nevertheless be treated as Acceptance for payment purposes, subject to Bombardier's right to withhold (or deduct monies from payments due the Subcontractor) an amount equal to twice the estimated cost necessary to remedy Open Items (as defined below) or any other sums the withholding of which is permitted pursuant to the Subcontract.

The Notice of Conditional Acceptance shall specify as "Open Items" such defects and deficiencies and provide that the Cab Simulator is accepted on condition that the Subcontractor make any necessary repairs or other corrective action so that the Open Items be remedied. Any work hereunder shall be such as to make the Cab Simulator fully meet the Subcontract Documents. The Subcontractor shall not, however, perform such Subcontract Work on Bombardier's or the Authority's premises without express permission or direction from Bombardier or the Authority, as applicable. If the Subcontractor, however, fails to remedy the Open Items within fourteen (14) days, or, where it is unreasonable for the work to be completed within fourteen (14) days, then within such greater period of time expressly authorized in writing by Bombardier, Bombardier may (i) deliver a Notice of Rejection which shall have the same force and effect as if the Cab Simulator had been rejected upon post-delivery inspection, or (ii) do or cause to be done, at the Subcontractor's expense, any necessary work to remedy an Open Item. Where it is unreasonable for the Subcontractor to remedy the Open Items within fourteen (14) days, the Subcontractor shall submit within seven (7) days a schedule for completion of the work, specifying the time period for completion, for Bombardier's approval.





C. Where Bombardier performs any work to remedy any Open Items or otherwise performs remedial or repair work that is the Subcontractor's responsibility, Bombardier shall be deemed to be performing such repair or remedial work as agent of the Subcontractor, and the Subcontractor shall be required to reimburse Bombardier for the cost involved. If the work was done by Bombardier's or LIRR's employees, all labor or materials will be billed to the Subcontractor in accordance with the then appropriate (Bombardier or LIRR) current Schedule for Rates for such work. Any such costs may be deducted by Bombardier from any payment due or to become due to the Subcontractor.

D. Upon delivery of the Protective Spare Equipment, Diagnostic Test Equipment and Special Tools, Bombardier will inspect the delivered items and, if found in accordance with the Subcontract Documents, will accept such Protective Spare Equipment, Diagnostic Test Equipment and Special Tools.

E. If Bombardier delivers equipment to the Subcontractor with defects or deficiencies, the Subcontractor shall give Bombardier a notice specifying the defects within five (5) days of delivery. Bombardier shall then repair or replace, at its option, such equipment within fifteen (15) days of receipt of this notice.

*ARTICLE 208 REJECTION*

A. If inspection of a Cab Simulator discloses that it is in the opinion of Bombardier unfit for service, or if the Cab Simulator had been accepted but Subcontractor has failed to remedy the Open Items as such are defined in within the time specified, a notice to that effect ("Notice of Rejection") will be given to the Subcontractor indicating that such Cab Simulator or part of a Cab Simulator is rejected. At Bombardier's option, such Cab Simulator may be returned to the Subcontractor at the Subcontractor's expense for corrective action. Any work required hereunder for corrective action shall be such as to make the Cab Simulator fully meet the Subcontract Documents. Rejection shall vitiate "delivery" for all purposes and shall subject the Subcontractor to appropriate contract enforcement remedies.

B. All expenses and costs incurred by Bombardier in connection with rejection, including, without limitation, the removal of said Cab Simulator from the Destination Point, reinspection and retesting, shall be borne by the Subcontractor.

C. Risk of loss for the Cab Simulator rejected hereunder shall be borne by the Subcontractor during the time when Subcontractor has control/possession of the Cab Simulator.




*ARTICLE 209 STOP WORK ORDER*

A. Bombardier may, at any time, by written order to the Subcontractor, require the Subcontractor to stop all, or any part, of the Subcontract Work for a period of ninety (90) days (or any lesser period), commencing no sooner than the date the order is delivered to the Subcontractor, and for any further period to which the parties may agree. Any such order shall be specifically identified as a "Stop Work Order" issued pursuant to this Article. Within the period of ninety (90) days (or the lesser period specified) after a Stop Work Order is delivered to the Subcontractor, or within any extension of that period to which the parties shall have agreed, Bombardier shall either:

(i) cancel the Stop Work Order, or

(ii) terminate the work covered by such order as provided in ARTICLE 210 TERMINATION FOR CONVENIENCE BY BOMBARDIER.

B. If a Stop Work Order issued under this Article is canceled or the period of the order or any extension thereof expires, the Subcontractor shall resume work without compensation to the Subcontractor for such suspension other than extending the time for completion of the Subcontract Work to the extent that the Subcontractor may have been delayed by such suspension; except that in the event Bombardier determines that the suspension of work was necessary due to Subcontractor's defective or incorrect work, unsafe work conditions caused by the Subcontractor or any other reason caused by Subcontractor's fault or omission, the Subcontractor shall not be entitled to an extension of time as a result of the issuance of this Stop Work Order.

Notwithstanding anything to the contrary, the total days under all Stop Work Orders hereunder shall not exceed 180 calendar days. To the extent the Subcontractor is entitled to an Extension of Time as set forth in this Article and Article 205, the Subcontractor shall also be entitled to damages for delay caused by a Stop Work Order subject to the limitations of Article 204G. In the event that the suspension of work was caused by a Stop Work Order issued to Bombardier by the Authority under ARTICLE 209 of the Master Contract, then the Subcontractor shall not be entitled to an extension of time in excess of the extension of time granted to Bombardier thereunder and damages for delay shall not be in excess of the damages for delay granted to Bombardier under the Master Contract, prorated on the value of this Subcontract.

*ARTICLE 210 TERMINATION FOR CONVENIENCE BY BOMBARDIER*

A. In addition to cancellation or termination as otherwise provided in the Subcontract, Bombardier may, at any time terminate this Agreement for convenience by written notice to the Subcontractor and in such event, the Subcontractor shall, upon receipt of such notice, unless otherwise directed by Bombardier:

1. stop work on the date specified in the notice (the "Effective Date");

2. take such action as may be necessary for the protection and preservation of Bombardier's materials and property, if any;

3. cancel all cancelable orders for materials and equipment;

4. assign to Bombardier and deliver to the site or any other location designated by Bombardier any non-cancelable orders for material and equipment that is not capable of use except in the performance of this Subcontract and has been specifically fabricated for the sole purpose of this Subcontract and not incorporated in the Subcontract Work;

5. take no action which will increase the amounts payable by Bombardier under this Subcontract; and

6. take reasonable measure to mitigate Bombardier's liability under this Article.

B. In the event that Bombardier exercises its right to terminate this Subcontract pursuant to this Article, Bombardier will pay Subcontractor as follows:

1. Its reasonable cost (i) of the portion of the Work completed in accordance with the Subcontract up to the Effective Date, (ii) incurred in performance of actions taken pursuant to Paragraphs A.1, 3, 4 and 6 above, and (iii) of non-cancelable and non-returnable material and equipment that is not capable of use by the Subcontractor except in the performance of this Subcontract and has been specifically fabricated for the sole purpose of this Subcontract but not incorporated in the Work; and

2. any other reasonable costs including demobilization costs incidental to such termination of Work.

C. To the extent practical, the reasonable value shall be based upon the TCSAP. In no event shall any payments under this Article exceed the contract price of such items. Where the "reasonable cost" paid by Bombardier under Paragraph B.1 above is less than the actual cost as claimed by the Subcontractor, the burden of proof for justifying such lower cost will be borne by Bombardier.

D. All payments pursuant to this Article shall be accepted by the Subcontractor in full satisfaction of all claims against Bombardier and Authority arising out of the termination including, without limitation, lost profits, overhead or other consequential damages. Further, Bombardier may deduct or set off against any sums due and payable pursuant to this article it may have against the Subcontractor. The Subcontractor's obligation as to the quality, reliability, correction and warranty of accepted Equipment shall continue in force after such termination.

E. If Bombardier exercises its right to terminate as a result of a termination of the Master Contract by the Authority, then all payments under this Article shall not exceed payments made by the



Authority to Bombardier under ARTICLE 211 of the Master Contract on account of the Subcontract Work that is included in the Work.

*ARTICLE 212 TITLE TO EQUIPMENT*

Upon the earlier of Conditional Acceptance, Final Acceptance or payment of Equipment, title thereto free and clear of all liens and encumbrances shall vest in Bombardier or, if designated by Bombardier, in the Authority. The Subcontractor shall, concurrent with or prior to its delivery of Equipment, deliver to Bombardier such instrument or instruments such as a Bill of Sale, as may be required by Bombardier, and the Certificate of Origin, as may properly recite or prove the free and clear title of Bombardier, or if designated by Bombardier, of the Authority, to such Cab Simulator, and the certified weight slip.

*ARTICLE 213 RESERVED*

*CHAPTER 2A - OPTIONS*

*ARTICLE 202A RESERVED*

*ARTICLE 203A RESERVED*

*ARTICLE 204A OPTION FOR UNSCHEDULED MAINTENANCE PARTS*

**A. The Option**

1. Bombardier shall have an option ("the Unscheduled Maintenance Parts or UMP Option") to procure the parts required to maintain and repair Systems, Subsystems and Components for other than Scheduled Maintenance.

2. If the option hereunder is exercised, the Subcontractor shall be required to deliver Unscheduled Maintenance Parts for a period commencing with the end of the Warranty Period under Article 906 for any Cab Simulator and ending five (5) years after the later of the date of Conditional Acceptance (or Final Acceptance if there is no Conditional Acceptance) ("the UMP Option Delivery Period").

3. If Bombardier fails to issue a Purchase Order under this Article for fourteen (14) continuous months during the UMP Option Delivery Period, then the Subcontractor shall have the right to rescind this Option by written notice to Bombardier.

B. **Period to Exercise the Parts Option**

Bombardier may exercise the Option described in this Article by providing a written notice to the Subcontractor after the Effective Date and within one (1) year of the commencement of the UMP Option Delivery Period.

C. **Unscheduled Maintenance Parts Schedule**

1. The parts, the number of units and the unit prices are to be established as follows:

(a) In connection with developing the parts needed to support its Warranty Plan under Article 906, Par. K, the Subcontractor will develop a schedule of parts that will be required by the Authority to perform Unscheduled Maintenance and repairs on the Cab Simulator once the Cab Simulator is no longer under Warranty (The "UMP Schedule"). The UMP Schedule will also list the estimated number of parts required for the ensuing three (3) years and include the estimated lead time to deliver such parts and the proposed price under Subparagraph (b). The UMP Schedule shall be submitted to Bombardier for approval and shall be considered part of the approval of the Warranty Plan.

(b) Where the part is regularly sold to railroad operators and owners other than the Authority in the normal course of business by the Subcontractor, the price shall be based on an established price in effect at the time of the pricing of the parts. In other events, the price shall be determined in accordance with the estimates of the cost of manufacturing the parts calculated in accordance with the provisions of Article 402D. All disputes about the pricing of the parts shall be subject to the disputes resolution procedure of Article 803.

(c) During the UMP Option Delivery Period, each year after the initial approval or the UMP Schedule, the Subcontractor shall submit for approval a revised UMP Schedule in accordance with the terms of this Article.

(d) All parts ordered in accordance with the Unscheduled Maintenance Parts Option shall be manufactured in accordance with the relevant Design accepted by Bombardier and shall be subject to the appropriate warranty as provided in Article 906.

D. **Purchase Orders**

Once the Option is exercised, orders for Parts shall be made through Purchase Orders from Bombardier or the Authority. Each Purchase Order shall include requirements for dates of delivery of each item ordered that is consistent with the industry standard lead time for production of the item and be subject to the terms and conditions of the standard Purchase Order Agreement in Attachment 4.

*ARTICLE 205A* *RESERVED*



*ARTICLE 206A RESERVED*

*ARTICLE 207A RESERVED*

*ARTICLE 208A RESERVED*

*ARTICLE 209A RESERVED*

## CHAPTER 3 - PRICE AND PAYMENT

*ARTICLE 301 AMOUNT TO INCLUDE AND PRICE TO BE PAID*

A. The Subcontractor shall receive in full compensation for fulfilling all of its obligations under the Subcontract the prices set forth in this Chapter or as otherwise expressly provided in the Subcontract. Additional compensation to the Subcontractor or credits to Bombardier may be contained in Change Orders as provided in Chapter 4.

B. The total amounts payable for Cab Simulator- are set forth in the Attachment 3 Price Schedules.

C. In the event that Bombardier exercises the option for Unscheduled Maintenance Parts the prices to be paid to Subcontractor, are set forth in Article 204A.

*ARTICLE 302 RESERVED*

*ARTICLE 303 PAYMENTS TO SUBCONTRACTOR*

A. Base Cab Simulator Price

The Subcontractor shall submit to Bombardier an invoice for which a milestone payment was achieved. Subject to its right of withholding payments, Bombardier shall pay such invoice within thirty (30) days after its receipt.

B. Reserved

C. Unscheduled Maintenance Parts.

The Subcontractor shall submit to Bombardier an invoice with respect to Unscheduled Maintenance Parts when they are received at the Destination Point without defects or, if damaged, corrected to the satisfaction of Bombardier. The amount of such invoice shall be the Cab Simulator Price of the delivered multiplied by the number of items so accepted and received.



Subject to its right of withholding payments, Bombardier shall pay such invoice within thirty (30) days after its receipt.

D. Payments

Payments shall be made in accordance with the Purchase Order.

Notwithstanding the above provisions, however, any payments may be withheld if the Subcontractor is not proceeding with the Subcontract Work in accordance with this Subcontract and the Subcontractor shall have failed to make a good faith effort to remedy such deficiency. Such payments also may be withheld if Bombardier is authorized to withhold payments hereunder by any other provisions of this Subcontract and for all costs, damages, or expenses, for which under this Subcontract the Subcontractor is liable to Bombardier or the Authority.

No payment made by Bombardier shall operate as a waiver of any portion of this Subcontract, of any power herein reserved to Bombardier or of any right to damages provided herein or at law or in equity.

Bombardier and the Authority reserves the right to conduct an inspection or audit of any payment estimate and the final payment estimate to verify that the amount to be paid is in accordance with the provisions of this Subcontract. The applicable "Receipt of Invoice" date will be deemed extended ten (10) business days in the event Bombardier or the Authority elect to perform this function.

Notwithstanding anything to the contrary in this Subcontract, the payment period in paragraph A above will be tolled as set forth below, whenever the audit or inspection reveals a defect in delivered materials or services, or suspected improprieties of any kind, which might include, but is not limited to, a determination by Bombardier or the Authority that the Subcontractor is in breach of a material term of this Subcontract. In any such case, the date of " Receipt of Invoice " date shall be tolled to the date that acceptable goods or services are delivered or provided, or the date that the impropriety is resolved.

Payments shall be made by Bombardier to the Subcontractor at the address provided in the Purchase Order unless Bombardier is otherwise notified in writing by Subcontractor at least ten (10) days prior to the date on which payment is due.

Interest shall be payable in case of late payment by Bombardier at the annual rate of the Citibank, New York at that time.

To be considered a proper invoice, an invoice must be in form mutually agreed upon within thirty (30) days after the Subcontract Effective Date, be submitted in accordance with the requirements of this Chapter, and be accompanied by all required supporting documentation, as may be required by Bombardier.

Each invoice shall be accompanied by the following specific items, as applicable to the specific payment involved:

- The Subcontractor's invoices, if any, relating to time and materials pursuant to Chapter 4 of this Subcontract, must be accompanied by all affidavits, time records, staffing and other records, bills of sale and similar documents, as well as a statement with sufficient specificity which establishes the basis and validity of the payment requested.

- Where required by applicable federal, State or local law, Subcontractor's certification that he has complied with the minimum wage and other provisions and stipulations in accordance therewith.

- Any documentation generated by Bombardier, such as the Final Completion Certificate, will be issued in accordance with the terms of this Subcontract.

E. Nothing provided herein shall create any obligation on the part of the Authority to pay or see to the payment by Bombardier of any monies to the Subcontractor, nor create any relationship in contract or otherwise between the Subcontractor and the Authority, nor create any obligation on the part of Bombardier or the Authority to pay or to see to the payment by the Subcontractor of any monies to any Sub-subcontractor or Supplier, nor create any relationship in contract or otherwise between any Sub-subcontractor or Supplier and Bombardier or the Authority.

F. The Subcontractor shall be responsible for franchise fees and taxes levied against it and based on the net income of Subcontractor. The Authority is exempt from sales and compensating use taxes on all tangible personal property pursuant to Section 1275 of the Public Authorities Law, and the Subcontractor shall not include any charges representing such taxes on any invoices submitted under this Chapter.

G. All payments hereunder shall be deemed made upon mailing to the Subcontractor at its mailing address set forth in this Subcontract. Payment to the Subcontractor shall be made by wire transfer, if Subcontractor requests and accepted by Bombardier, in accordance with wire transfer payment procedures established by Bombardier.

H. After the first payment has been made, Bombardier at its sole discretion may require that the Subcontractor provide payment receipt acknowledgments from all Sub-subcontractors and Suppliers who have worked on or provided material for the Subcontract.

I. Invoices shall be submitted to the following address:

1101 Parent Street
St-Bruno (Québec)
J3V 6E6
Canada



 

*ARTICLE 304 SET OFFS, WITHHOLDING AND DEDUCTIONS*

A. Bombardier may set off, deduct, or withhold from any payment due the Subcontractor such sums as may be specifically allowed in the Subcontract or by applicable law including, without limitation, the following:

1. An amount of any claim by a third party, as provided in ARTICLE 502, WITHHOLDING MONEY DUE SUBCONTRACTOR TO MEET THIRD PARTY CLAIMS.

2. Any unpaid legally enforceable debt owed by the Subcontractor to Bombardier or the Authority.

3. Such sums as Bombardier determines may reasonably be necessary to ensure completion of Warranty Work or Open Items with respect to or, if the remedial work is performed by Bombardier or the Authority may deduct from any payment due the Subcontractor an amount equal to its costs incurred on account of the Subcontractor's failure to fully perform its warranty or other obligations.

B. Any withholding which is ultimately held to have been wrongful shall be paid to Subcontractor including interest at the annual prime rate of the Citibank, New York at that time.

C. The Contractor shall make best efforts to provide the Subcontractor with advance written notification of its intent to do so along with its reasons. Such advance notice will provide the Subcontractor the opportunity to resolve the identified problem(s).

D. Any such withholding or reduction of payments, shall in no way affect the Subcontractor's responsibility, including but not limited to its warranty obligations under the Subcontract.

*ARTICLE 305 PROGRESS PAYMENTS*

Payments shall be made in the following amounts upon attainment of the following milestones:

20% of the TCSAP as Down Payment at award of Subcontract;
10% of the TCSAP at PDR;
10% of the TCSAP at CDR;

30% of the TCSAP at FAT;
5% of the TCSAP at Completion and Installation;
15% of the TCSAP at SAT;
5% of the TCSAP at completion of Training;
5% of the TCSAP at the completion of all Subcontract obligations.

*ARTICLE 306 FINAL COMPLETION CERTIFICATION*



A. Whenever the Subcontractor shall have completely performed all Subcontract Work with respect to the Cab Simulator (excluding Warranty Work except as referenced elsewhere in this sentence), Bombardier shall so certify in writing in the form of a final completion certification (the "Final Completion Certification") which shall state, that the Cab Simulator has been Accepted under Article 207 and there are no Open Items or open warranty defects.

B. As a condition precedent to the issuance of such Final Completion Certification:

1. The Subcontractor shall submit to Bombardier a release of Bombardier and the Authority, in form approved by Bombardier, of all claims and liability to the Subcontractor for anything therefore done or furnished for, or in any way relating to the Subcontract Work, except those claims expressly deleted from the scope of said release.

2. The Subcontractor shall submit to Bombardier a statement in writing for each and all alleged claims of the Subcontractor against Bombardier or the Authority.

3. The Subcontractor shall furnish any further security required by the Subcontract in regard to Subcontractor's Warranty obligations.

C. Bombardier, in its sole discretion, may issue a Final Completion Certification, notwithstanding that there are Open Items or open warranty defects or the Warranty Period has not expired, in which event Bombardier, may deduct from the final payment, as security for performance, an amount equal to Bombardier's estimated cost to correct any Open Warranty Defects and/or Open Items.

*ARTICLE 307 NO ESTOPPEL*

Bombardier or the Authority shall not nor shall any department or officer of either be precluded or estopped by any return or certificate made or given by Bombardier or the Authority, or other officer, agent or appointee thereof under any provisions of this Subcontract from showing at any time, either before or after the final completion and acceptance of the Subcontract Work and payment thereof pursuant to any such return or certificate, the true and correct classification, amount, quality and character of the Subcontract Work done and material furnished by the Subcontractor or any other person under this Subcontract or the reasonable value of Subcontract Work done under **ARTICLE 401** of this Subcontract or from showing at any time that any such return or certificate is untrue and incorrect or improperly made in any particular or that the Subcontract Work and materials or any part thereof do not in fact conform to the requirements of this Subcontract; and Bombardier and the Authority shall not be precluded or estopped, notwithstanding any such return or certificate and payment in accordance herewith, from demanding and recovering from the Subcontractor such damages as they may sustain by reason of its failure to comply with this Subcontract.

*ARTICLE 308* *RESERVED*

*ARTICLE 309* *FINAL PAYMENT TO ACT AS RELEASE*

The acceptance by the Subcontractor, or any person claiming under the Subcontractor, of the final payment for the Subcontract Work as per this Agreement, whether such payment be made pursuant to any judgment or order of any court or otherwise, shall be and shall operate as a release to Bombardier and the Authority from all claim and liability to the Subcontractor for anything theretofore done or furnished for, or relating to, the Subcontract Work or for any prior act, neglect, fault or default of Bombardier, the Authority or of any person relating to or affecting the Subcontract work, except only the claims against Bombardier submitted in accordance with **ARTICLE 306 (B)(1) and (2).**

## CHAPTER 4 - CHANGES TO THE SUBCONTRACT

*ARTICLE 401* *CHANGE ORDERS*

A. Oral waivers, modifications or changes are not permitted. No change in this Subcontract shall be made unless Bombardier gives its prior written approval therefore. For purposes of this Article, "Change Order" or "Extra Work" means an order issued by Bombardier for work within the general scope of this Subcontract that adds to or differs from the Subcontract Work then required under this Subcontract, or for the deletion of any Subcontract Work then required under this Subcontract.

B. Subcontractor shall be liable for all costs resulting from, and/or for satisfactorily correcting, any specification change not properly ordered by written modification to this Subcontract and signed by Bombardier and under no circumstances shall the Subcontractor proceed with any work that differs from Subcontract Work then required under this Subcontract. If the Subcontractor performs any such work, it shall be responsible for all costs related thereto and shall assume all risks associated therewith.

C. Bombardier reserves the right to issue Change Orders pursuant to this Article in its sole discretion.

1. Bombardier shall initiate the Change Order procedure by a notice to the Subcontractor setting forth the proposed Change Order (hereinafter referred to as "Notice of Proposed Change Order").

2. In the absence of a duly issued Change Order, if Bombardier shall direct, order or require any work, whether orally or in writing, which the Subcontractor deems to be the subject of a Change Order, the Subcontractor shall nevertheless comply therewith, but shall as expeditiously as possible, and in no event to more than fifteen (15) days thereof give written notice to Bombardier ("Request for a Change Order") stating why he deems such to be the



subject of a Change Order and provide the details required for a Proposal on Change Order described in 401D. In such cases, the Subcontractor shall continue to perform the work and resolution of the terms and conditions of such work shall proceed pursuant to the procedures set forth in ARTICLE 402.

3. The failure of the Subcontractor in timely fashion to serve the notice described in ARTICLE 401.C.2., shall be deemed to be a conclusive and binding determination on its part that the direction, order or requirement of Bombardier does not involve a Change Order and shall be deemed to be a waiver by the Subcontractor of all claims for additional compensation or damages by reason thereof.

4. The provisions of the Subcontract Documents relating generally to Subcontract Work and its performance shall apply without exception to a Change Order, except as may be otherwise provided by written agreement between the Subcontractor and Bombardier.

D. <u>Proposal on Change Order</u>

1. Should any Notice of Proposed Change Order require changes in other provisions of this Subcontract, including, but not limited to, Delivery Schedule, an increase or decrease in the cost of, or in the time required for the performance of any part of the Subcontract Work whether changed or not changed by such order, this Subcontract shall be modified in writing accordingly.

2. As expeditiously as possible, and in no event more than fifteen (15) days from the Subcontractor's receipt of a Notice of Proposed Change Order, the Subcontractor shall provide to Bombardier a detailed Proposal on Change Order (PCO) which includes adjustments to any items in the Price Schedule of Attachment 3 (including the cost elements in accordance with Article 402), to the Delivery Schedule, or to any other provisions of this Subcontract necessary to accomplish the change. Based upon a cost analysis performed by Bombardier, this PCO shall be accepted or modified by negotiations between the Subcontractor and Bombardier, including agreement on a fixed and/or not-to-exceed price; as a result of which a detailed Change Order issued by Bombardier shall be executed in writing by both parties.

3. Disagreements that cannot be resolved through negotiations shall be resolved in accordance with Chapter 8, provided, however, that Bombardier may nevertheless and before any resolution thereof, issue a directive to proceed in accordance with the Change Order ("Extra Work Directive") as issued, whereupon the Subcontractor shall be obligated to proceed with the work thereunder, and further provided, however, that the resolution thereof with respect to the amount of and basis for payment shall be in accordance with ARTICLE 402.

4. In the event any Change Order is issued by Bombardier hereunder as a result of a change order issued by the Authority under the Master Contract, the Subcontractor shall not be entitled to a price adjustment in excess of any price adjustment awarded to Bombardier

A:\T&C_IITRI_final.doc





pursuant to the Master Contract and such price adjustment shall only become due and payable by Bombardier at the time, and to the extent, that Bombardier's corresponding claim to the Authority for an adjustment to the price payable to Bombardier has been finally resolved and has been satisfied by Authority.

*ARTICLE 402 EXTRA WORK DIRECTIVE*

A. If the parties fail to reach agreement with respect to the Notice of Proposed Change Order, or a Request for a Change Order, or in case of exigent circumstances, Bombardier may nevertheless issue a directive to do the proposed extra work ("Extra Work Directive"); however, in the event that no such Extra Work Directive is issued, the Subcontractor shall be permitted to stop the performance of such proposed Extra Work.

1. Immediately upon receipt, the Subcontractor shall be obligated to proceed with the Work set forth in an Extra Work Directive.

2. Where an Extra Work Directive is issued because of a failure of the parties to reach agreement pursuant to ARTICLES 401.C. and 401.D., any modifications to the proposed work set forth in the Notice of Proposed Change Order must be previously reflected in a revised Notice of Proposed Change Order submitted in accordance with ARTICLE 401.

B. Disputes Regarding Change Orders

1. Except as provided in ARTICLE 402.C., the Subcontractor shall be entitled to initiate a Dispute pursuant to Chapter 8 by furnishing a written statement to Bombardier within seven (7) days of the Extra Work Directive, based upon any aspect of such Extra Work which the Subcontractor disputes; provided, however, that such dispute must (i) relate to specific matters raised or specific matters reserved by the Subcontractor in its PCO, or in its Request for a Change Order and (ii)have not been resolved prior to the issuance of the Extra Work Directive. The written statement must set forth all details of Subcontractor's claims including the manner that the disputed item was specified in the Subcontractor's proposal.

2. During the pendency of any dispute hereunder, the Subcontractor must proceed with work as set forth in the Extra Work Directive unless otherwise advised by Bombardier's written instructions. In the event that there is a dispute as to price, the Subcontractor will be paid in accordance with ARTICLE 402.C., which payments will be in full satisfaction of Subcontractor's claim for any additional compensation or payment.

C. In the event Bombardier and Subcontractor have been unable to agree on a negotiated price and the Subcontractor has proceeded with the work thereunder, or in the event that a dispute as to whether an order to perform work constitutes a change order is resolved in the Subcontractor's favor, the Subcontractor shall be paid for the Extra Work on the basis of Subcontractor's costs pursuant to ARTICLE 402.D.

D. To support its claim under an Extra Work Directive, the Subcontractor shall submit an Extra Work Directive claim which shall set forth all of the elements of a PCO as specified in ARTICLE 401.D.1., including an itemized breakdown indicating all increases or decreases in the cost of the Subcontract Work and shall include:

1. The sum of plant, field and engineering labor hours performed by the Subcontractor's, Sub-subcontractor's, or Supplier's own employees, and deemed by Bombardier to be reasonably required for such Extra Work, multiplied by a fixed hourly rate for each such class of labor, which hourly rate shall include the cost of labor, F.I.C.A., unemployment insurance, Worker's Compensation insurance, fringe benefits required by agreement or custom, overhead, administrative expenses, and an allowance for profit of eight percent (8%).

2. The actual reasonable cost of materials plus material handling costs or travel plus general and administrative expenses and an allowance for profit of eight percent (8%). Material handling costs may include all actual indirect costs, including general and administrative expense, allocated to direct materials in accordance with the Subcontractor's usual accounting practices, as hereinafter limited. Such material handling costs shall include only costs clearly excluded from the labor hour rate.

3. The Subcontractor represents that its shop labor and engineering rates and the rates charged by Sub-subcontractors and Suppliers shall be equal to or better than rates charged to other transit and rail transportation properties.

4. Upon conclusion of the work, Bombardier shall approve payment of all costs deemed fair and reasonable. Any dispute with respect to the amount to be paid shall be resolved in accordance with **CHAPTER 8.**

5. Where an Extra Work Directive was issued because of a failure of the parties to reach agreement on price pursuant to ARTICLE 401.D., Bombardier at any time during the progress of the Extra Work may reopen negotiations to establish a fixed and/or not-to-exceed price for the work or may accept the most recent fixed and/or not-to-exceed price offered by the Subcontractor prior to the parties having reached an impasse on price. The price established pursuant to this subparagraph shall be deemed to be a conclusive and binding determination and shall constitute a waiver by the Subcontractor of all claims for additional compensation or damages by reason thereof.

E The Subcontractor shall be entitled in any instance to request consideration by Bombardier of the issuance of a Change Order and initiation of the Change Order procedure described above.

F. In case any work or materials shall be required to be done or furnished under the provisions of this Article, the Subcontractor shall furnish to Bombardier such documentation as Bombardier may require to support all costs of the Change Order Work or Extra Work. Upon the request of Bombardier, the Subcontractor shall allow audit, in accordance with ARTICLE 1004 of this





Agreement, books, vouchers, collective bargaining labor agreements, records or other documents showing the actual cost for labor and materials. Such documents shall not be binding on Bombardier.

G. If any part of the work is proposed to be reduced or eliminated, a reasonable reduction in the contract price shall be computed in the same manner as increases for extra work under the provision of this Article, except that profit shall not be included if the overall impact of all Change Orders results in a reduction in the aggregate TCSAP.

H. In the event any Extra Work Directive is issued by Bombardier hereunder as a result of an extra work directive issued by the Authority under the Master Contract, the Subcontractor shall not be entitled to a price adjustment in excess of any price adjustment awarded to Bombardier pursuant to ARTICLE 402 of the Master Contract and such price adjustment shall only become due and payable by Bombardier at the time, and to the extent, that Bombardier's corresponding claim to the Authority for an adjustment to the price payable to Bombardier has been finally resolved and has been satisfied by Authority.

*ARTICLE 403* *NEW STATUTES AND REGULATIONS AFFECTING THE SUBCONTRACT WORK*

In the event that a statute or regulation is enacted subsequent to the Effective Date and is determined by Bombardier to be applicable to the Subcontract Work, any change to the Subcontract Work required for compliance with such statute or regulation shall be deemed a Change Order subject to the provisions of this CHAPTER 4.

## CHAPTER 5 - SECURITY FOR THE PERFORMANCE OF SUBCONTRACT WORK

*ARTICLE 501* *PERFORMANCE BOND*

A. Performance Bond

The Subcontractor shall procure and deliver to Bombardier a Performance Bond, in the form attached hereto as Attachment 5 issued by a bank acceptable to Bombardier and doing business in the United States, in an amount equal to fifty percent (50%) of the TCSAP, or in any lesser amount as determined by Bombardier at its sole option. The Subcontractor shall deliver such Performance Bond to Bombardier within thirty (30) days of the Effective Date. The cost of such Performance Bond shall be paid by Bombardier. Failure by the Subcontractor to provide a satisfactory Performance Bond shall constitute a material breach of this Subcontract and shall be a sufficient reason for termination of this Subcontract by Bombardier in accordance with Article 701.

The Performance Bond shall be effective at the initial amount from the Effective Date until expiration of the General Warranty Period of the Cab Simulator.



B.   In case a surety shall become insolvent, its license is revoked or suspended, or in the case of a surety approved on the basis that it is listed as an approved Federal surety, that such Federal approval is revoked or suspended, the Subcontractor, within ten (10) days after notice by Bombardier, shall substitute other and sufficient surety or sureties acceptable to Bombardier. If the Subcontractor fails to do so, Bombardier may elect to deem the Subcontractor to be in default.

*ARTICLE 502     WITHHOLDING MONEY DUE SUBCONTRACTOR TO MEET CLAIMS*

A.   If at any time a claim, lien or judgment shall be made by any person or corporation against the Subcontractor, the MTA, Bombardier, the Authority, the State or the Federal Government, including claims by Bombardier or the Authority against the Subcontractor, for which Subcontractor is liable under this Subcontract or, to matters pertaining to the Subcontract Work, the amount of such claim or so much thereof as may be deemed reasonable shall be retained by Bombardier, in addition to the other sums herein authorized by the Subcontract to be so retained, out of any monies then due or thereafter becoming due to the Subcontractor hereunder as security for the payment of such claim. If the liability of any such party on such claim or claims shall have been finally adjudicated by a judgment of a court of competent jurisdiction or such claim or claims shall have been admitted by the Subcontractor to be valid then the claim may be paid from the amount so retained hereunder, credited against the payments due Subcontractor, and the balance, if any, paid to the Subcontractor.

B.   Should any such claim remain unsatisfied at the time the final payment is due the Subcontractor, Bombardier shall have the right to retain out of said final payment a sum in its judgment sufficient to protect the State, Federal Government, MTA, the Authority and Bombardier in regard to all unsatisfied claims. In lieu of the foregoing, Bombardier may require other security.

C.   In case the amount thus retained should be insufficient to pay the amount adjudicated to be due upon such claim, the Subcontractor shall pay the amount of the deficiency to Bombardier. Upon the failure of the Subcontractor to do so, Bombardier may sue for and recover from the Subcontractor the amount or balance as a debt from the Subcontractor.

D.   Notwithstanding anything in this Article to the contrary, in the event of a claim by persons or corporations other than the Authority or Bombardier, Bombardier shall not withhold money due the Subcontractor provided Bombardier receives adequate written assurance from the Subcontractor's insurance carrier or bank required hereunder that the insurer or bank will assume all responsibility in connection with the claim including defending the Subcontractor, MTA, the Authority or Bombardier. Bombardier shall have sole discretion to determine the adequacy of the assurance furnished.

*ARTICLE 503     USE OF MONIES WITHHELD*

 

A. Deposits, retainage or other monies withheld, shall be security for the faithful performance of the Subcontract by the Subcontractor. In case any default causes loss, damage or expense to Bombardier then Bombardier may apply the amount necessary to restore such loss, damage or expense, out of the said deposit, retainage or other monies.

B. The Subcontractor shall be entitled to receive the securities withheld (to the extent not applied as above provided), or monies representing the amount due, on the date when the amount which the securities are in substitution for is due to be paid in accordance with Chapter 3 and this Chapter 5.

*ARTICLE 504 RESERVED*

**CHAPTER 6 - SUBCONTRACTOR'S LIABILITY, INDEMNIFICATION, RISK OF LOSS**

*ARTICLE 601 INDEMNIFIED PARTIES*

The term Indemnified Parties whenever referred to in this Subcontract shall consist of the following parties including their respective officers, employees and agents:

1. The Long Island Rail Road Company;
2. Metropolitan Transportation Authority;
3. State of New York;
4. American Premier Underwriters, Inc.;
5. Bombardier Inc.;
6. Bombardier Corporation;
7. Bombardier Transit Corporation;
8. Bombardier Mass Transit Corporation;
9. Bombardier Holdings (U.S.A.) Inc.

*ARTICLE 602 RESPONSIBILITY FOR INJURIES TO PERSONS AND PROPERTY*

A. The Subcontractor shall be solely responsible for (i) all injuries (including death) to persons, including, but not limited to, employees of the Subcontractor and Sub-subcontractors and Indemnified Parties and (ii) damage to property, including, but not limited to property of the Indemnified Parties, the Subcontractor or its Sub-subcontractors. The liability hereunder shall be limited to such injuries or damage arising out of or occurring on account of, or in connection with, the performance of the Subcontract Work, whether or not the occurrence giving rise to such injury or such damage happens on property of the Authority, Bombardier or any of its affiliates or subsidiaries, but shall exclude injuries to such persons or damage to such property to the extent caused by the negligence of the Indemnified Parties.

B. The Subcontractor's liability hereunder includes any injury (including death) or damage to property related to the performance of, including the failure to perform the Subcontract Work.

 

*ARTICLE 603* *INDEMNIFICATION*

A. To the extent permitted by law, the Subcontractor shall indemnify and save harmless the Indemnified Parties from loss and liability upon any and all claims on account of such injuries to persons or such damages to property, arising from Subcontractor or in connection with the Subcontract Work, irrespective of the actual cause of the accident, irrespective of whether it shall have been due in part to negligence of the Subcontractor or his Sub-subcontractors or negligence of the Indemnified Parties or of any other persons, but excepting bodily injuries and property damages to the extent caused by the negligence of the Indemnified Parties, including losses and liabilities caused by Bombardier's or the Authority's modification of the Equipment without the knowledge and concurrence of Subcontractor, the overhaul/remanufacture of the Subcontract Work by Bombardier or the Authority through their own personnel or their Agents other than Subcontractor, or Bombardier's or the Authority's failure to maintain or the Authority's neglect of the Equipment delivered.

B. The term "loss and liability", as used herein, shall be deemed to include, but not be limited to, liability for the reimbursement for payments of workers' compensation under the Workers' Compensation Law of the State of New York, or liability for payments made under the Federal Employees' Liability Act or similar statutes.

C. Except as otherwise provided in Paragraph A of Article 603 above, the liability of the Subcontractor under this Article is absolute and is not dependent upon any question of negligence on his part or on the part of its agents, officers or employees. The approval of Bombardier or the Authority of the methods of doing the Subcontract Work or the failure of Bombardier or the Authority to call attention to improper or inadequate methods or to require a change in methods or to direct the Subcontractor to take any particular precautions or to refrain from doing any particular thing shall not excuse the Subcontractor in case of any such injury to person or damage to property.

D. In case any damage shall occur to any part of the Authority or Bombardier on account of the Subcontract Work, and the Subcontractor is responsible therefore, Bombardier or the Authority shall have the right to cause such damage to be repaired and to charge the expense of such repairs to the Subcontractor. In the event that such Subcontract Work is performed by Bombardier or the Authority, then Bombardier or the Authority, as applicable, shall deduct from any monies due or to become due to the Subcontractor the amount of such expense that may be incurred in repairing any of such damage from any monies due or to become due to the Subcontractor under this Subcontract or any other agreement between the Subcontractor and the Authority or Bombardier.

E. The provisions of this Chapter shall apply to Sub-subcontractors and Suppliers and their officers, agents and employees in all respects as if they were employees of the Subcontractor. The Subcontractor shall not be discharged from any of his obligations and liabilities under this Chapter by reason of lower tier subcontracting, but shall be liable for all acts and negligence of



Sub-subcontractors and Suppliers, and their officers, agents and employees as if they were employees of the Subcontractor.

F. The right to indemnification hereunder shall in no way be diminished, waived or discharged by Bombardier's or the Authority's recourse to exercise of any other remedy provided for by contract or by law.

*ARTICLE 604 RISK OF LOSS TO THE SUBCONTRACT WORK*

A. The Subcontractor assumes all risk of loss or damage to the Cab Simulator or any parts or equipment which is part of the Subcontract Work to the fullest extent permitted by applicable law, irrespective of whether such loss or damage arises from acts or omissions (whether negligent or not) of the Authority, the Subcontractor, Bombardier or third persons, or from any cause whatsoever, excepting loss or damage arising solely from negligent or intentionally tortuous acts of the Authority or Bombardier; provided such loss or damage occurs prior to delivery, except that risk of loss or damage to Open Items and Warranty Work shall be borne by the Subcontractor until the related work is completed and further except that if the failure to complete the Open Items and Warranty Work causes damage to the Subcontract Work or other parts of the Authority's property, the Subcontractor shall be responsible for all resulting loss or damage.

B. When risk of loss for the Cab Simulator terminates, Bombardier shall thereafter assume responsibility for the care, protection and ordinary upkeep.

C. With respect to damage to the Subcontract Work, Subcontractor's obligation hereunder is to immediately repair, replace and make good such loss or damage so as to restore the Subcontract Work to the same character and condition as before the loss or damage in accordance with the Subcontract Documents without cost to Bombardier.

*ARTICLE 605 REQUIRED INSURANCE*

A. The Subcontractor shall procure, at its sole cost and expense, and shall maintain in force at all times from the Effective Date until the end of the Warranty Period for the Cab Simulator, policies of insurance as herein below set forth, written by companies approved by Bombardier and shall deliver to Bombardier evidence of such policies. These policies must: (i) be written in accordance with the requirements of subparagraphs 1-4 below, as applicable; (ii) be endorsed in form acceptable to Bombardier to include a provision that the policy will not be canceled, materially changed, or not renewed without at least 30 days prior written notice to Bombardier, return receipt requested; and (iii) state or be endorsed to provide that the coverage afforded under the policies shall apply on a primary and not on an excess or contributing basis with any policies which may be available to Bombardier. Policies written on a " claims made " basis are not acceptable. At least two weeks prior to the expiration of the policies evidence of renewal or





replacement policies of insurance, with terms and limits no less favorable as the expiring policies, shall be delivered to Bombardier.

1.    A Commercial General Liability insurance policy (I.S.O. Form CG 00 01 196 or equivalent approved by Bombardier) in the Subcontractor's name with LIRR, the Metropolitan Transportation Authority (MTA), and Bombardier Inc. named as Additional Insured (I.S.O. Form CG 20 10 397 or equivalent approved by Bombardier) with limits of liability in the amount of $1,000,000 each occurrence on a combined single limit basis for injuries to persons (including death) and damage to property.  Aggregate limits of liability must be approved by Bombardier.

      Such policies shall (i) include broad form contractual liability coverage for liability assumed by the Subcontractor under the Subcontract (ii) include "XCU" coverage (Explosion, Collapse, and Underground Hazards), Products Completed Operations Coverage, Independent Contractors Coverage, and (iii) shall not contain any exclusion unacceptable to Bombardier.

2.    Automobile and Truck Liability Insurance Policy (I.S.O. Form CA 00 01 0187 or equivalent approved by Bombardier) in the Subcontractor's name with LIRR, the Metropolitan Transportation Authority (MTA), and Bombardier Inc., named as Additional Insured (I.S.O. Form CG 20 10 11 85 or equivalent approved by Bombardier) with limits of liability in the amount of $1,000,000 each occurrence on a combined single limit basis for claims for bodily injuries (including death) to persons and for damage to property arising out of the ownership, maintenance or use of any owned, hired or non owned motor vehicle brought on the job site by the Subcontractor, its employees, or Sub-subcontractor and its employees. The policy shall be intended to include employees of the named insured acting in the scope of their employment.

3.    Worker's Compensation Self Insurance (including Employer's Liability Insurance) meeting the statutory limits of New York State.

4.    Physical Damage, covering all Equipment during all periods when the Subcontractor has the risk of loss hereunder, including when such Equipment are on property owned by, or under the control of Bombardier or the LIRR and/or MTA.  The Policy must provide coverage on all-risk basis, in an amount sufficient to repair or replace said Equipment, and must continue until Bombardier conditionally, or finally accepts the Equipment and must name Bombardier, the Authority, MTA and other indemnified parties listed in Article 601 above as loss payees as their respective interests may appear.

5.    Any additional insurance policies necessary to obtain required permits or otherwise comply with applicable law, ordinances or regulations regarding the performance of the Subcontract Work.



 

B. Within 30 days from the Effective Date, certificates of Insurance shall be provided to show evidence of policies 1, 2, 3 or 4. If a Certificate of Insurance is submitted it must: (1.) indicate the I.S.O. Form used by the carrier; (2.) be signed by an authorized representative of the insurance carrier; (3.) disclose any deductible, self-insured retention, aggregate limit or any exclusions to the policy that materially change the coverage; (4.) indicate that Bombardier, the Authority and MTA are Additional Insureds on all policies (except Worker's Compensation); (5.) reference the Subcontract by number on the face of the certificate; and (6.) expressly reference the inclusion of all required endorsements. If requested by Bombardier, the Subcontractor must furnish within 30 days of a request proof that the person signing the Certificate is authorized by the insurance carrier.

C. If, at any time during the period of this Subcontract, insurance as required is not in effect, or proof thereof is not provided to Bombardier, Bombardier shall have the options to: (i) direct the Subcontractor to suspend work with no additional cost or extension of time due on account thereof; (ii) obtain the required insurance at Subcontractor's expense providing Bombardier with coverage immediately; or (iii) treat such failure as an Event of Default.

D. The Subcontractor shall immediately file with Bombardier a notice of any occurrence likely to result in a claim against Bombardier or the Authority, and shall also file with Bombardier detailed sworn proof of interest and loss within sixty (60) days from the date of loss.

E. If the transport or delivery of Equipment to the Delivery Point involves rail, motor vehicle or marine exposures, the Subcontractor shall certify to Bombardier in writing prior to any such pickup or delivery that appropriate insurance coverage have been obtained and will be maintained by it or its Sub-subcontractor/Suppliers, as applicable.

*ARTICLE 606 EXCLUSION OF CERTAIN DAMAGES*

In no event shall the Subcontractor be liable to Bombardier or the Authority for liability for consequential damages for loss of investment, profit, revenue, return, use, or for business interruption, or for any substantially similar loss, resulting from, or arising out of, the performance of the Subcontract Work or breach of the Subcontract, including but not limited to such damages, related to any breach of warranty hereunder, under reserve that Bombardier benefits from such an exemption under the Master Contract in connection therewith and except to the extent that:

A. Any such damages are recoverable under policies of insurance required to be carried by the Subcontractor hereunder;

B. Any such damages arise out of, or are based upon claims of third parties;

C. Any such damages are expressly available to Bombardier under the Subcontract.





*ARTICLE 607 CAP ON SUBCONTRACTOR'S LIABILITY*

In no event shall the liability incurred by the Subcontractor to Bombardier in connection with any and all contractual remedies provided to Bombardier hereunder exceed the TCSAP (including the price for the Cab Simulator, including Change Orders, and including the price of Apparatus and other items procured by the Railroad hereunder); provided, however, that such limitation on liability shall in no event include damages payable or liability incurred as a result of third-party claims or any damages recoverable under policies of insurance required to be carried by the Subcontractor hereunder.

## CHAPTER 7 - SUBCONTRACT TERMINATION

*ARTICLE 701 TERMINATION FOR DEFAULT*

Without limiting any other rights of Bombardier hereunder, if in Bombardier's opinion, the Subcontractor shall fail to begin to render the Work or if the Work to be supplied under the Agreement is abandoned by the Subcontractor; or if the performance of this Agreement is unnecessarily or unreasonably delayed by the Subcontractor or, if the Subcontractor is violating any material term of the Agreement, or is not executing the same in good faith or in accordance with the terms thereof; or if the Subcontractor has abandoned the Subcontract Work; or if the Subcontractor shall become insolvent or be declared bankrupt, or shall commit any act of bankruptcy or insolvency; or if Subcontractor has failed to obtain an approval required by the Subcontract, Bombardier may give notice in writing to the Subcontractor of such delay, neglect or default, specifying the same, and, if the Subcontractor shall fail to cure any of the foregoing within a period of three (3) Days after such notice, or if it is not possible to cure within such a time period fail to take reasonable steps to cure, then, Bombardier, shall have full power and authority to declare the Subcontractor to be in default, and Bombardier may thereupon terminate in whole or in part, for default this Agreement.

In such event, the Subcontractor shall discontinue all the Work or any part thereof under this Agreement. Bombardier shall therefore have the right to contract for the completion of the Work at the expense and risk of the Subcontractor, and to charge the expenses of said Work and any other costs incurred by Bombardier in relation with the termination to the Subcontractor. The expense so charged may be deducted and paid by Bombardier out of such monies as may be due or may at any time thereafter become due to the Subcontractor under and by virtue of the Agreement.

The Subcontractor shall transfer title to Bombardier and deliver in the manner, at the times, and to the extent, if any, directed by Bombardier the fabricated or unfabricated parts, Work in process, completed Work, supplies, tools, and Material produced as part of, or acquired in connection with the performance of, the Work terminated, and the completed or partially completed plans, drawings, information, and other property which, if the Agreement had been completed would have been used or furnished to Bombardier.



If, after termination of the Agreement under the provisions of this Section, it is determined subsequently for any reason whatsoever that the Subcontractor was not in default, or that the termination was improper unwarranted or wrongful or that the default was excusable under the Agreement, the rights and obligations of the parties shall be the same as if the Agreement had been terminated pursuant to Article 210.

A termination for default shall not operate to release either party from obligations that have accrued prior to termination.

Subcontractor shall be paid for all Work satisfactorily completed in accordance with the Subcontract through the effective date of termination.

*ARTICLE 702* *RESERVED*

*ARTICLE 703* *RESERVED*

*ARTICLE 704* *THE AUTHORITY AND BOMBARDIER MAY AVAIL THEMSELVES OF ALL REMEDIES*

The Authority and Bombardier and Subcontractor may avail themselves of each and every remedy herein specifically given to them or now or hereafter existing at law or in equity or by statute, and each and every such remedy shall be in addition to every other remedy so specifically given or otherwise so existing and may be exercised from time to time and as often and in such order as may be deemed expedient by the Authority and Bombardier, and the exercise, or the beginning of the exercise, of one remedy shall not be deemed to be a waiver of the right to exercise, at the same time or thereafter, any other remedy.

*ARTICLE 705* *DISPOSITION OF THE CAB SIMULATOR AFTER TERMINATION*

Following termination under this Chapter or under Termination For Convenience, the Subcontractor shall forthwith carry out any orders or directions by Bombardier with respect to the disposition of the Cab Simulator or other Equipment in the possession or under the custody or control of the Subcontractor. This provision shall survive any such termination.

CHAPTER 8 - AUTHORITY OF BOMBARDIER, DISPUTES AND CLAIMS

*ARTICLE 801* *AUTHORITY OF BOMBARDIER*

A. The Subcontractor hereby authorizes Bombardier to determine in the first instance all questions of any nature whatsoever arising out of, under, or in connection with, or in any way related to or on account of, this Subcontract including without limitation: questions as to the value, acceptability and fitness of the Subcontract Work; questions as to either party's fulfillment of its obligations



under the Subcontract; questions as to the interpretation of the TECHNICAL SPECIFICATION, TECHNICAL DESCRIPTION and Contract or Subcontract Drawings; and claims for damages, compensation and losses.

B. Bombardier may give orders to do work which it determines to be necessary for Subcontractor to fulfill the Subcontractor's obligations under the Subcontract. Bombardier may also order the Subcontractor to correct any unsafe condition which shall arise in performance of the Subcontract Work.

C. Bombardier will promptly provide appropriate explanations and reasons for its determinations and orders hereunder, if requested by the Subcontractor. Bombardier shall exercise its authority under this Article in a reasonable manner given the circumstances and exigencies then prevailing.

D. The Subcontractor shall be bound by all such determinations or orders and shall promptly obey and follow every order of Bombardier, including the withdrawal or modification of any previous order and regardless of whether the Subcontractor agrees with Bombardier's determination or order. Notwithstanding the foregoing Subcontractor shall have the right to avail itself of procedures under ARTICLE 803 to dispute any such determination or order. Orders shall be in writing unless not practicable, in which event any oral order must be confirmed in writing by Bombardier as soon thereafter as practicable.

*ARTICLE 802* *RESERVED*

*ARTICLE 803* *DISPUTES RESOLUTION PROCEDURE*

A. The provisions of this Article shall constitute the Subcontractor's sole means for challenging any determination, order or other action of Bombardier pursuant to ARTICLE 801 or 802, or otherwise asserting against Bombardier any claim of whatever nature arising under, or in any way relating to, this Subcontract (any such challenge or assertion by the Subcontractor shall be herein referred to as a "Dispute"). These dispute resolution procedures shall be the parties sole remedy in connection with any dispute. Exhaustion of these dispute resolution procedures including the judicial review set forth in ARTICLE 805 shall be the Subcontractor's sole remedy in connection with any Dispute, except for "Other Disputes," defined below, which do not require submission or are not on consent submitted to an Arbiter.

B. The parties to this Subcontract hereby authorize and agree to the resolution of all Disputes arising out of, under, or in connection with, the Subcontract in accordance with the following and pursuant to the procedures set forth herein:

1. With respect to any Technical Dispute solely between the Subcontractor and Bombardier, which relates in whole or primary part to technical issue(s) under the Subcontract, including, without limitation, determinations as to the acceptability or fitness of any work, the meaning or interpretation of the TECHNICAL SPECIFICATION, TECHNICAL



DESCRIPTION, Contract Drawings or Subcontract Drawings, the question of whether Disputed Work falls within the scope of the TECHNICAL SPECIFICATION and/or TECHNICAL DESCRIPTION, the acceptability of any proposed substitutions, modifications or other submission under the Subcontract, the disapproval of proposed Sub-subcontractors or Suppliers (to the extent such disapproval is related to technical issues), the question of whether Final Completion has been achieved, or the nature and extent of any remaining work or Open Items, the parties hereby authorize an independent Arbiter appointed upon agreement of both Parties (hereinafter the "Arbiter"), acting personally, to render a final and binding decision. A Party may within ten (10) days of the issuance of Arbiter's decision appeal to a Contractual Dispute Resolution Board (as defined below) in the State of New York, in accordance with the relevant provisions contained in this Article 803. If no such appeal is commenced within the ten (10) day delay, Arbiter's decision shall be final and binding on the parties. Notwithstanding the filing of an appeal and until the appeal decision is rendered, Arbiter's decision shall be treated as final and binding by the parties and the parties shall conform to the decision of the Arbiter. Technical Disputes shall not include disputes relating to determinations of whether Disputed Work constitutes Change Order work, determinations of Excusable Delay; or alleged violations of the License granted to the Authority pursuant to the License Agreement, or matters of infringement of patents, trademarks, copyrights or trade secrets, all of which are deemed "Other Disputes," subject to the provisions of Subparagraph (2) hereof.

2. With respect to "Other Disputes" defined as any Dispute other than those specified in Subparagraphs (1) above, solely between the Subcontractor and Bombardier, as determined in the sole discretion of Bombardier, the parties agree as follows:

   (i). "Other Disputes" shall be finally settled in New York by means of a Contractual Dispute Resolution Board (the "CDRB").

   (ii) The CDRB shall consist of three (3) members, one member to be selected by Bombardier and one member to be selected by the Subcontractor. The third member, to serve as the Chairman of the CDRB, will be selected by the CDRB representatives selected by Bombardier and the Subcontractor. Each party shall bear the fees and expenses of its own representative and the parties shall share equally any fees and expenses of the Chairman and any other costs associated with actions and activities of the CDRB.

3. All Disputes shall be initiated through a written submission by either party (such submission to be hereinafter referred to as the "Dispute Notice"), to the other party, within the time specified in the Subcontract or, if no time is specified, within ten (10) days of the determination which is the subject of the Dispute.

4. If such Dispute constitutes a Technical Dispute, then within twenty (20) days after the submission of such Dispute Notice, the party initiating the Dispute must provide the Arbiter with all evidence and other pertinent information in support of the party's position and/or





claim. Within twenty (20) days from the date of the Dispute Notice, the party against whom the Dispute Notice was filed shall submit any and all materials which it deems pertinent to the Arbiter. The Arbiter's ability to render and the effect of a decision hereunder shall not be impaired or waived by any negotiations or settlement offers in connection with the matter presented, whether or not the Arbiter participated therein, or by any prior decision of others, or by any termination or cancellation of this Subcontract. The decision of the Arbiter shall be final and binding on both parties.

5.   Upon submission of a Dispute Notice regarding "Other Disputes" as provided for above, within ten (10) working days, each party shall select its representative for the CDRB, and within twenty (20) working days, the representatives shall select a Chairman. If the representatives are unable to agree on the selection of a Chairman, then either party may petition the commercial section of the American Arbitration Association to appoint an arbitrator as Chairman. Upon selection, the Chairman shall contact the parties to arrange for a hearing, at which time the parties will have an opportunity to present their respective positions on the merits of the disagreement before the CDRB. The procedures to be followed by the parties at the hearing shall be as determined by the CDRB. In the event of a disagreement among the members of the CDRB, a majority of the members shall govern with respect to such matters. Within thirty (30) days after the CDRB has convened to hear the parties' positions on the merits of the dispute and received all materials and arguments, the CDRB shall issue its ruling on the matter. The decision of the CDRB shall be final and binding on both parties.

6.   Notwithstanding anything to the contrary contained in ARTICLE 805 hereof, any determination of the Arbiter or the CDRB pursuant to this Article shall be absolute and conclusive upon both parties and subject to no further review of any nature, whether in the form of an Article 78 of the New York Civil Practice Law and Rules proceeding or otherwise.

7.   In the event that a party commences an action pursuant to Subparagraph 5 and the party against whom the action is commenced asserts that such dispute is properly within the domain of the Arbiter, Bombardier and the Subcontractor agree to stay the action pending submission of the jurisdictional question to the CDRB in accordance with the procedures set forth in Subparagraphs 2, 3, 4, 5 and 6.

C.   It is expressly understood and agreed that the pendency of a Dispute hereunder shall at no time and in no respect constitute a basis for any modification, limitation or suspension of Subcontractor's obligation to fully perform in accordance with the Subcontract and that Subcontractor shall remain fully obligated to perform the Subcontract Work notwithstanding the existence of any such Dispute.

D.   It is expressly agreed and understood that any proceeding arising out of a Dispute under this Agreement may be joined, at the sole discretion of Bombardier, with any proceeding brought under the Master Contract, provided that Subcontractor is then entitled to participate in all such

 

proceedings. However, in such event, the dispute shall be governed by the dispute resolution procedure contained in the Master Contract and in accordance with the delay established therein , a copy of which is annexed hereto as Attachment 2 for reference by the Subcontractor.

*ARTICLE 804 ADDITIONAL PROVISION RELATING TO THE PROSECUTION OF CLAIMS OR MONEY DAMAGES*

Except as otherwise provided in the Subcontract, if the Subcontractor claims or intends to claim compensation for any damage or loss sustained by reason of any act, neglect, fault or default of the Authority or Bombardier, the Subcontractor shall furnish a written notice to Bombardier setting forth the nature of the claim and the extent of the damage sustained within three (3) days of the occurrence of such loss or damage to the extent practicable. Within fourteen (14) days thereafter, Subcontractor shall submit a detailed claim which shall state all information relating to the claim and the damage sustained which shall be supported by any then available documentation, including daily records showing all costs incurred. Submission of both written notices within the time specified shall constitute the Subcontractor's submission to Bombardier for the purposes of requesting Bombardier's determination in accordance with ARTICLE 801 above. Any such claim shall state as fully as then possible all information relating thereto and shall be supported by any then available documentation, including daily records showing all costs incurred. Such information shall be supplemented with any and all further information, including information relating to the quantum of losses or damages sustained, as soon as practicable after it becomes or reasonably should become known to the Subcontractor.

Any claim for compensation or monetary damages, the successful prosecution of which necessarily depends upon a technical determination favorable to the Subcontractor, may not proceed unless and until the Subcontractor first obtains such a favorable determination with respect to the technical issue and must be made within three (3) days of such determination; notwithstanding the foregoing, Subcontractor must submit to Bombardier any documentation or proof in support of the monetary claim within three (3) days of the occurrence of such loss or damage in order to proceed with such a claim.

Compliance with the provisions hereof shall constitute a condition to the Subcontractor's submission of a Dispute pursuant to ARTICLE 803 with respect to any claim for compensation and the Subcontractor shall be deemed to have waived any claim not submitted in accordance herewith.

*ARTICLE 805 CHOICE OF LAW, CONSENT TO JURISDICTION AND VENUE*

This Subcontract shall be deemed to be executed in the City of New York, State of New York, regardless of the domicile of the Subcontractor, and shall be governed by and construed in accordance with the laws of the State of New York.



To effect this agreement and intent the Subcontractor agrees:

1. If the Authority, pursuant to the Master Contract, initiates any action against Bombardier, Bombardier Transit Corporation or the Subcontractor in Federal Court or in New York State Court (and in the case of an action against Bombardier or Bombardier Transit Corporation, Bombardier requests pursuant to Article 803.D. that a Dispute is joined with a proceeding under the Master Contract), service of process may be made on the Subcontractor either in person, wherever such Subcontractor may be found, or by registered mail addressed to the Subcontractor at its address as set forth in this Subcontract, or to such other address as the Subcontractor may provide to Bombardier in writing.

2. With respect to any action between the Authority and/or Bombardier and the Subcontractor in New York State Court, the Subcontractor hereby expressly waives and relinquishes any rights it might otherwise have (i) to move to dismiss on grounds of forum non convenience, (ii) to remove to Federal Court; and (iii) to move for a change of venue to a New York State Court outside Queens or New York County.

3. With respect to any action between the Authority and/or Bombardier and the Subcontractor in Federal Court located in New York City, the Subcontractor expressly waives and relinquishes any right it might otherwise have to move to transfer the action to a Federal Court outside the City of New York.

## CHAPTER 9 - INSPECTION, TESTING, GUARANTEES AND CHARACTER OF SUBCONTRACT WORK

### *ARTICLE 901 INSPECTION*

A. At all times during the performance of the Subcontract, Bombardier and the Authority each has the right to conduct and the Subcontractor hereby approves, the most thorough and minute inspection of all Subcontract Work including materials and the manufacture or preparation of such materials from the beginning to the final completion of the Subcontract Work in accordance with the Subcontract Documents. The Authority and Bombardier have the right to draw the attention of the Subcontractor to all defects in workmanship or materials and other errors or variations from the requirements of this Subcontract. But no omission on the part of Bombardier or the Authority or any of their representatives to point out such errors, variations or defects shall give the Subcontractor any right or claim against the Authority or Bombardier or shall in any way relieve the Subcontractor from his obligations according to the terms of this Subcontract.

B. Bombardier and the Authority may examine, inspect, and approve each initial part, major assembly, subassembly, system, subsystem, apparatus, or material manufactured or assembled by either the Subcontractor or its Sub-subcontractors and Suppliers. The Subcontractor shall afford Bombardier notice of the completion of the First Article and an ample opportunity for inspection



and Approval. After the First Article Approval, no substitutions, either in type, including design and material, or in manufacturing source or method, may be made except with the written approval of Bombardier. When directed by Bombardier, Subcontractor shall preserve the First Article until Acceptance of the Cab Simulator is completed.

C.   The Subcontractor, shall not deviate from the Detailed Program Schedule to insure Bombardier has ample advanced notice of the exact location where the various parts of the Subcontract Work will be done.

D.   The right of inspection by Bombardier and the Authority herein provided is intended solely for Bombardier's and the Authority's benefit.

E.   The Subcontractor shall at all times give to Bombardier and the Authority and to any other person designated by Bombardier, except for any competitor of the Subcontractor, all facilities, necessary or convenient, for inspecting the Subcontract Work including the materials to be incorporated at any stage of their manufacture. The right of inspection shall include the right to bring any document or instrument into and out of the Subcontractor's facilities and utilize the instruments in any non-destructive testing. This right of inspection shall further include the right to photograph any and all phases of construction related to the Work. Representatives of Bombardier and the Authority bearing the authorization of Bombardier shall be admitted at any time without delay at any place where the Subcontract Work is being performed, or to inspect materials at any place or stage of their manufacture, preparation, shipment or delivery.

F.   If the Subcontract Work or any part thereof shall be found defective, the Subcontractor shall without cost to Bombardier forthwith remedy such defect in a manner to comply with the Subcontract Documents.

G.   Any inspection hereunder shall not unreasonably disrupt the Subcontractor's performance of the Subcontract Work.

H.   Bombardier and the Authority may perform FAT and therefore examine, inspect and approve each initial part, major assembly, subassembly, system, subsystem, apparatus, or material manufactured or assembled by either the Subcontractor or Sub-subcontractors. The Subcontractor will afford Bombardier notice of the completion of the First Article and an ample opportunity for inspection. After Bombardier and the Authority have approved the First Article, no substitutions, either in type, including design and material, or in manufacturing source or method, may be made except with the written approval of Bombardier. In the event that the FAT need to be re-performed because it failed, the Subcontractor shall reimburse all of the Authority's and Bombardier's costs associated or connected to those repeated FATs.



 

*ARTICLE 902 UNCOVERING FINISHED SUBCONTRACT WORK*

A. Bombardier's right to make inspections shall include the right to order the Subcontractor to uncover or take down portions of finished work. Should the work thus exposed or examined prove in Bombardier's discretion to be in accordance with the Subcontract, the uncovering or taking down and the replacing and the restoration of the parts removed will be treated as an Extra Work Directive under Article 402.

B. If the work exposed or examined proves unsatisfactory to Bombardier, such uncovering, taking down, replacing and restoration shall be at the expense of the Subcontractor and no Extension of Time will be granted. Such expenses shall also include repayment to Bombardier for any and all expenses or costs incurred by it or by the Authority, including employees' salaries or otherwise, in connection with such uncovering, taking down, replacing and restoration.

C. If the work was uncovered because Subcontractor failed to (i) give Bombardier notices required by the Subcontract related to performing work or (ii) follow its Quality Plan with respect to the uncovered work, then the Subcontractor shall not be entitled to either an Extra Work Directive or an Extension of Time with respect to such uncovering, taking down, replacing and restoration.

*ARTICLE 903 SUBCONTRACT TECHNICAL SPECIFICATION AND TECHNICAL DESCRIPTION*

A. The description and performance requirements of the Cab Simulator, Systems and Apparatus are given in the TECHNICAL SPECIFICATION and TECHNICAL DESCRIPTION including the Contract Drawings and Subcontract Drawings. Notwithstanding anything in the Subcontract to the contrary, the TECHNICAL SPECIFICATION and TECHNICAL DESCRIPTION are provided by Bombardier solely for the purpose of describing the performance required from the Cab Simulator and Systems and do not in any way constitute a design by Bombardier of such Cab Simulator and Systems. Bombardier makes no warranties whatsoever concerning the TECHNICAL SPECIFICATION and TECHNICAL DESCRIPTION including Contract Drawings and Subcontract Drawings except that Bombardier does warrant the accuracy of any clearance diagrams and/or speed profiles included in the Subcontract Documents. The Subcontractor is responsible for the design and manufacture of the Cab Simulator and Apparatus meeting the performance requirements and other requirements of the Subcontract.

B. Unless as otherwise specifically provided, the TECHNICAL SPECIFICATION and TECHNICAL DESCRIPTION shall include the Contract Drawings and Subcontract Drawings. Bombardier shall have the right, during the progress of the Subcontract Work, to clarify the TECHNICAL SPECIFICATION and TECHNICAL DESCRIPTION, including the right to add explanatory specification and to clarify the TECHNICAL SPECIFICATION and TECHNICAL DESCRIPTION, without the clarification being deemed Extra Work, provided such clarification does not change the essential nature and scope of work.



*ARTICLE 904 CHARACTER OF SUBCONTRACT WORK / KEY PERSONNEL AND SUPPORT AT BOMBARDIER'S OFFICES*

A. The Subcontractor shall furnish work of the best character, including but not limited to all labor and materials, plant, tool supplies and other means necessary to furnish, test and deliver the Cab Simulator, parts and equipment as required by the Subcontract.

B. The Subcontractor agrees to fully comply with the requirements of Article 904 of the Master Contract (a copy of such Article is attached hereto as Attachment 2).

The Subcontractor agrees that its Key Personnel will be assigned to the Project in the capacities listed on Attachment 7 and that such Key Personnel will remain in the listed positions unless due to circumstances beyond the Subcontractor's control.

C. The Subcontractor agrees that the Key Personnel of its Major Sub-subcontractors will be assigned to the Project in the capacities listed on Attachment 13 and that such Key Personnel will remain in the listed positions unless due to circumstances beyond the Major Sub-subcontractor's control.

D. Any replacement of Key Personnel under Paragraph B above, shall be subject to Bombardier approval which will not be unreasonably withheld.

E. Key Personnel under Paragraph C above shall be replaced by an equally qualified person.

ARTICLE 904A RESERVED

*ARTICLE 905 TESTING*

A. All tests required to be performed by Subcontractor shall be done as set forth in the **TECHNICAL SPECIFICATION, TECHNICAL DESCRIPTION** and the Subcontract Documents.

B. The Subcontractor shall be responsible for all testing expenses including Bombardier and the Authority additional expenses not contemplated by the originally approved Detailed Program Schedule, and which are caused by (1) a Subcontractor-caused failure in testing, or (2) significant inefficiencies caused by the Subcontractor.

C. The Subcontractor, at no extra cost to Bombardier or the Authority, shall be responsible to provide all the necessary personnel and material to support all testing and commissioning activities to be performed (i) at the Subcontractor's facilities and (ii) at the Authority's Cab Simulator Site in New York, all as described in the **TECHNICAL SPECIFICATION, the TECHNICAL DESCRIPTION, or as requested by Bombardier.**.



*ARTICLE 906* *GENERAL WARRANT*

All the w nties provided pursuant to Article 906 are provided to Bombardier and to the Authority.

A. The Subc ractor unconditionally warran that the Subcontract Work, including but not limited to designs workmanship, material, devices, Apparatus, components and parts furnished under this Subco tract, conforms to the Subcontract requirements and is free of any patent or latent defect in t design, material or workmanship and is fit for the intended purpose (the "General Warranty"

1. The arranty Period for the Cab Simulator shall commence upon the earlier of (i) Cond onal Acceptance by Bombardier or (ii) Final Acceptance by Bombardier and shall expir ive (5) years thereafter (the "Warranty Period").

B. The Gene Warranty shall not apply t any non-conformity to the extent the Subcontractor establishes he non-conformity is cause by (i) abuse or neglect by the Authority and/or Bombardie or (ii) the Authority's or Bom ardier's material modification to the Cab Simulator or any part hereof without the concurr nce of the Subcontractor. Notwithstanding this, Bombardie and the Authority's sole obligation with respect to defective Authority or Bombardi supplied parts or components f any are so supplied pursuant to other provisions of this Subco act, will be to replace the par r component following verification to the satisfaction of Bomb er and the Authority of th defect, except to the extent Bombardier's or the Authority' bligation is modified pursu to a Change Order executed with respect to such Authority Bombardier-supplied parts or omponents.

C. The Subc actor's obligation under th General Warranty shall include at its own cost and expense, t prompt repair or replacemen the equipment including without limitation, the Cab Simulator ystems, Subsystems, parts components which are defective or inoperable, or which ha been damaged due to defe in such item or any other item or items of the Subcontra Work warranted under th Subcontract, or which fail to comply with the **TECHNI L SPECIFICATION** or **TE HNICAL DESCRIPTION** or any other provision of this Subc act (the "Warranty Subcontr Work"). The Warranty Subcontract Work shall be of a quali or class at least equal to th required by the Subcontract and shall result in the Equipme lly meeting the Subcontract cuments.

D. It is conte ated that the Subcontractor s l perform all Warranty Subcontract Work hereunder; provided, vever, Bombardier or the Au rity, may perform some of the Warranty Subcontract Work, at option of Bombardier or th uthority, if the Subcontractor does not perform the Warranty k in a timely manner. Such nbardier or Authority work related to, or part of, the Warranty contract Work shall not r ve the Subcontractor of its responsibility for the General anty, provided Bombardie hall be responsible for defective work that they perform. bardier's and the Authorit labor and material costs for Warranty Subcontract



Work shall be reimbursed by the Subcontractor in accordance with the affected Bombardier or the Authority's schedule of Rates for Outside Parties then in effect.

E. Time is of the essence during the Warranty Period and the Subcontractor shall use all reasonable means to perform the Warranty Work, in order to secure the prompt return of the defective Cab Simulator or part into service. Warranty Work shall be accomplished with minimum disruption to Bombardier and the Authority's operations.

F. Reserved

G. Reserved

H. During the Warranty Period, the Subcontractor shall maintain an inventory of parts in quantities sufficient to meet all obligations under the General Warranty (the "Warranty Parts") and, at a minimum, shall store a one (1) year supply of such parts on the Authority's premises or at a location convenient thereto, the location to be determined by Bombardier. The Subcontractor shall bear the costs of storage. Subcontractor shall promptly furnish these parts to replace defective parts identified for any Warranty Work performed by Bombardier. In the event that the Subcontractor is unable to furnish a replacement for a defective part in a timely manner, Bombardier, at its sole discretion, may supply parts from its own inventory for Warranty Work; however, the Subcontractor shall, at its own cost, replenish the Authority's inventory of such spare parts with new parts on an item-for-item basis within thirty (30) days.

I. Reserved

J. Reserved

K. Reserved

L. The Subcontractor shall be responsible for the pick up and return, all transportation costs, and the Risk of Loss of the Cab Simulator returned to the Subcontractor for Warranty Work.

M. Except as provided in Article 907, the General Warranty shall not in any way or manner decrease, modify, affect, relieve or excuse the Subcontractor, Sub-subcontractors, Suppliers or any other person or persons from their responsibility or liability under this Subcontract or applicable law for the breach of which they would be responsible and liable in damages to Bombardier or any other person or persons.

N. Bombardier shall have the right to inspect all work done under the General Warranty subject to the same terms applicable to the Subcontract Work under the Subcontract generally.

O. All guarantees and warranties under this Subcontract are fully enforceable by either Bombardier or the Authority acting in their own name.



P. Bombardier shall have the same obligations and responsibilities to Subcontractor, as set forth in this Article 906 for Subcontractor, for those parts to be supplied by Bombardier to the Subcontractor.

*ARTICLE 907 RESERVED*

*ARTICLE 908 SOFTWARE WARRANTY*

A. In addition to any other requirements set forth in the Subcontract, the Subcontractor warrants that; for the period of the Warranty otherwise applicable hereunder, the software (including any licensed software) shall: (i) be of a language that is commercially available in the United States and for which software tools are available; (ii) be capable of being copied by Bombardier and the Authority (for the Approved Purposes); (iii) not contain viruses or pre-programmed devices which will cause any software utilized by Bombardier or the Authority to be erased or become inoperable or incapable of processing accurately; (iv) the software and each module and function thereof shall be capable of operating fully and correctly on the Cab Simulator and; (v) the software does not contain any code that will, upon the occurrence or the nonoccurrence of any event, disable the software. This warranty shall not apply to any software modified by the Authority or Bombardier without the approval of Subcontractor.

B. Subcontractor represents and warrants that the Cab Simulator, Systems, Subsystems and components and Apparatus (collectively the "Product" for purpose of Article 908.B) shall be Year 2000 Compliant. For purposes of this representation and warranty, the following shall apply:

1. The term "PRODUCT" means (A) each piece or component of equipment, hardware, custom or commercial software, firmware, middleware, or other information technology, or internal components, routines or subroutines therein which perform any date/time recognition function, calculation, comparing or sequencing, that is being delivered, developed, or modified under this Subcontract, (B) any system being provided by Subcontractor and all interfaces to such system that the Subcontractor is providing under this Subcontract, including but not limited to data entry interfaces for such system and interfaces with other systems, and (C) where services are being furnished (e.g. consulting, system integration, code or data conversion or data entry), the resulting deliverables, and

2. the term "YEAR 2000 Compliant" means that the PRODUCT being provided by Subcontractor under this Subcontract, individually or in combination, shall, without human intervention, (A) accurately process all date/time related data (including, but not limited to, calculating, comparing, and sequencing) from, into, and between centuries, including, without limitation, the twentieth and twenty-first centuries, and the years 1999 and 2000 and all leap year calculations, (B) either includes data structures that utilize a four digit year format or, at a minimum, operates so that all import and export data is in a four digit format, and (C) when used in combination with other information technology, accurately process date/time related data to the extent that other information technology being used in combination with the PRODUCT (i) was specified in the Subcontract as being information



technology with which the PRODUCT must be compatible, (ii) was otherwise warranted by Subcontractor as being compatible, or (iii) properly exchanges date/time related data with the PRODUCT.

*ARTICLE 909 QUALITY SYSTEM REQUIREMENTS*

The Subcontractor shall be responsible for providing a Quality Plan and for assuring that the Subcontract Work is otherwise done in accordance with the Quality System Requirements of Section 104 of the **TECHNICAL SPECIFICATION** and in accordance with the **TECHNICAL DESCRIPTION**.

*ARTICLE 910 EFFECT OF FAILURE TO COMMENT OR APPROVE*

With respect to any time period specified herein for Bombardier to comment or grant approval of any submission by Subcontractor, any failure on the part of Bombardier to return comments or grant approval as set forth hereunder shall not be deemed approval by Bombardier. Where Bombardier fails to provide reasonably accurate and complete comments within the time required therefor under the Subcontract, under circumstances where such failure is unreasonable, Subcontractor's sole remedy shall be to seek an extension of time and damages pursuant to **ARTICLE 205**.

*ARTICLE 911 PROGRESS REVIEW MEETINGS*

Progress review meetings ("PRM") shall be held with Bombardier and the Authority in New York City as required by the Authority or the Subcontract Documents. The Subcontractor, at the request of Bombardier, shall be represented by his project manager or a Bombardier approved designee.

PRM between Bombardier and the Subcontractor shall be held at a time and place mutually agreed between Bombardier and Subcontractor. An agenda of the meeting shall be submitted to Bombardier for acceptance at least five (5) days before the meeting date. All costs to the Subcontractor with respect to PRM shall be borne by the Subcontractor.

*ARTICLE 912 EFFECT OF APPROVAL*

A. Any review, permission to proceed, acceptance or approval by Bombardier or the Authority under the Subcontract shall be construed merely to mean that Bombardier or the Authority knew of no good reason, at that time, to object thereto. No such review, permission to proceed, acceptance, or approval shall impose any liability on Bombardier or the Authority or release or relieve



Subcontractor of full responsibility for the accurate and complete performance of the Subcontract Work or any other duty, obligation or liability imposed on it by this Subcontract.

B. No certificate by Bombardier nor any order by Bombardier or the Authority for payment of money, nor any payment for, nor acceptance of, the whole or part of the Subcontract Work nor any extension of time, nor any possession or use taken by Bombardier or the Authority or its employees shall operate as a waiver of any portion of this Subcontract or of any power herein reserved to Bombardier or the Authority or of any right to damages herein provided; nor shall any waiver of any breach of this Subcontract be held to be a waiver of any other or subsequent breach.

C. Bombardier's rights to review, approve, accept or give permission to proceed shall not be construed as in any way obligating Bombardier or the Authority to determine what changes would be necessary for any Subcontract Work to comply with any Subcontract requirement.

*ARTICLE 913 FIELD INSPECTION OFFICES*

Bombardier and the Authority shall, at all reasonable times, have access to the Work and to the Subcontractor's facilities and its Sub-subcontractors' facilities during the course of its performance and until the expiration of the warranty periods provided herein, and shall be furnished with every reasonable facility (including without limitation telephones, telecopiers, desks, chairs, computers, etc.) for the purpose of ascertaining that Materials and workmanship are in accordance with the requirements of the Subcontract Documents. This shall include providing access to or copies of drawings or other documents used to state the condition of the Subcontract Work and materials and equipment which may be needed to properly inspect and check the design, construction, assembly, installation, workmanship, clearance, tolerances, and functioning of the Equipment and part thereof supplied hereunder. All Subcontract Work done and all Equipment furnished shall be subject to inspection by or on behalf of Bombardier and/or the Authority, at the manufacturing facility, or shipping or receiving point.

## CHAPTER 10 - MISCELLANEOUS PROVISIONS

*ARTICLE 1001 EQUAL EMPLOYMENT OPPORTUNITY*

A. The Subcontractor shall not discriminate against employees or applicants for employment because of race, creed, color, national origin, sex, age, disability or marital status, and will undertake or continue existing programs of affirmative action to ensure that minority group members and women are afforded equal employment opportunities without discrimination. For purposes of this Article affirmative action shall mean recruitment, employment, job assignment, promotion, upgrading, demotion, transfer, layoff, or termination and rates of pay or other form of compensation.



B. The Subcontractor shall request each employment agency, labor union, or authorized representative of workers with which it has a collective bargaining or other agreement or understanding to furnish a written statement that such employment agency, labor union or representative will not discriminate on the basis of race, creed, color, national origin, sex, age, disability or marital status and that such union or representative will affirmatively cooperate in the implementation of the Subcontractor's obligations herein.

C. The Subcontractor shall state, in all solicitations or advertisements for employees, that, in the performance of this Subcontract, all qualified applicants will be afforded equal employment opportunities without discrimination because of race, creed, color, national origin, sex, age, disability or marital status.

D. After award of this Subcontract, the Subcontractor shall submit to Bombardier a workforce utilization report, in a form and manner required by Bombardier, of the workforce actually utilized on this Subcontract. broken down by specified ethnic background, gender, and Federal Occupational Categories or other appropriate categories specified by Bombardier.

E. Within sixty (60) days of the execution of this Subcontract, the Subcontractor shall submit a staffing plan, in a form and manner required by Bombardier, which shall contain information on employees projected to work on activities related to the Subcontract. This information must be broken down by specified ethnic background, gender and related job titles.

F. After the award of the Subcontract, the Subcontractor shall submit on a semi-annual basis, in a form and manner required by Bombardier, throughout the life of the Subcontract, a workforce utilization report which details the number of employees that worked on activities related to this Subcontract. This information must be broken down by specified ethnic background, gender and related job titles. In instances where a Subcontractor's contract specific workforce cannot be broken out, the Subcontractor must affirm such and submit an EEO- 1 Form for its overall current workforce.

G. The Subcontractor shall include the provision of paragraphs (A) through (F) above, in every Sub-subcontract, except as provided in paragraph (I), in such a manner that the provisions will be binding upon each Sub-subcontractor as to work in connection with this Subcontract, including the requirement that subcontractors and parties to this Subcontract shall undertake or continue existing programs of affirmative action to ensure that minority group members and women are afforded equal employment opportunities without discrimination, and, when requested, provide to the Subcontractor information on the ethnic background, gender, and Federal Occupational Categories of the employees to be utilized on this Subcontract.

H. The provisions of this Article shall not be binding upon the Subcontractor or Sub-subcontractors in the performance of work or the provision of services or any other activity that are unrelated, separate or distinct from this Subcontract as expressed by the terms set forth herein.





I. The requirements of this Article shall not apply to any employment outside of New York State, or application for employment outside New York State or solicitations or advertisements therefor, or any existing programs of affirmative action regarding employment outside New York State.

*ARTICLE 1002 ANTITRUST ASSIGNMENT*

The Subcontractor hereby assigns, sells and transfers to Bombardier all right, title and interest in and to any claims and causes of action arising under the antitrust laws of New York State or of the United States relating to the particular goods or services purchased or procured by Bombardier under this Subcontract.

*ARTICLE 1003 TRANSFER OF WORK; ASSIGNMENT OF AUTHORITY RIGHTS*

No provision of the Subcontract shall in any way be affected by the transfer or any subsequent retransfer of title to the completed Subcontract Work or any part thereof between or among LIRR, ~~MNCR, MTA,~~ or any of its subsidiaries and its affiliates, and any financing agency of the Authority. For the purpose of the Subcontract, no such transfer shall be deemed to have taken place. Nevertheless, should Bombardier or the Authority from time to time formally assign to the MTA or its subsidiaries, or affiliates, the Bombardier or the Authority's rights under the Subcontract, then, to the extent of such assignment, such right shall be for the benefit of MTA, such affiliate or such subsidiary (as the case may be) which shall, to such extent, have direct rights to causes of action against the Subcontractor under the Subcontract.

*ARTICLE 1004 AUDIT AND INSPECTION*

At all times, the Subcontractor shall permit authorized independent representatives of Bombardier, the Authority, MTA, State of New York to inspect and review all of Subcontractor's work materials, payrolls, records of personnel, invoices of materials and other relevant construction, equipment, data and records, and to audit the books and records pertaining to the Subcontract, if Bombardier has reasons to believe that the general financial situation of the Subcontractor might jeopardize the successful performance of this Subcontract.

The Subcontractor shall obtain for all the authorized representatives of Bombardier, the Authority, MTA and the State of New York, similar access to the, plants, facilities, records and documents of its Suppliers and Sub-subcontractors.

*ARTICLE 1005 INDEPENDENT CONTRACTOR*

The Subcontractor agrees that, in accordance with its status as an independent Subcontractor, it will conduct itself with such status, that it will neither hold itself out as nor claim to be an officer

 

or employee of Bombardier, the Authority, MTA, State, or Federal Government by reason hereof, and that it will not by reason hereof make any claim, demand or application to or for any right or privilege applicable to an officer or employee of Bombardier, the Authority, the MTA, State, City or Federal Government including, but not limited to, Worker's Compensation coverage, Unemployment Insurance benefits, Federal Employees Liability Compensation, Social Security coverage or retirement membership or credit, in any retirement system of the State, Federal Government, Authority, MTA or Bombardier.

*ARTICLE 1006 GENERAL REPRESENTATIONS AND WARRANTIES*

In order to induce Bombardier to enter into and perform this Subcontract, Subcontractor represents and warrants to Bombardier and to the Authority that:

A. Existence; Compliance with Law

The Subcontractor (i) is duly incorporated and organized, validly existing and in good standing as a corporation under the laws of the jurisdiction of its incorporation and is duly qualified and in good standing under the laws of each jurisdiction where its ownership, lease, or operation of property in the conduct of its property or business requires, and (ii) has the power and the legal right to conduct the business in which it is currently engaged and to enter into and perform this Subcontract.

B. Authority

The Subcontractor has full power, authority and legal right to execute, deliver and perform the Subcontract to which it is a party. The Subcontractor has taken all necessary action to authorize the execution, delivery and performance of the Subcontract.

C. No Legal Bar

The execution, delivery and performance of the Subcontract do not and will not violate any provision of any existing law, regulation, or of any order, judgment, award or decree of any court or government or of the charter or by-laws of the Subcontractor or of any mortgage, indenture, lease, contract, or other agreement or undertaking to which the Subcontractor is a party or by which the Subcontractor or any of its properties or assets may be bound, and will not result in the creation or imposition of any lien on any of its respective properties or assets pursuant to the provisions of any such mortgage, indenture, lease, contract or other agreement or undertaking.

D. No Litigation

Except as specifically disclosed to Bombardier in writing prior to the date hereof, no claim, litigation, investigation or proceeding of or before any court, arbitrator or governmental authority is currently pending nor, to the knowledge of the Subcontractor, is any claim, litigation or



 

proceeding threatening against the :bcontractor or against its properties or revenues (i) which involves a material claim of defec: e design or workmanship in connection with any contract entered into by the Subcontractor c (ii) which, if adversely determined, would have an adverse and material effect on the Subcont: ctor's ability to perform this Subcontract. For purposes of this paragraph, a claim, litigation, investigation or proceeding may be deemed disclosed to Bombardier if Bombardier has received, prior to the date hereof, detailed written information concerning the nature of the matter involved, the relief requested, and a description of the intention of the Subcontractor to controvert or respond to such matter.

E. No Default

The Subcontractor is not in default in any respect in the payment or performance of any of its obligations or in the performance of any mortgage, indenture, lease, contract or other agreement or undertaking to which it is a party or by which it or any of its properties or assets may be bound, and no such material default or event of default (as defined in any such mortgage, indenture, lease, contract, or other agreement or undertaking) has occurred and is continuing or would occur solely as a result of the execution and performance of this Subcontract. The Subcontractor is not in material default under any order, award, or decree of any court, arbitrator, or government binding upon or affecting it or by which any of its properties or assets may be bound or affected, and no such order, award or decree would affect the ability of the Subcontractor to carry on its business as presently conducted or the ability of the Subcontractor to perform its obligations under this Subcontract or any of the other financing to which it is a party.

F. No Inducement or Gratuities

1. Subcontractor warrants that n person or selling agency has been employed or retained to solicit or secure this Subcont: ct upon any agreement or understanding for a commission, percentage, brokerage, or c ingent fee, excepting bona fide employees or bona fide established commercial or se ig agencies maintained by Subcontractor for the purpose of securing business.

2. Additionally, Subcontractor arrants that no gratuities or other inducements have been offered or given or will be c ered or given (in the form of entertainment, gifts, offers of employment, or any other t g of value) to any official or employee of the Authority, Bombardier or the MTA. T Subcontractor further warrants that during the term of the Subcontract it shall not mak any offers of employment to any Authority or Bombardier employee, or solicit or inter w therefore, without obtaining the written approval of the employee's Department Head

3. For breach or violation of foregoing warranties, Bombardier shall have the right to cancel the Subcontract with liability or, at its discretion, to deduct from the TCSAP, as the case may be, or otherwi o recover the full amount of such commission, percentage, brokerage or contingent fee, gratuities, and to include the occurrence of such a breach or violation in assessments of t ubcontractor's responsibility in future bids.



G. Conflict of Interest

Subcontractor covenants that neither it nor any officer of the corporation or partner of the partnership, as the case may be if Subcontractor be a corporation or partnership, has any interest, nor shall it acquire any interest, either directly or indirectly, which would conflict in any manner or degree with the performance of the Subcontract Work hereunder. It further covenants that, in the performance hereof, no person having such interest shall be employed by it. It is expressly understood that breach of any of the covenants contained in this paragraph is a material breach hereof and shall entitle Bombardier to recover immediately damages, as well as all monies paid hereunder.

H. No Conviction or Indictment

Subcontractor hereby represents that to the best of its knowledge neither it nor any of its personnel or shareholders has been the subject of any investigation nor has any of them been convicted or indicted for commission of any crime involving misconduct, corruption, bribery, or fraud in connection with any public contract in the State of New York or any other jurisdiction, except as has been specifically disclosed in writing to Bombardier, and that, should any such conviction or indictment be obtained or any such investigation commenced prior to the expiration of the term hereof, regardless of the date of the occurrence giving rise to the subject matter of such conviction, indictment or investigation, it will be disclosed in writing to Bombardier.

***ARTICLE 1007 RESERVED***

***ARTICLE 1008 COMPLIANCE WITH LAWS, RULES AND REGULATIONS/INCLUDING ENVIRONMENTAL MATTERS***

A. The Subcontractor and all persons employed upon the Subcontract Work, including its Sub-subcontractors, agents, officers, and employees shall comply with all applicable laws, rules and regulations, including all applicable requirements of governmental agencies and departments in the jurisdiction in which the Subcontract Work is performed, and all safety regulations of the Authority and Bombardier, whether or not referenced in the Subcontract.

B. The Subcontractor and all Sub-subcontractors and Suppliers must submit evidence that all standards, orders and regulations issued pursuant to the Federal Clean Air Act will be met. If either the State or City air pollution control agency has more restrictive standards, they shall be enforced. The evidence and related documents will be retained by Bombardier or the Authority for on-site examination by appropriate enforcement agencies.

C. The Subcontractor and any Sub-subcontractor and Suppliers must comply with all local, State and Federal laws, rules and regulations applicable to this Subcontract and to the Subcontract Work to



be done hereunder, including but not limited to the Federal Occupational Safety and Health Act of 1970.

D. Attention is called regarding environmental matters that must be observed by the Subcontractor in the prosecution of the Subcontract Work, consisting, among others, of safety of operations, noise control, prevention and/or control of air pollution, removal of waste materials, storage of construction materials, protection against fire, minimum disturbance to pedestrian and vehicular traffic, maintaining use of public facilities, and protection against dust hazards. These matters are specifically enumerated merely as a guide. The enumeration is not a complete list of environmental matters to be observed and does not exclude matters contained in this Subcontract or matters applicable by virtue of City, State or Federal law, rule or regulation which are not specifically designated in this paragraph. All environmental provisions will be strictly enforced.

*ARTICLE 1009 AUTHORITY OR BOMBARDIER SUPPLIED MATERIAL, LABOR OR FACILITIES*

A. The Authority and Bombardier reserve the right to provide for incorporation into the Subcontract Work, parts or components from their own inventory other than those already specified in the Technical Description. If invoked, this provision will be implemented pursuant to **ARTICLE 401**, with Bombardier entitled to a credit for the cost of part(s) or component(s), and with provisions for responsibility for general or special warranties with respect to such components or parts.

B. The Authority make no warranties, express or implied, including, but not limited to warranties of merchantability or fitness for a particular purpose, with respect to any such part or component. If the Subcontractor uses the Authority's facilities in connection with any part of the Subcontract Work including, but not limited to, testing, Warranty Work and remedying Open Items, the same shall be done in accordance with the Authority's then standard Rolling Stock License Agreement, as the case may be.

*ARTICLE 1010 QUALIFIED PRODUCTS LIST*

A. The Authority has established a Qualified Products List (QPL) for products which must undergo rigorous tests and/or meet certain performance standards in order to ensure safe and reliable operations of the transit system. Products on the QPL that pertain to the Subcontract Work are listed in the TECHNICAL SPECIFICATION.

B. Where a QPL item is required, the Subcontractor may propose Bombardier approval another product as equal. If Subcontractor desires to have an "or equal" approved, it shall notify Bombardier, which shall thereupon advise the Subcontractor of their requirements for approval of such item, including any pre-approval testing where appropriate. Subcontractor shall bear all costs including the Authority and Bombardier's cost associated with this provision.



*ARTICLE 1011 BRAND NAMES/SUBSTITUTION OF SPECIFIED MATERIAL*

A. Except with respect to QPL items, wherever in the **TECHNICAL SPECIFICATION** or in the **TECHNICAL DESCRIPTION** a particular brand, or make of material, or equipment is shown or specified, such material or equipment is to be regarded merely as a standard for the purpose of concisely indicating the requirements as to type, quality, performance, design and finish. Any material or equipment other than that specified will be acceptable if, in the opinion of Bombardier and the Authority, it is as satisfactory for the particular work for which it was intended as the material or equipment specified. Complete documentation in support of an "or equal" contention will be required. Bombardier may require that a presentation be made for any proposed substitution. The Authority and Bombardier will have the right to reject any such other material or equipment offered which is not approved by Bombardier or the Authority as being in all respects equal to the named material or equipment for the work for which it is to be used. Such rejection may be for any reason including without limitation Bombardier's or the Authority's determination that the evaluation would result in excessive expense or human resources, or adversely impact the Authority or Bombardier's operations or maintenance related to standardization.

B. Unless there is a specific statement to the contrary, the Subcontractor understands that requests for such approval of any alternative material or equipment shall be submitted within ten (10) days after Subcontract Award.

C. The Subcontractor is obligated to furnish all data and information as Authority or Bombardier in their discretion deems necessary to establish the equivalency of the alternative material or equipment. If the Subcontractor seeks reconsideration of any determination with respect to equivalency, the Authority and Bombardier shall have discretion to reconsider the matter. In the event of reconsideration the Subcontractor shall be obligated to pay all Authority and Bombardier expenses in connection therewith.

D. The Authority and/or Bombardier shall be the sole judge of the acceptability of items offered equivalent to that specified and may reject any item not considered as equivalent thereto. The Subcontractor must submit proof satisfactory to the Authority and/or Bombardier, including a non-returnable sample if requested by the Authority and/or Bombardier, that the item the Subcontractor offers is equivalent to the material or equipment specified in quality, performance and such other characteristics as the Authority and/or Bombardier may deem relevant.

The Authority and/or Bombardier will consider as evidence of equivalency an independent laboratory certification concluding that the Subcontractor's proposed item meets or exceeds all requirements and standards, including performance criteria, or the particular brand or make of material or equipment specified by the Authority and/or Bombardier. The laboratory must be accredited by the American Association for Laboratory Accreditation or be otherwise acceptable to the Authority and/or Bombardier.



*ARTICLE 1012 NO CLAIM AGAINST THE MTA, THE STATE OR THE FEDERAL GOVERNMENT*

The Subcontractor shall make no claim against the State, the Federal Government or against the members, officers, agents, directors or employees of any of them or of Bombardier, Bombardier Transit Corporation, Bombardier Corporation, Bombardier Mass Transit Corporation, Bombardier Holdings (U.S.A.) Inc., the Authority or the MTA under or by reason of this Subcontract or any of its articles or provisions. The Subcontractor's sole claim made under or by reason of this Subcontract or any of its articles or provisions shall be against the MTA, the Authority, Bombardier, Bombardier Transit Corporation, Bombardier Corporation, Bombardier Mass Transit Corporation, or Bombardier Holdings (U.S.A.) Inc.

*ARTICLE 1013 SUBCONTRACTOR HAS EXAMINED ALL OF THE SUBCONTRACT DOCUMENTS AND MASTER CONTRACT*

A. The Subcontractor hereby represents that prior to the execution of this Subcontract, Subcontractor has carefully read each and every clause and section of the Subcontract Documents and the Master Contract and had full opportunity to consider the same and make necessary investigations relating thereto; and he shall not make any claim for, or have any right to, damages or an extension of time for completion of the Subcontract Work or any other concession because of misinterpretation or misunderstanding of the Subcontract Documents or because of any lack of information.

B. It is the Subcontractor's responsibility and obligation to examine the facilities, maintenance and operating procedures of Bombardier and the Authority, if it bears on the Subcontract Work. The absence of any request to examine such is understood to mean that the Subcontractor is cognizant of the requirements and the environment within which the Equipment will operate.

*ARTICLE 1014 INSERTION OF REQUIRED PROVISIONS*

It is the intent and understanding of the parties hereto that each and every provision of applicable Federal, New York State and local law required to be inserted herein shall be and is inserted herein. Furthermore, it is hereby stipulated that every such provision is to be deemed to be inserted herein, and if, through mistake or otherwise, any such provision is not inserted in correct form, then this Subcontract shall forthwith, upon the application of either party, be amended by such insertion so as to comply strictly with the law and without prejudice to the rights of either party.

*ARTICLE 1015 SEVERABILITY*

 

If this Subcontract contains any provision found to be unlawful, the same shall be deemed to be of no effect and shall, upon the application of either party, be stricken from the Subcontract without affecting the binding force of the Subcontract as it shall remain after omitting such provision.

*ARTICLE 1016 CORRESPONDENCE TRACKING*

Bombardier has established a method of numbering all correspondence sequentially between the Subcontractor and Bombardier after the Effective Date. The Subcontractor shall be responsible for maintaining correspondence tracking reports. The reports shall indicate the status of all correspondence and shall be in a form acceptable to Bombardier. The reports shall be transmitted to Bombardier monthly. The Subcontractor shall be responsible for maintaining the tracking reports for both Bombardier initiated correspondence and the correspondence initiated by the Subcontractor.

*ARTICLE 1017 SUBCONTRACT DOCUMENTS CONTAIN ALL TERMS*

A. These Subcontract Documents contain all the terms and conditions agreed upon by the parties hereto, and no other agreement, oral or otherwise, regarding the subject matter of this Subcontract shall be deemed to exist or to bind any of the parties hereto, or to vary any of the terms contained herein.

B. No oral modifications or waivers shall be permitted.

C. Titles, Headings and Subheadings are for convenience only.

*ARTICLE 1018 RESERVED*

*ARTICLE 1019 RESERVED*

*ARTICLE 1020 FIELD SERVICE AND REPLACEMENT PARTS FACILITIES*

The Subcontractor shall maintain adequate field service and replacement parts facilities within the Canada or U.S. for all the components incorporated in the Equipment. Before expiration of the Warranty Period, the Subcontractor shall make arrangements to assure that following the Warranty Period all necessary components required for maintaining the Equipment shall be available within reasonable periods of time.

*ARTICLE 1021 ROUTING AND SHIPPING INSTRUCTIONS*



The Subcontractor must conform to routing and/or shipping instructions of the Purchase Order. No deviation is to be made from instructions shown herein without the prior approval from our traffic department. The complete routing must be shown on all documents. The Subcontractor understands that he shall be responsible for the freight charges if the instructions are not followed. In the event of delay in delivery of the Equipment beyond the times prescribed on the Purchase Order, or beyond the times to which such delivery may be extended by Bombardier pursuant to this Subcontract, Bombardier shall be reimbursed for any additional charges for special transportation because of late deliveries.

### *ARTICLE 1022 COLLECTIVE BARGAINING*

The Subcontractor shall provide Bombardier not less than three months written notice of the scheduled expiration of any collective bargaining agreement (current expiration date N/A) covering any of its employees or, if the Subcontractor has knowledge thereof, any employees of any of the Subcontractor's suppliers. Failure to give any of the notices referred to in this paragraph shall be a sufficient reason for termination of this Subcontract by Bombardier in accordance with Article 701.

### *ARTICLE 1023 NOTICE OF LABOR DISPUTES*

In addition to the notification requirement detailed in Article 1028, whenever the Subcontractor has knowledge that an actual or potential labor dispute is delaying, or likely to delay, performance of the Subcontract Work, the Subcontractor shall immediately give notice thereof to Bombardier. Such notice shall include all relevant information with respect to the actual or potential dispute, including without limitation the estimated impact on any scheduled deliveries as well as recommendations for work-around plans to minimize the delay. The Subcontractor agrees to insert the substance of the foregoing requirement in all agreements with its Subcontractors and each such agreement shall provide for notice of actual or potential labor disputes to the Subcontractor and Bombardier. Failure to give any of the notices referred to in this paragraph shall be a sufficient reason for termination of this Subcontract by Bombardier in accordance with Article 701.

## CHAPTER 11 - NEW YORK STATE CONTRACT PROVISIONS

### *ARTICLE 1101 OPPORTUNITIES FOR MINORITY AND WOMEN OWNED BUSINESS ENTERPRISES*

This Subcontract and the Master Contract are subject to Article 15-A of the New York Executive Law (section 310, et seq.), enacted under Chapter 261, Section 63 of the Laws of 1988, as amended. Article 15-A provides that it has been and remains the policy of the State of New York

AAT&C_HTRI_final.doc





to promote equal opportunity in employment for all persons, without discrimination on account of race, creed, color, national origin, sex, age, disability or marital status, to promote equality of economic opportunity for minority group members and women, and business enterprises owned by them, and to eradicate through effective programs the barriers that have unreasonably impaired access by minority and women-owned business enterprises to state contracting opportunities. The specific terms and requirements with respect to the Authority's program pursuant to this law are set forth in Attachment 8.

The Subcontractor hereby commits to 0 % of the TCSAP of Minority Disadvantage Business Enterprises Content and 0 % of the TCSAP of Women Disadvantage Business Enterprises and agrees to subcontract with the following enterprises for the following percentage of the TCSAP for performance of some of the Subcontract Work :

*N/A*

Further, the Subcontractor agrees to provide to Bombardier a monthly progress report in the form requested by Bombardier.

*ARTICLE 1102 — NEW YORK STATE LABOR LAW*

A. Subcontractor agrees that it will comply and will cause all persons employed upon the Subcontract Work, including its Sub-subcontractors, agents, officers and employees, to comply with all applicable laws in the jurisdiction in which the Subcontract Work is performed. It further agrees to comply with all applicable requirements of New York State labor Law with respect to Work performed in New York.

B. If the Subcontract shall fall within the purview of the provisions of Chapter 615 of the Laws of 1922, known as the Worker's Compensation Law, and acts amendatory thereof, it shall be void and of no effect unless the person or corporation making or performing the same shall secure compensation for the benefit of, and keep insured during the life of this Subcontract the employees engaged thereon, in compliance with the provisions of said law.

*ARTICLE 1103 NEW YORK STATE CONTENT*

A. The Subcontractor agrees to achieve a minimum New York State Content (hereinafter defined) of 0.33 % ($20,000) of the TCSAP.

B. New York State Content shall mean the portion of the Subcontract performed at sites within the State of New York or the use of goods actually produced and services actually provided in the State of New York.

C. Reserved.

 

*ARTICLE 1104 RESERVED*

*ARTICLE 1105 PROHIBITION ON PURCHASE OF TROPICAL HARDWOODS*

Bombardier and the Subcontractor agree that all of the provisions of ARTICLE 1105 PROHIBITION ON PURCHASE OF TROPICAL HARDWOODS of the Master Contract are incorporated herein by reference. As used therein, the term «Contract» shall include this Subcontract. Subcontractor agrees that he has received a copy of and has read ARTICLE 1105 of the Master Contract and agrees to comply with it.

**CHAPTER 12 SPECIAL CONDITIONS**

*ARTICLE 1201 DESIGN REVIEW SPECIAL CONDITIONS*

A. It has been established in the Master Contract that the participation of the Authority early in the technical review process and before submission of formal design review submittals is important to achieve efficient and timely review by the Authority of these submittals. The Authority knowledge of the detailed implementation of the **TECHNICAL SPECIFICATION** before Bombardier submits formal design submittals will provide the Authority with an understanding of Bombardier's approach to the implementation of the **TECHNICAL SPECIFICATION** before the Authority must approve or reject the formal submittals. The following provisions describe the process that Bombardier will follow to notify the Authority of and permit the Authority participation in the meetings described below.

B. Before undertaking each of the major design review activities (Stage 1 - Advanced Design Review, Stage 2 - Preliminary Design review, and Stage 3 - Final design Review, Bombardier will provide the Authority with a schedule of activities for completing that design review activity, including working session meetings with Bombardier, the Authority and the Subcontractor and its Sub-Subcontractors, if requested by Bombardier (the "System Functional Descriptions Workshops » or the « Functional Analysis »).

C. Bombardier will provide to the Subcontractor the schedule of those meetings with the Authority.

D. The Authority shall be allowed to participate fully in the System Functional Descriptions Workshops and as a result of these System Functional Descriptions Workshops Bombardier will adjust and modify, if necessary, the **TECHNICAL DESCRIPTION**. Any adjustment or modification made to the **TECHNICAL DESCRIPTION** in accordance with this paragraph shall not give the right to the Subcontractor to claim any adjustment to the Total Subcontract Price or the Delivery Schedule unless Bombardier receives an adjustment under the Master Contract for the above referenced adjustment or modification.



*ARTICLE 1202 RESERVED*

IN WITNESS WHEREOF, the parties have executed this Subcontract as of the date set forth above.

**BOMBARDIER INC**

Name: Suzanne Poirier
Title: Purchasing Agent

Name: Daniel Tousignant
Title: Director, Procurement

**IIT RESEARCH INSTITUTE**

Name: Bobette J. Ash
Title: Group Contracts Manager, ASG



C. Bombardier will provide to the Subcontractor the schedule of those meetings with the Authority.

D. The Authority shall be allowed to participate fully in the System Functional Descriptions Workshops and as a result of these System Functional Descriptions Workshops Bombardier will adjust and modify, if necessary, the **TECHNICAL DESCRIPTION**. Any adjustment or modification made to the **TECHNICAL DESCRIPTION** in accordance with this paragraph shall not give the right to the Subcontractor to claim any adjustment to the Total Subcontract Price or the Delivery Schedule unless Bombardier receives an adjustment under the Master Contract for the above referenced adjustment or modification.

***ARTICLE 1202 RESERVED***

IN WITNESS WHEREOF, the parties have executed this Subcontract as of the date set forth above.

**BOMBARDIER INC**

Name: Suzanne Poirier
Title: Purchasing Agent

Name: Daniel Tousignant
Title: Director, Procurement

**IIT RESEARCH INSTITUTE**

Name: Bobette J. Ash
Title: Group Contracts Manager, ASG

**ATTACHMENT 1**

LIST OF EQUIPMENT, DATA AND DRAWINGS TO BE SUPPLIED TO SUBCONTRACTOR BY BOMBARDIER

ATTACHMENT 2

# ARTICLES OF THE MASTER CONTRACT

- 70 -

A:\T&C_HTRI_final.doc

requirements of the Contract Documents or relieve the Contractor of any responsibilities under the Contract, including without limitation, the accuracy of drawing or any obligation under any warranty provision.

ARTICLE 803 DISPUTES RESOLUTION PROCEDURE

A. The provisions of this Article shall constitute the Contractor's sole means for challenging any determination, order or other action of the Project Manager pursuant to ARTICLE 801 or 802, or otherwise asserting against the Railroad any claim of whatever nature arising under, or in any way relating to, this Contract (any such challenge or assertion by the Contractor shall be herein referred to as a "Dispute"). These dispute resolution procedures shall be the parties' sole remedy in connection with any Dispute. Exhaustion of these dispute resolution procedures including the judicial review set forth in ARTICLE 805 shall be the parties' sole remedy in connection with any Dispute, except for "Other Disputes," defined below, which do not require submission or are not on consent submitted to an Arbiter.

B. The parties to this Contract hereby authorize and agree to the resolution of all Disputes arising out of, under, or in connection with, the Contract in accordance with the following and pursuant to the procedures set forth in paragraph C hereof:

1. With respect to any Dispute which relates in whole or primary part to technical issue(s) under the Contract including, without limitation, determinations as to the acceptability or fitness of any work, the meaning or interpretation of the Specifications or Contract Drawings, the question of whether Disputed Work falls within the scope of the Specifications, the acceptability of any proposed substitutions, modifications or other submission under the Contract, the disapproval of proposed Subcontractors or Suppliers (to the extent such disapproval is related to technical issues), the determination of Excusable Delay to the extent the delay claim is related to a technical matter, acceptability of Cars or the nature and extent of any remaining work or Open Items, the parties hereby authorize the Chief Engineer, Capital Program Management (the Technical Disputes Arbiter), of the Railroad, acting personally, to render a final and binding decision. Technical Disputes shall not include disputes relating to determinations of whether Disputed Work constitutes Change Order work, determinations of Excusable Delay, or alleged violations of the Licenses granted to the Railroad pursuant to ARTICLE 105, or matters of infringement of patents, trademarks, copyrights or trade secrets, all of which are deemed "Other Disputes," subject to the provisions of Subparagraph (2) hereof.

2. With respect to "Other Disputes" defined as any Dispute other than those specified in sub-paragraph (1.) hereof, except where the parties agree to elect resolution thereof by the Technical Disputes Arbiter, the parties hereby agree as follows: (a) "Other Disputes" which involve solely a claim for money in the amount of $1.25 million or less shall be decided by the MTA's Contractual Disputes Review Board



(CDRB) to render a final and binding decision in accordance with the "Guidelines for the Submission of Disputes to the CDRB (hereinafter "CDRB Guidelines" which are incorporated herein by reference. It is understood and agreed that the CDRB shall be comprised of officers and employees of MTA, and/or its respective affiliate agencies, but excluding participants from the Railroad. The parties further agree that the CDRB Guidelines may be subject to periodic amendment by the Railroad or the MTA; however such amendment may not alter any substantive or due process rights accorded the Contractor under this Article. (b) With respect to all other "Other Disputes," the Contracting Party, the Railroad, or the Contractor may mutually agree to submit the claim to the CDRB, in which case the decision of the CDRB shall be final and binding on all parties; failing such mutual agreement, the aggrieved party may commence a plenary action in accordance with the provisions of ARTICLE 805.

C.  All Disputes shall be initiated through a written submission by either party (such submission to be hereinafter referred to as the "Dispute Notice"), to the Technical Dispute Arbiter or to the CDRB, as the case may be (hereinafter jointly referred to as "the Arbiter"), within the time specified in the Contract or, if no time is specified, within fifteen (15) days of the determination which is the subject of the Dispute.

1.  Within thirty (30) days after the submission of such Dispute Notice, the party initiating the Dispute must provide the Arbiter with all evidence and other pertinent information in support of the party's position and/or claim.

2.  Within thirty (30) days from the date of the Dispute Notice, the party against whom the Dispute Notice was filed shall submit any and all materials which it deems pertinent to the Arbiter.

3.  Upon submission of a Dispute Notice to the CDRB, either party may request that the CDRB provide informal non-binding mediation in an effort to reach a settlement of the dispute. If requested, the CDRB shall appoint a mediator to meet with the parties in accordance with the CDRB Guidelines. Each party agrees to participate in mediation at the request of the other. If mediation is unsuccessful or is not undertaken, the Arbiter shall render its decision in writing and deliver a copy of same to the parties within a reasonable time not to exceed sixty (60) days after the receipt of all materials. In rendering such decision, the Arbiter upon notice to the parties may seek such technical or other expertise as it shall deem necessary or appropriate and may seek any such additional oral and/or written argument or materials from either or both parties as it deems fit. If so requested by any party, the Arbiter shall permit any Supplier, Subcontractor or Manufacturer whose work is at issue to participate in the CDRB proceedings. The Arbiter shall have the discretion to extend the time for submittals required hereunder.

4.  The Arbiter's ability to render and the effect of a decision hereunder shall not be impaired or waived by any negotiations or settlement offers in connection with the matter presented, whether or not the Arbiter participated therein, or by any prior




decision of others, or by any termination or cancellation of this Contract. The decision of the Arbiter shall be final and binding on both parties.

D. 1. In the event that a dispute is submitted to the CDRB pursuant to Paragraph B.2 hereof and the party against whom the Dispute Notice was filed asserts that such dispute is properly within the domain of the Technical Disputes Arbiter as defined in sub-paragraph B.1, that party shall file with the CDRB a notice as to its position in this regard within the time otherwise permitted for its submission of all materials pursuant to Paragraph C. The filing of such a notice shall stay all further proceedings with respect to the Dispute before the Arbiter, including the submission of materials, pending disposition of such question by the CDRB. The CDRB may request such material(s) and/or argument(s) as it deems appropriate in connection with such question and shall render its decision within ten (10) days of its receipt of all such material(s) and/or argument(s).

2. The party against whom the Dispute Notice was filed shall, within ten (10) days of such decision, thereupon submit any and all materials which it deems pertinent with respect to the substance of the Dispute to the Arbiter as thus determined.

E. In the event that a party commences an action pursuant to Paragraph B.2(b) and the party against whom the action is commenced asserts that such dispute is properly within the domain of the Technical Disputes Arbiter, the Railroad and the Contractor agree to stay the action pending submission of the jurisdictional question to the CDRB in accordance with the procedures set forth in Paragraph D.

F. It is expressly understood and agreed that the pendency of a Dispute hereunder shall at no time and in no respect constitute a basis for any modification, limitation or suspension of Contractor's obligation to fully perform in accordance with the Contract and that Contractor shall remain fully obligated to perform the Work notwithstanding the existence of any such Dispute.

ARTICLE 904 CHARACTER OF WORK/KEY PERSONNEL

A. The Contractor shall furnish work of the best character, including but not limited to all labor and materials, plant, tool supplies and other means necessary to furnish, test and deliver all Cars, parts and equipment as required by the Contract.

B. The Contractor agrees that its Key Personnel will be assigned to the Project in the capacities listed on Attachment 4 and that such Key Personnel will remain in the listed positions unless due to circumstances beyond the Contractor's control.

C. The Contractor agrees that the Key Personnel of its Major Subcontractors will be assigned to the Project in the capacities listed on Attachment 1 and that such Key Personnel will remain in the listed positions unless due to circumstances beyond the Major Subcontractor's control.

D. Any replacement of Key Personnel under Paragraphs B above, shall be subject to Railroad approval which will not be unreasonably withheld.

E. Key Personnel under Paragraph C above shall be replaced by an equally qualified person.

ATTACHMENT 3

PRICE

The Subcontractor is reminded that the Authority is exempt from New York State and local taxes and compensating use taxes. Therefore, the Subcontractor shall not include any amounts for State or local taxes in its prices provided in all Price Schedules. All Prices shall be in U.S. dollars.

TOTAL CAB SIMULATOR ACQUISITION PRICE (TCSAP)

The Subcontractor shall be paid the following amounts for the Cab Simulator to be provided under the Base Subcontract as the full and the sole compensation for furnishing the Base Order Cab Simulator.

Total Cab Simulator Price $600,000.00 USD

The Prices established above include all costs to perform the Subcontract Work.



ATTACHMENT 4

# NON-DISCLOSURE AGREEMENT

- 72 -

A:AT&C_IITRI_final.doc

 

NON-DISCLOSURE AGREEMENT

This Agreement dated this 7th day of January 2000 is between Bombardier Inc., a Canadian corporation, having offices at 1101 Parent Street, St-Bruno, Québec, Canada (hereinafter called "Bombardier") and IIT Research Institute, an Illinois corporation, having offices at 10 West 35th Street, Chicago, Illinois 60616 (hereinafter called the "IITRI").

**WHEREAS** Bombardier develops and sells transportation equipment, spare parts and the accessories and apparatus related to it;

**WHEREAS** IITRI develops and sells rail simulation products and services;

**WHEREAS** Bombardier and IITRI may have reasons to disclose certain confidential information to each other regarding the LIRR–METRO-NORTH M-7 project (hereinafter called the "Project");

**WHEREAS** both Bombardier and IITRI agree and understand that the other party requires confidentiality and non-disclosure would either of them receive confidential information from the other.

**NOW THEREFORE**, in consideration of the foregoing premises and covenants contained herein, the parties agree as follows:

1. **DEFINITION.** As used herein, the term "Confidential Information" includes any documents or information, and any copy thereof, disclosed by one party to the other party orally or in writing, or to which the other party may have access to in connection with or in the course of the Project, which information includes but is not restricted to (i) Bombardier's or IITRI's business, including commercial and technical aspects of products, processes and services (ii) present status and capabilities of the business, and (iii) marketing and planning programs, products specifications, plans, drawings, financial, operational and technical data (hereinafter identified as "Confidential Information").

2. **OWNERSHIP OF CONFIDENTIAL INFORMATION.** Each party agrees that all Confidential Information received from the other party shall remain the sole and exclusive property of the disclosing party and that nothing contained herein shall be considered as granting the other party any rights not mentioned herein.

3. **HANDLING OF CONFIDENTIAL INFORMATION.** The receiving party agrees to hold all Confidential Information in strict confidence. The receiving party shall limit disclosure of such Confidential Information only to its employees and other persons having the need to know in furtherance of the purposes herein described. The receiving party shall take reasonable care to safeguard the confidentiality of all such Confidential Information, which

care shall not be less than the degree of care used to prevent disclosure of its own information of a similar nature.

4. LIMITATION ON USE. The receiving party shall use Confidential Information only for the purposes of submitting a proposal and performing the Project. The receiving party agrees not to use Confidential Information for any other purposes including advertising. The receiving party shall only use the Confidential Information in accordance with disclosing party's indications. The receiving party shall not use the Confidential Information to benefit itself or to damage the disclosing party. Such Confidential Information will remain the property of the disclosing party and is not to be mechanically copied or reproduced without the express written permission of the disclosing party.

5. LIMITATION ON DISCLOSURE. For a period of ten (10) years from the effective date of this Agreement, neither party shall divulge or disclose to any third party, in whole or in part, Confidential Information which is the property of the other party, except that either party may disclose such Confidential Information to the Long Island Rail Road Company ("LIRR") and Metro-North Commuter Railroad Company for use on the LIRR portion of the M-7 Project only.

6. REMEDIES. The receiving party agrees that divulgation to third parties or use by third parties of Confidential Information, except as permitted by Section 5 above, could be detrimental for the disclosing party. Therefore, the disclosing party shall be entitled to request an immediate injunction against the receiving party should this Agreement be breached. Furthermore, either party has the right to terminate this Agreement prior to expiration of the term hereof if the other party fails to comply with any of its obligation under this Agreement. Such termination shall not relieve the either party of its obligation to maintain Confidential Information in confidence.

7. RETURN OF CONFIDENTIAL INFORMATION. Upon written request by the disclosing party, the receiving party shall return all tangible forms of Confidential Information (including any and all copies thereof) in its possession, within the prescribed time frame requested by the disclosing party. Notwithstanding the above, in the event that the disclosing party did not request the receiving party to return all tangible forms of Confidential Information (including any and all copies thereof) on or before January 7, 2010, the receiving party shall have the obligation to return all such Confidential Information at the latest on January 7, 2010.

8. EXCLUSIONS. Neither party shall be liable for damages incurred to the other party when Confidential Information:

a) was lawfully received from an independent third party without any breach of confidentiality by that third party without restriction and without breach of this Agreement, or



b) is developed by the receiving party independently of the Confidential Information as evidenced by prior written record or other tangible documents in the possession of the receiving party; or

c) was approved for public release by written authorization of disclosing party; or

d) was disclosed pursuant to the requirement of a governmental agency or court order.

**9.** TERM. The term of this Agreement is ten (10) years from the effective date of this Agreement. Confidential Information may be disclosed by either party to the other party during the term of this Agreement. However, the receiving party's obligations hereunder with respect to handling, maintaining in confidence and limited use of the Confidential Information disclosed to it during the term of this Agreement survive the expiration or termination of this Agreement and will be binding upon the receiving party and its successors, assignees or personal representatives, as the case may be.

**10.** NOTICES. All notices hereunder shall be in writing and shall be sufficiently given and shall be deemed given when delivered to the applicable address stated below by registered or certified mail, return receipt requested, or by such other means as shall provide the sender with documentary evidence of such delivery. The addresses to which notices shall be delivered are as follows:

for Bombardier Inc.: Bombardier Inc.
1101 Parent Street
St-Bruno, Québec, Canada
Tel.: (514) 441-8104
Fax: (514) 441-8117
Attention: Suzanne Poirier

for IITRI : IIT Research Institute
10 West 35th Street
Chicago, Illinois 60616
Tel: (312) 567-4566
Fax: (312) 567-4968
Attention: Bobette Ash



11. **GOVERNING LAW.** This Agreement shall be governed by and interpreted in accordance with the laws of the State of New York.

Each of the parties has caused this Agreement to be signed by its duly authorized representative as of the effective date of this Agreement, which is the last date accompanying a signature below.

| **Bombardier Inc.** | **IT Research Institute** |
| --- | --- |
| by: DANIEL TOUSIGNANT | by: Bobette J. Ash |
| [signature] Signature | [signature] Signature |
| March 9, 2000 Date | March 8, 2000 Date |

ATTACHMENT 5

PERFORMANCE BOND

BOND Number: __________

WHEREAS, Bombardier Inc. (hereinafter called: "Bombardier") desires to purchase from IIT Research Institute (hereinafter called: " IIT") certain __________ (hereinafter called: "the Equipment") in connection with the manufacture of cars to be built and delivered by Bombardier to the Long Island Rail Road Company (hereinafter called:" the Authority");

WHEREAS, IIT executed an agreement with Bombardier, on __________April, 2000 (hereinafter called: the "Subcontract") to supply to Bombardier said Equipment and any necessary training, engineering and technical publications related thereto;

WHEREAS, IIT agreed to deliver a Performance Bond to Bombardier, as security for its performance under said Subcontract;

NOW, THEREFORE, we, IIT, as principal, and ____________________, as Surety, are held and firmly bound unto Bombardier, in the sum of US $300,000.00 lawful money of the United States of America, for the payment of which sum, well and truly to be made, we bind ourselves, jointly and severally, firmly by these presents.

The work to be performed under the Subcontract shall consist of the furnishing all equipment, materials, supplies and manufactured articles, and for the performance of all labor, work, or other operations, and for the fulfillment of the Subcontract in strict accordance with the specifications contained in the Subcontract, all of which are make a part hereof. The work shall be complete, and all work, materials, and services not expressly called for in the specifications or not shown on the drawings which may be necessary for the proper construction of the work in good faith shall be performed, furnished and installed by the IIT as though originally so specified or shown, at no increase in cost to Bombardier.

NOW THEREFORE, if IIT shall well and truly do and perform all of the covenants and obligations of said Subcontract on its part to be done and performed at the times and in the manner specified herein, then this obligation shall be null and void at the expiration of the Warranty period, otherwise it shall be and remain in full force and effect; PROVIDED, that any alterations in the work to be done, or the material to be furnished, which may be made pursuant to the terms of said Subcontract, shall not in any way release IIT or the Surety thereunder, nor shall any extensions of time to be granted under the provisions of said Subcontract release either the IIT or the Surety, and notice of such alterations or extension of the Subcontract is hereby waived by the Surety.

In the event that suit is brought upon this bond by the Authority and/or Bombardier and judgment is recovered, the Surety shall pay all costs of such suit incurred by the Authority and/or Bombardier, including reasonable attorney's fees to be fixed by the Court.

WITNESSE our hands this__________day of __________ 1999.

IIT Research Institute.

By:______________________________

Name:
Title:

SURETY

By:______________________________

Name:

Title:

ATTACHMENT 6

RESERVED

- 75 -

AJT&C_IITRI_final.doc

ATTACHMENT 7

RESERVED

- 76 -

A:\T&C_IITRI_final.doc

ATTACHMENT 8

RESERVED

ATTACHMENT 9

RESERVED

**ATTACHMENT 10**

RESERVED

ATTACHMENT 11

RESERVED

- 80 -

AAT&C_IITRI_final.doc

ATTACHMENT 12

RESERVED

# EXHIBIT C



December 20, 2002
O/R 045-IIT/BO-0068

Bombardier Inc.
1101 Parent Street
Saint-Bruno, Quebec
Canada J3V 6E6

Attention: Mr. Gilles Aubry, Contract Administrator

Subject: Notification of Assignment

Reference: Asset Purchase Agreement by and between Alion Science and Technology Corporation and IIT Research Institute

Dear Customer:

On October 4, 2002, IIT Research Institute (IITRI) executed an asset purchase agreement with Alion Science and Technology Corporation (Alion), a recently formed for-profit Delaware corporation owned by most of the former employees of IITRI, to acquire substantially all the assets and operations of IITRI. This will become effective on December 20, 2002.

Effective upon closing of the asset purchase, we will begin assigning or novating existing agreements/subcontracts/purchase orders to Alion as the successor in interest of substantially all of the assets of IITRI.

Other than the substitution of the company's name from IITRI to Alion, the terms and conditions of existing agreements/subcontracts/purchase orders, including delivery locations and payment terms, shall remain unchanged and in full force and effect.

If you have any questions, please contact our Senior Procurement Manager, Mr. G.C. Hodge at 312-567-4028.

Sincerely,

Terry A. Buckner
Corporate Vice President
Director, Contracts and Procurement

# EXHIBIT D



January 24, 2002
O/R 045-BO/IIT-0080

**BOMBARDIER**
*TRANSPORTATION*
Bombardier Inc.
1101 Parent Street
Saint-Bruno, Québec, Canada J3V 6E6
Telephone 1(450) 441-3197
Fax 1(450) 441-8117
www.transportation.bombardier.com

**Via E-Mail and Fax Transmittal**

Mr. Thomas J. Rodehau
Alion, Science and Technology
1750 Tysons Blvd., Suite 1300
McLean, VA  22102

Subject:      **Alion**

Reference:    045-IIT/BO-0070
              045-IIT/BO-0071

Dear Mr. Rodehau :

Following your above referenced letters dated January 15 and 22, 2003, we
feel that there are some misunderstandings with regard to the subcontract for
the M-7 Simulator project.  Bombardier has contracted with IITRI for the
supply of the M-7 Simulator and as of now, there has been no change in that
respect.

Since there is no contractual relationship between Alion and Bombardier,
and until further development with IITRI, we would like to inform you that
Bombardier will not hold any meetings with Alion Science and Technology
with regard to the M-7 Simulator project. Please be informed that any and
all delay caused to Bombardier by this situation will be attributed to, and the
responsibility of IITRI.

Sincerely yours,


Gilles Aubry
Contract Administrator
Saint-Bruno

GA/da

Action:      Closed
Code:        32.00

c.c.:        Josée Gagnon, Jean De Blois
             Mark Krebs, Director of Business Development, IITRI
             Via fax : 312-567-4021  Via e-mail: mkrebs@iitri.org

Case No.: ______________

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

**ALION SCIENCE & TECHNOLOGY CORPORATION**

Petitioner,

-against-

**BOMBARDIER, INC.**

Respondent.

---

**DECLARATION OF**
**GREGORY W. GILLIAM**

---

**VENABLE LLP**
*Attorneys for Petitioner*
405 Lexington Avenue
56th Floor
New York, New York 10174
(212) 307-5500
(212) 307-5598 (Fax)

---

To:
Attorney(s) for

---

Service of a copy of the within is hereby admitted.

Dated:

------------------------------------------
Attorney(s) for

---

PLEASE TAKE NOTICE

NOTICE OF ENTRY ☐

that the within is a (certified) true copy of a
duly entered in the office of the within named Court on 20 .

NOTICE OF SETTLEMENT ☐

that an Order of which the within is a true copy will be presented for
settlement to the Hon. one of the judges of the within named Court,
at
on 20 , at .m.